**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **PHAROS CAPITAL PARTNERS, L.P.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 2:03cv362** |
| | : | |
| **DELOITTE & TOUCHE, L.L.P.,** | : | **Judge Marbley** |
| **CREDIT SUISSE FIRST BOSTON** | : | |
| **CORPORATION, THE SHATTAN** | : | **Magistrate Judge Abel** |
| **GROUP, L.L.C., PURCELL & SCOTT,** | : | |
| **L.P.A., HAROLD W. POTE, and ERIC** | : | |
| **R. WILKINSON,** | : | |
| | : | |
| **Defendants.** | : | |

<u>**PLAINTIFF'S SECOND AMENDED COMPLAINT AND JURY DEMAND**</u>

Plaintiff Pharos Capital Partners, L.P. ("Pharos") files this Second Amended Complaint and Jury Demand against Defendants Deloitte & Touche, L.L.P. ("Deloitte"), Credit Suisse First Boston Corporation ("CSFB"), The Shattan Group, L.L.C., ("Shattan"), Purcell & Scott, L.P.A. ("Purcell & Scott"), Harold W. Pote ("Pote"), and Eric R. Wilkinson ("Wilkinson"), upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters, as follows:

**I.**

<u>**PRELIMINARY STATEMENT**</u>

Not since the passage of the watershed federal securities legislation in the 1930s has investor confidence in corporate America been so low – and for good reason. Investors everywhere are reeling from a seemingly endless string of corporate scandals involving schemes of greed and deception made possible by the active support of investment banking, auditing, and legal professionals. Although the very reason for the involvement of each in the structuring and

placement of large debt and equity offerings is to build credibility and reliability in the minds of potential investors, it is now clear that all too many of those professionals have been willing to sell their objectivity and professional integrity in exchange for the fees associated with the "latest deal."

This case is about one such multi-billion dollar scam and the professionals who provided the support that ensured its success. Less than two years ago, National Century Financial Enterprises ("National Century"), based in Dublin, Ohio, was promoted by each of the Defendants as an innovative, growing, and profitable provider of financial services to the health care industry. Based upon the active representations of Defendants, Pharos invested many millions of dollars to acquire National Century preferred stock. It is now clear that the representations of the company and its professionals – Defendants – were knowingly false. In fact, at the time Pharos was paying millions into the equity of National Century, each of the Defendants knew that National Century was not only insolvent, but riddled with fraud. As a consequence, that stock is now worthless. Pharos files this suit to bring those parties to justice and to obtain the legal relief to which it is entitled.

## II.

## PARTIES

### A.  Plaintiff

1.      Pharos is a Delaware limited partnership with offices in Dallas and Nashville, Tennessee. The Nashville office is located at One Burton Hills Boulevard, Suite 180, Nashville, Tennessee 37215. Pharos is engaged in the business of acquiring equity and equity-related investments for and on behalf of its limited partner investors. The general partner of Pharos is Pharos Capital Group, LLC, a Delaware limited liability company.

B.     **Defendants**

2.     Deloitte is a Delaware limited liability partnership with its principal place of business located at 1633 Broadway, New York, New York 10019-6754.  At all relevant times, Deloitte served as National Century's advisor and auditing firm, and issued reports and unqualified audit opinions with respect to National Century's financial statements.  As Deloitte does not have a registered agent in the State of Ohio, Deloitte may be served through the Ohio Secretary of State located at 180 E. Broad St., 15th  Floor, Columbus, OH 43215

3.     CSFB is a subsidiary of Zurich-based Credit Suisse Group (NYSE: CSR).  CSFB is a Massachusetts corporation with its principal place of business located at 11 Madison Avenue, New York, New York 10010.  CSFB represented National Century as agent and lead underwriter with respect to numerous securitizations, including the last round of equity financing in which Pharos invested.  As CSFB does not have a registered agent in the State of Ohio, CSFB may be served through the Ohio Secretary of State located at 180 E. Broad St., 15th  Floor, Columbus, Ohio  43215.

4.     Shattan is a Delaware limited liability partnership with its principal place of business located at 540 Madison Avenue, Floor 35,  New York, New York 10022-3225.  Shattan also acted as co-underwriter and co-agent in connection with the preferred stock offering which resulted in Pharos's investment in National Century.  As Shattan does not have a registered agent in the State of Ohio, Shattan may be served through the Ohio Secretary of State located at 180 E. Broad St., 15th  Floor, Columbus, OH 43215.

5.     Purcell & Scott is an Ohio limited partnership with its principal place of business located at 6035 Memorial Drive, Dublin, Ohio 43017.  At all relevant times, Purcell served as National Century's outside counsel and advised the company on numerous securities offerings,

including the preferred stock offering which resulted in Pharos's investment in National Century. Purcell & Scott may be served at their principal place of business in Dublin, Ohio.

6.     Pote was, at all relevant times, a National Century "outside" director and Executive Vice President of JPMorgan Chase's Regional Banking Group.  Prior to the last round of National Century equity financing, JPMorgan was a 17.1% beneficial owner of National Century by virtue of its acquisition of Chase Manhattan and, with it, Beacon Group III – Focus Value Fund, L.P. (the "Beacon Group"), which invested in National Century's Series A Convertible Preferred Stock in 1998.  At all relevant times, Pote was a member of National Century's Executive Committee, Asset and Liability Committee, and the sole member of the board's Audit Committee.  Pote may be served at his residence located at 162 East 81st Street, New York, New York 10028.

7.     Wilkinson was, at material times, a National Century "outside" director, as well as a partner of J.P. Morgan Partners (having also previously served as a managing director of the Beacon Group).  Wilkinson and Pote were the only members of the National Century Board of Directors who were not also members of the management team.  Thus, Wilkinson and Pote assumed special responsibility for the oversight and control of the company's "insiders." Wilkinson may be served at his residence located at 420 Burd Street, Pennington, New Jersey 08534-2701.

### III.

### JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction over this matter based on 28 U.S.C. § 1334.

9.     This Court has personal jurisdiction over each of the Defendants because, among other reasons, Defendants conducted business in Ohio and committed one or more torts in this State.

10.     Venue is proper in this Court because one or more of the Defendants resides in this district, and because all or a substantial part of Pharos's causes of action accrued or arose here.

## IV.

## FACTS

### A.     Pharos:  Putting Money To Work For Its Investors

11.     Pharos was formed to achieve superior long-term capital appreciation through privately-negotiated equity and equity-related investments in health care, service, and technology companies.  Prior to forming Pharos, its principals had established strong investment and business operations track records.  They then set about to continue their success working together, with a dedicated team of investment professionals, to build and grow the Pharos portfolio.

12.     Pharos counts among its investors a number of Fortune 500 companies.  Given the reputations, experience, and past success of its principals, and the enthusiastic backing of large institutional investors, Pharos is well-positioned to distinguish itself from its competitors and to generate significant capital appreciation for its limited partners.

### B.     National Century:  All That Glitters Isn't Gold

13.     Not long ago, Dublin-based National Century was the largest health care finance company in the United States, providing medical accounts receivable financing to a wide variety of small and middle market health care providers.  National Century's customers included hospitals, nursing homes, home health care agencies, specialty clinics, physician groups, durable

medical equipment providers, laboratories, and other businesses and professionals providing health care services.

14.     Founded in 1991 by Lance K. Poulsen, Donald H. Ayers, and Rebecca S. Parrett, National Century quickly "took off" and accumulated an impressive record of sustained and substantial growth in revenues and profits.  From its inception, National Century purchased and serviced billions of dollars of health care receivables.  During the five-year period 1996-2001, National Century and its outside professionals reported that the company's total revenues increased at a compounded annual rate of 36%, from $66.3 million in 1996 to $306.6 million in 2001.  National Century's net income for the year ended December 31, 2001, was reportedly $41.6 million, representing an impressive 53% compounded annual growth rate since 1996.

15.     National Century's principal business was to finance health care providers through the purchase of their accounts receivables that were payable by commercial and government payors (*e.g.*, insurance companies, Medicare, and Medicaid).  National Century purchased those receivables at a discount, thereby providing needed cash to the health care providers well in advance of the time in which those receivables could ordinarily be collected.

16.     As of June 30, 2002, National Century owned $3.3 billion of medical accounts receivables.  National Century purchased those receivables with borrowed funds – specifically, monies obtained through securities which were backed by the receivables themselves.  In addition, National Century and its professionals represented that those obligations were supported by adequate reserves to protect National Century against the risk of non-payment of the underlying receivables.

17.     National Century consistently maintained investment grade (primarily triple-A) ratings from Fitch Ratings ("Fitch") and Moody's Investor Services ("Moody's").  In concept,

National Century generates profits from program fees charged to health care providers for providing advances, as well as positive gains on the spread between those program fees and its cost of funds used to buy the receivables.

18.     With a multi-billion dollar portfolio of receivables and more than 2,100 active client locations, National Century was the market leader in providing receivable purchase financing to small and middle market health care providers.

**C.      The Trap:   Pharos Is Induced To Make A Substantial Investment In National Century.**

19.     National Century and Defendants worked tirelessly to convince the public that it was a well-run company whose business model and financial affairs were fundamentally sound – and the effort paid off.  National Century became a "darling" within the investment community, and garnered significant public cache in articles in trade journals and the business press.  It is no wonder, then, why Pharos was attracted to National Century.

20.     In early 2002, the principals of Pharos were approached by CSFB regarding a possible investment in the National Century preferred stock.  Although National Century enjoyed ready access to bank financing and capital markets (having raised over $6 billion in securitizations since 1992), Defendants informed Pharos that lenders and credit-rating agencies deemed it important that National Century have a diversified equity base.  Thus, CSFB, Shattan, and National Century proposed to issue, in a private offering, Series B Convertible Preferred Stock (the "Preferred Stock") at a price of $12,822 per share.  The Preferred Stock would be convertible into National Century common stock on a one-for-one basis and would provide for board observation rights and registration rights.

21.     Intrigued by National Century's operating history and business model, as described by CSFB and Shattan, Pharos entered into negotiations with National Century.  During

the course of those negotiations, CSFB provided Pharos with materials for the alleged purpose of describing National Century's business model and financial results, and inducing Pharos to make a substantial purchase of the Preferred Stock.  Among the documents provided to Pharos were: (1) a Private Placement Memorandum, prepared and issued by CSFB and Shattan, as agents of National Century; (2) National Century financial statements, along with "clean" audit reports issued by Deloitte; (3) an opinion letter issued by Purcell & Scott; and (4) other materials created, reviewed and/or approved by National Century, its officers and directors, and its agents and consulting professionals (including, without limitation, Deloitte, Purcell & Scott, Shattan, CSFB, Pote, and Wilkinson).  Pharos relied heavily on the contents of those materials in evaluating the offering.

22.    After CSFB and Shattan provided "due diligence" materials to Pharos, CSFB set up phone calls between Pharos and National Century management.  CSFB then arranged for Pharos personnel to visit National Century's offices in Dublin, Ohio.  In addition to arranging those calls and the meeting, CSFB was an active participant in them.

23.    Pharos, National Century, Lance Poulsen, Barbara Poulsen, and Flohaz Partners, LLC (a limited liability company composed of the four founders of National Century) entered into a Preferred Stock Purchase Agreement, dated July 8, 2002 (the "Stock Purchase Agreement").  Among other things, the Stock Purchase Agreement set forth the terms under which Pharos committed to purchase $12 million of National Century Preferred Stock.  On July 9, 2002, that purchase was consummated, and Pharos became a stakeholder in America's largest provider of financial services to the health care industry.

**D.**     **The Moving Parts:  The Mechanics Of National Century's Business Model**

    **1.**     **Securitized "programs:"  National Century's source of funds for purchasing receivables**

24.     National Century provided medical receivables financing to its clients through the creation of company-sponsored, wholly-owned, special-purpose, bankruptcy-remote subsidiary corporations, called "programs."  Each program issued notes (the "program notes") pursuant to an indenture, secured by pools of receivables and other collateral.  Thus, the principal balance sheet assets of each program were receivables which had been purchased from health care providers and cash.  The principal liability was receivable-backed debt (*i.e.*, the program notes).

25.     Each program required that National Premier Financial Services, Inc. ("NPFS"), a wholly-owned subsidiary of National Century, act as the "servicer."  NPFS was responsible for performing due diligence with respect to the clients (health care providers) and to predict and monitor the collection of purchased receivables.  The servicer was also subject to various reporting requirements as set forth in the program indentures.

26.     Through the years, National Century created and funded over forty (40) securitized programs.  The two largest programs in existence at the time of Pharos's purchase of the Preferred Stock were NPF VI and NPF XII.  NPF VI, which raised $840 million from noteholders through a program indenture, was administered by Chase Manhattan Bank (now JPMorgan Chase) as trustee.  NPF XII, which raised $2.2 billion, was administered by Bank One, as trustee.  Each of those funds was a wholly-owned subsidiary of National Century, and was serviced by NPFS.

    **2.**     **Medical service providers:  National Century's financing clients**

27.     As program sponsor, National Century solicited the participation of health care providers to sell selected receivables to the program.  Each client-provider would typically enter

into an arrangement known as a Sale and Subservicing Agreement (an "SSA") and one or more lockbox account agreements with a financial institution acceptable to National Century. Pursuant to the terms of the SSA, the client-providers agreed to sell, and the program agreed, at its discretion, to purchase, receivables payable by certain payors, which were generated through the operation of the client's business.  The SSAs were usually for terms of three to five years. Pursuant to the SSA, the program advanced funds to the client-providers for the purchase of certain receivables, generally on a weekly basis for the term of the SSA.  Proceeds from the client-providers' receivables were remitted by eligible payors directly to lockbox accounts established and administered pursuant to the terms of such client's SSA and lockbox account agreement.

### 3.    The pricing of purchased receivables and the establishment of reserves

28.    The receivables purchased by National Century primarily consisted of the obligations of investment grade insurance companies and federal and state government agencies. In determining the purchase price of those receivables, National Century:  (1) discounted the face amount of the receivable to reflect the expected reimbursement rate, thereby deriving the "Eligible Receivable Amount;" (2) discounted the Eligible Receivable Amount by at least 3% to arrive at a "Net Value;" and (3) allegedly established reserves and other accounts, thereby withholding from the purchase price a sufficient amount so that at any time:  (a) at least 6.5% of the Net Value of all outstanding purchased receivables was to be held in "Credit Reserve Accounts;" and (b) another 2% of the Net Value was to be held in "Offset Reserve Accounts," which could be utilized to satisfy deficiencies caused by breaches of client representations or warranties applicable to the purchased receivables.

29.    National Century could access its Credit Reserve and Offset Reserve Accounts as protection against the risk of collection shortfalls.    National Century also withheld an

"Administrative Fee" of approximately 8.5% of the Net Value, which provided additional credit risk protection.  Only after the receivable was collected was the Administrative Fee offset by an equal subservicing fee (payable to the client-provider).

30.     The foregoing practices should have resulted in National Security maintaining a total effective reserve equal to approximately 20% of the Eligible Receivable Amount (*i.e.*, the sum of the 3% collateral withholding, 6.5% Credit Reserve, 2% Offset Reserve, and 8.5% Administrative Fee).

31.     In addition to those amounts, National Century represented that it set aside an additional general reserve against losses.  As of December 31, 2001, that reserve was reportedly 2.2% of the outstanding balance on National Century's receivables portfolio less provider reserves.

### 4.     National Century:  a money machine

32.     National Century's most significant revenue sources were the "Program Fees," which were charged monthly to the client-providers and were based upon the Net Value of the outstanding purchased receivables relating to each such provider.  Typically, Program Fees were approximately 11% on an annualized basis.  The Program Fees, together with interest income, one-time program closing fees, and other miscellaneous fees, were the sources of National Century's revenues which were represented to the public.

33.     The foregoing represents how National Century was *supposed* to work.  Reality, however, was far different.

**E.**     **Behind The Scenes At National Century:  A Tale Of Lying, Cheating, And Stealing.**

    **1.**     **National Century's misuse of program funds for loans and other unauthorized purposes**

34.     Contrary to the representations set forth in the materials provided to Pharos by National Century and Defendants in connection with Pharos's analysis of the company and evaluation of a possible investment in the Preferred Stock, National Century and its advisors had long before abandoned all attempts to have National Century adhere to its stated business model. Indeed, it is now known that only about 30% of the $3 billion raised in the securitization programs (NPF VI and NPF XII) was used to purchase receivables that were eligible under those programs' indentures.  Unbeknownst to Pharos, approximately 38% was used to purchase receivables that completely failed to meet the indentures' eligibility requirements.  Incredibly, the remaining 32% of those funds was paid out as *unsecured advances* to user-providers in violation of the indenture agreements.

35.     Thus, contrary to all representations to Pharos, National Century was in the business of making high-risk loans, rather than purchasing qualified receivables in accord with the indenture agreements under which it obtained the funds to acquire health care receivables. To make matters worse, the borrowers of those illegally-made loans were in most cases the small and middle-market health care providers with whom National Century was already doing business.  Worse still, National Century insiders, i.e., National Century's management team and the outside director defendants, held undisclosed financial interests in these loan recipients. Accordingly, National Century's exposure for the potential uncollectability of those loans was dangerously high.

36.     Defendants worked individually and in concert to conceal the true state of affairs at National Century from Pharos.  Critically, the representations contained in the materials

provided to Pharos in connection with its analysis of National Century and evaluation of the Preferred Stock were untruthful, in that they misrepresented the operational and financial picture of National Century and concealed the unauthorized components of National Century's business operations.  Each Defendant not only participated in those misrepresentations, but was well aware of National Century's substantial and increasing dependence on illegitimate activities.  Obviously, had Pharos known or been able to discover the fraud by National Century, Pharos would not have entered into the Stock Purchase Agreement and paid $12 million for the Preferred Stock.

  **2.**   **National Century's robbing of the reserves and attempted cover-up**

  37.   Instead of maintaining its reserves at safe levels, as it represented it had done and would continue to do, National Century decided – at a point well in advance of Pharos's purchase of the Preferred Stock – to rob those reserves in order to meet its cash flow commitments, make interest payments to noteholders pursuant to the program notes, and purchase new receivables.  Once National Century began robbing its reserves, a "domino" effect was created which inevitably and substantially depleted the reserve accounts that had been set aside to protect the company and the noteholders in the event of collection problems.  For example, the required level of reserves for NPF XII was 17%; however, those funds were depleted to a level of .06%.  In addition to leaving the reserve accounts at dangerously low levels, those practices were indicative of a cash flow crisis within National Century.  Thus, in order to cover up its illegal use of the reserve funds from its shareholders and noteholders, National Century devised an accounting shell game involving carefully-timed transfers between reserve accounts.

  38.   The indenture documents relating to the NPF VI and NPF XII bond programs required that certain minimum cash reserves be established as security for the notes.  As part of

the reporting requirements relating to those programs, monthly "Investor Reports" were prepared by National Century, through its servicing subsidiary, NPFS, and distributed to the program trustees (JPMorgan Chase and Bank One, respectively) and to various rating agencies. The Investor Reports provided information regarding fund activity, balances, compliance information, and cash reserves. Interestingly, the monthly Investor Reports for NPF VI were prepared on the last day of each month, and on the first day of each month with regard to NPF XII Reports – a seemingly innocuous fact that turned out to be of immense importance.

39. Because of the different reporting dates, National Century could transfer funds (albeit, illegally) between the reserve accounts of those two programs to cover cash shortfalls in their respective reserve accounts – conduct that clearly violated the indenture agreements governing each program. Yet, unbeknownst to Pharos, that is exactly what National Century did. Those cross-program transfers created the false impression that both programs were independently in compliance with their reserve requirements.

40. According to the *Wall Street Journal*, internal company memoranda reveal that National Century was more than $100 million short in cash reserves as early as November 1999, and that management deliberately chose to make up those shortfalls by switching funds between different bond issues. One memorandum, dated November 15, 1999, written by a manager in National Century's compliance department to his boss, states: "Currently, across all NPF funding programs, the reserve and equity balances are deficient by over $100 million. The funds required . . . equals $286 million while the sum of funds available as of November 15, 1999 is $185 million." That memo was copied to Lance Poulsen and other senior executives. Another internal memorandum, dated February 2000, sent to Poulsen and other senior executives, revealed that the programs were "collectively short by over $72 million." The author states: "In

recent months, NCFE [National Century] has cured the shortages by wiring funds between the Chase programs [NPF VI] and the Bank One programs [NPF XII] and testing the requirements on different days," and that, "Previously, the maximum amount needed to cure the shortages has not exceeded $45 million; this month will require more than double that amount."

41.     Other of National Century's internal documents also vividly illustrates the fraud and wrongdoing at National Century. For example, National Century's Executive Minutes dated July 1, 1998, indicate that on or about that date, KPMG Peat Marwick ("KPMG") made a presentation to National Century's management and to insiders of the Beacon Group. KPMG's presentation materials at that meeting plainly indicated the complicity of Pote and Purcell & Scott in the fraudulent acts of National Century.

42.     The KPMG presentation also included additional shocking revelations that clearly demonstrated that National Century was cooking its books. Yet every Defendant in this case— CSFB, Shattan, Deloitte, Purcell & Scott, Pote, and Wilkinson – made public statements and undertook actions to mislead potential investors like Pharos whose investments continued to breathe life into the corpse that was National Century. Those revelations included:

> "We agree to add page in monthly management report which says we moved what $ between books each month."
>
> "The Company has the ability to manage the performance of the programs through asset transfers, aging freezes, default waivers and potentially other means. This ability . . . makes it difficult to track activity within the SPC's [Special Purpose Corporations] in terms of defaults and agings."
>
> "Although there are a number of programs which have periodically hit default triggers in the past two years . . . the Company's ability to manage the books appears to mitigate somewhat the risks of early amortization events. Although this management minimizes equity infusions in the Company, the performance of the SPC's may be scrutinized in an initial public offering."
>
> "Other activities may also serve to improve the performance of the SPC's: Receivable aging freezing which stops receivables from further aging and affects the performances statistics presented to investors and rating agencies."

"Subsequent analysis and discussion have confirmed that NCFE is supporting its SPC's in several ways: repurchasing problem assets; infusing cash to support performance tests; and re-aging receivables (or freezing) to support performance tests."

"Analysis of the program performance relative to aging appears confusing [fraudulent] based on the following comparison:"

43.     In short, years prior to Pharos's investment in the Preferred Stock, National Century was engaging in an elaborate and fraudulent "shell game," pursuant to which it wired funds back and forth between the reserve accounts of two "firewalled" securitized funds for the purpose of creating the illusion of compliance with those programs' reserve requirements. Of course, Pharos had no knowledge of those activities and would not have become a shareholder in National Century if it had known.

**3.     National Century's undisclosed self-dealing relating to affiliated client-providers**

44.     Undisclosed to Pharos was the fact that an overwhelming majority of National Century's client-providers were companies affiliated with Lance Poulsen and his cronies, including Pote. In fact, after Pharos invested, Pote admitted that he received stock warrants from one such company, Med Diversified. Indeed, 56% of the value of the claims underlying National Century's largest program, NPF XII, had been acquired from companies in which National Century and Poulsen held an interest.

45.     National Century's internal documents reveal a number of related-party client-providers, including Allied Medical, RxMedical, Anesthesia Solutions, Inc., HomeCare Concepts of America, Millenium (MedManager), Doctors Community Healthcare, Med-Diversified, California Psychiatric Management Services, Allied Medical, Inc., PhyAmerica Physicians Group, Inc., and Phoenix Group, Inc.

46.     Obviously, the fact that National Century was *not* doing business with third-party, arms-length client-providers but, instead, was purchasing receivables from closely-affiliated companies raised numerous conflicts of interest and opportunities for abuse.  That National Century acted against the best interests of its shareholders is reflected in the illegal loans it made to its affiliated client-providers.  Those loans would spell the ruin of National Century, and would cause the bottom to drop out of the value of Pharos's Preferred Stock.

47.     The facts of National Century's and its principals' ownership interests in those client-providers were never disclosed in the documents or other information provided to Pharos in connection with its evaluation of the Preferred Stock purchase.  Had National Century and Defendants not concealed that self-dealing and those conflicts of interest, Pharos would have "walked away" from the negotiations and never invested a dime.  Instead, it relied on the misstatements and deceptive disclosures contained in the private placement memoranda, financial statements, opinion letters, and other materials created, reviewed, edited, approved and/or issued by Defendants in purchasing the Preferred Stock.  That reliance proved fatal.

F.      **The Truth Outs:  The Real National Century Comes To Light.**

48.     Following Pharos's purchase of $12 million of the National Century Preferred Stock, National Century's fraudulent and otherwise unlawful conduct began coming to light.  For example, in an Investor Report delivered by National Century (through its servicing subsidiary, NPFS) to Bank One, dated October 23, 2002, National Century was forced to disclose that:  (1) there was only $851,993 in a Credit Reserve Account that was supposed to be maintained at a level of $145 million; (2) there was only $498,321 in an Offset Reserve Account that was supposed to be maintained at a level of $44 million; and (3) there was only $10 million in an Equity Reserve Account that should have been maintained at a level of $217 million.  When those facts came to light, Bank One immediately sought relief from state and federal courts in

Ohio, including the appointment of a receiver.  That, in turn, prompted the F.B.I. to undertake an investigation and to conduct a raid upon the offices of National Century.  Similar actions by the United States Securities and Exchange Commission soon followed.

49.     In late October, 2002, Fitch announced that it had been "informed by interested parties that NCFE [National Century] directed the trustee [of NPF XII, Bank One] to reroute certain funds intended for the NPF XII reserve accounts in order to fund the purchase of new receivables," and that, "The company's apparent willingness to disregard the documents and commit such a serious breach, causes Fitch to question NCFE's viability."  In response, National Century explained to Fitch and Moody's that the company was facing a liquidity problem and had to expend reserves, thereby depleting those accounts from their $400 million required levels to only $11 million.  Predictably, both Fitch and Moody's immediately downgraded their ratings with respect to the NPF VI and NPF XII notes.

50.     Thereafter, a number of significant noteholders in National Century's securitized programs wrote-down substantial portions of their investments, including Ambac Financial Group, Inc., Credit Suisse, Pacific Investment Management Co., and ING Group NV.

51.     On November 18, 2002, just three weeks after the above facts regarding the reserves surfaced, National Century was forced to file for protection under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Ohio.  Recent reports indicate that as much as $1 billion of National Century assets cannot presently be accounted for and in January, 2003, National Century announced that it would cease operations in May, just six months after it sought bankruptcy protection for purposes of "reorganizing."

G.     **Wrongdoers All:  Defendants' Roles In The Rise And Fall Of National Century**

52.     Each of Defendants played a critical role in the destruction of National Century and in the wrongs perpetrated against Pharos, other shareholders and creditors.  Although each Defendant has since sought to minimize its involvement in, and responsibility for, the acts described above, such efforts are unavailing and insincere.  Each of Defendants reaped millions of dollars in fees while ignoring their obligations to prevent the patterns and practices of unlawful behavior within the company of which they were (or should have been) aware.  Each, at various times, engaged in activity concealing and misrepresenting the true condition of National Century.

2.     **Deloitte**

53.     National Century informed Deloitte, both at the outset of their relationship and in connection with each ensuing audit, that the company's audited financial statements would be used and distributed by National Century to solicit equity investment in the company and its subsidiaries.  Deloitte knew that National Century was not a publicly-traded company and, therefore, that the company raised equity capital through private placements.  Consequently, Deloitte knew that the representations it made in the course of auditing National Century would be received by a limited group of private placement offerees (such as Pharos) and relied upon by those who were considering an investment in the company's securities.  As such, Pharos and other similarly-situated investors were among the group of persons for whose benefit Deloitte knew that National Century was obtaining audited financial statements and to whom they would be supplied.

54.     As National Century's "independent" auditor, Deloitte had full access to all of National Century's corporate books, records, resources, customer lists, and ledgers for the

purposes of auditing National Century's compliance with GAAP and ensuring that adequate internal controls existed.  However, Deloitte failed miserably in that responsibility.

### a.    The auditor's carelessness and material misrepresentations and omissions

55.    Deloitte knew of (or, alternatively, was aware of facts that should have reasonably caused it to conduct an adequate investigation to discover) the accounting and operational deficiencies and improprieties described above.  Nevertheless, Deloitte failed to report those material facts or otherwise call them to the attention of the potential investors to whom Deloitte knew its audited financial statements would be sent.

56.    Deloitte represented to potential institutional investors, through its "clean" audit reports, that National Century's financial statements for the years ending 1999 and 2000 accurately and fairly presented the financial condition and position of National Century and its subsidiaries.  Deloitte also represented in those audit reports that it had conducted a proper review of National Century's financial statements according to GAAS, that the financial statements were free of material misrepresentations, that evidence supporting the disclosures in the financial statements were examined on a test basis and that such disclosures were corroborated and confirmed pursuant thereto, and that National Century's financial statements and reports were prepared according to GAAP.  In reality, however, National Century's financial statements were a fictitious account of National Century's true financial condition, were replete with material misstatements and omissions, and were an important instrumentality for National Century to defraud investors like Pharos.

57.    Deloitte failed to report the hundreds of millions of dollars in overpayments to related entities.  Given Deloitte's obligations and the facts of which they were aware, Deloitte's failure in this regard is the same as an intentional misrepresentation.  For instance, Deloitte had

been informed that advances by National Century and its subsidiaries to a company controlled in part by shareholders of National Century exceeded, at both December 31, 1999 and December 31, 2000, $10 million. Deloitte had also been informed that advances (net of reserves) made to certain providers – in which shareholders of National Century owned an equity interest – exceeded, at December 31, 1999, $685 million, and at December 31, 2000, $1 billion. Deloitte failed to require that those entities be accounted for on National Century's balance sheets and financial statements, or otherwise insist upon other appropriate disclosures.

58. Deloitte's failures to detect, monitor, and report those related party transactions directly violated generally accepted auditing standards, which require auditors to pay close attention to related party transactions due to the possibility that they are not bona fide, arms'-length transactions. Indeed, AU §334.11 requires:

> For each material related party transaction (or aggregation of similar transactions) or common ownership or management control relationship for which FASB Statement No. 57 requires disclosure, the auditor should consider whether he has obtained sufficient competent evidential matter to understand the relationship of the parties and, for related party transactions, the effects of the transaction on the financial statements. He should then evaluate all the information available to him concerning the related party transaction or control relationship and satisfy himself on the basis of his professional judgment that it is adequately disclosed in the financial statements.

59. Furthermore, FASB Statement 57 makes clear that an auditor cannot presume that related party transactions are legitimate, bona fide or at arms' length:

> Transactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist. Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated.

60. Deloitte also consciously ignored National Century's transfers of reserves between various accounts in an attempt to hide the under-collateralization of National Century's

obligations. The transfer of funds between accounts appeared on the general ledger and, therefore, should have been apparent to Deloitte. In addition, the fact that the transfers were "washed out" on the consolidated financial statements should have been a red flag to Deloitte about the fraud being perpetrated by National Century.

61. Similarly, Deloitte should have been aware of National Century's fictitious receivables. National Century used three different accounting systems - the General Ledger System, the Funding System, and the Accounts Receivable System. Due to the overvalued, fictitious receivables, the Accounts Receivable System was continually out of balance with the other systems. National Century reconciled this problem by instituting a "Code 915" entry – that was nothing more than a number to cover the accounts receivable shortfall. Deloitte either knew or should have known that Code 915 entries accounted for a substantial portion of the receivables. Indeed, it was not until Code 915 entries totaled more than $1 billion that Deloitte expressed any concern. National Century simply responded to those concerns by purchasing "stale" or uncollectible receivables to offset the Code 915 entries and classified those purchases as new receivables designated as Code 99. Under those circumstances, GAAS required Deloitte to investigate and corroborate and report those fictitious "plug" entries that amounted to hundreds of millions of dollars.

62. In addition, Deloitte did nothing to verify the validity of receivables from the healthcare providers or the collateral for the Notes, even though the validity of those receivables was the critical foundation upon which the financial condition of National Century was based. Indeed, investigations after the scandal broke in late 2002 revealed that Deloitte purported to "audit" hundreds of millions of dollars of receivables and collateral by merely sending a letter of

inquiry to National Century and relying on the "word" of its client. As such, Deloitte once again failed to comply with its obligations under GAAS.

63. Furthermore, Deloitte had been informed of actual and existing noncompliance with trust indentures entered into between subsidiaries of National Century, including NPF XII, and trustees such as Bank One, pursuant to which National Century and NPF XII obtained their principal source of financing, and which noncompliance could have resulted (and ultimately did result) in the declaration of an Event of Default under the Master Indenture. Deloitte had also been informed that if an Event of Default was declared in respect to the Master Indenture, a Principal Amortization Event would occur under which the respective bankruptcy remote subsidiary of National Century (including NPF XII) would be required to cease purchasing new eligible receivables and to apply all cash received to the principal and interest due on related notes. Deloitte thus knew that a declaration of default could negatively affect the ability of National Century and its subsidiaries, including NPF XII, to fund their operations. Despite their awareness of these non-compliance events, which might not be cured and which would have the effect of causing the company to default on its indebtedness, Deloitte never disclosed them, and, indeed, ultimately gave National Century an unqualified audit opinion.

64. Deloitte issued its clean audit reports in the face of numerous other "red flags" and events revealing the existence of financial irregularities in connection with NCFE and its subsidiaries. For example, National Century terminated the services of its auditors, PriceWaterhouseCoopers, following the audit of NCFE's financial statements for the year ended December 31, 1998, the report in respect of which was delayed and not issued until August 10, 1999. In addition, Deutsche Bank refused to serve as the initial purchaser of asset backed notes issued by National Century's bankruptcy-remote subsidiaries – which were at all relevant times

the principal source of financing for National Century and its subsidiaries – as a result of Deutsche Bank's insistence on extensive audits of the operations of National Century and its subsidiaries.  Further, published reports disclosed allegations of fraudulent conduct by National Century and its subsidiaries in connection with the asset-backed notes financings, leading at least one rating agency to conduct an investigation into such allegations.

65.     Deloitte either knew, or in the exercise of reasonably prudent audit functions under GAAS, should have know of the clear problems and deceptions inherent in its client's financial affairs and business model.  Nonetheless, Deloitte issued a "clean" audit report for National Century's consolidated financial statements for the year ending December 31, 1999. Deloitte also audited and issued a "clean" report for National Century's 2000 and restated 1999 consolidated financial statements.

**b.     The auditor's knowledge of its client's intended use of the audited financial statements**

66.     Deloitte supplied and/or approved the dissemination of its false and misleading audit reports to Pharos for Pharos's guidance in deciding to buy the Preferred Stock.

67.     Moreover, Deloitte is in the business of auditing financial statements for clients who sell securities to investors.  Deloitte knows that its clients may distribute its audit reports directly to potential investors for the purpose of inducing them to buy securities.  Here, Deloitte knew that National Century's audited financial statements would be (and were) disseminated to, and relied upon by, institutional investors such as Pharos.  National Century is not a publicly-traded company, and raised capital through private placements of debt and equity securities with qualified institutional buyers.  As National Century's auditor, Deloitte knew this.  More specifically, Deloitte knew that its audits were to be used by National Century to sell securities to a relatively small and narrowly-defined class of investors who were eligible to participate in

private placement transactions pursuant to SEC Rule 144a. Rule 144a provides that only investors deemed "qualified institutional buyers" may purchase securities in private placement transactions. Rule 144a defines "qualified institutional buyers" as certain entities "that in the aggregate own[] and invest[] on a discretionary basis at least $ 100 million in securities of issuers that are not affiliated with the entity." To sell its securities directly to institutional investors, National Century had to provide them with financial information. The most obvious (and ostensibly reliable) source of that information was National Century's audited annual financial statements. Thus, Deloitte knew that its audit opinions would be given to a limited group of prospective institutional investors (which included Pharos) to induce them to invest in National Century's securities.

### c. Pharos's foreseeable reliance on the audited financial statements

68. The Private Placement Memorandum for the sale of the Preferred Stock was prepared by CSFB, Shattan and National Century in or before May 2001. Deloitte's combined audit report for National Century's 2000 and restated 1999 consolidated financial statements is dated May 18, 2001. While preparing that audit report, Deloitte was specifically aware of the Memorandum and of National Century's intention to raise equity through the private placement of the Preferred Stock. Deloitte also knew that the audit report for 2000 and 1999 (restated) would be supplied to, and relied upon by, certain qualified institutional buyers which had been targeted, including Pharos, who received the Memorandum and were considering investing in the Preferred Stock. Further, Deloitte knew that its issuance of a "clean" audit report was critical to the success of National Century's effort to privately place the Preferred Stock.

69. At all relevant times, Pharos was a qualified institutional buyer. Pharos received the Memorandum and was targeted by National Century, CSFB and/or the Shattan Group for

private placement of the Preferred Stock.  In July 2002, Pharos ultimately purchased $12 million of the Preferred Shares from National Century in reliance on the Deloitte's audit reports.

### d.    The auditor's motivations

70.    Deloitte had a substantial motive to intentionally or recklessly disregard National Century's fraud, and to certify as "clean" National Century's fraudulent financial statements. Deloitte knew that digging too deeply to expose National Century's fraud would jeopardize its business relationship with National Century and the substantial fees it was receiving from National Century.   In addition, demanding disclosure by National Century would have compromised Deloitte's efforts at cross-selling its other services to National Century.  Moreover, Deloitte knew that exposing National Century's fraud would very likely result in National Century's demise, which would have meant the loss of a valuable client for Deloitte.

### 3.    CSFB and Shattan

71.    CSFB and Shattan prepared and circulated the Memorandum that they knew was riddled with material misstatements and omissions of critical information.  They also served as placement agents for the Preferred Stock.  CSFB aggressively promoted National Century as a sound company in which Pharos should invest.  It did so through a number of methods, including the transmission of effusively upbeat e-mails about how sound an investment National Century offered, and it even arranged with Deloitte for the provision of documents such as the draft 2001 audit report.

72.    Specifically, on March 5, 2002, David Hurwitz of CSFB sent the following e-mail to Pharos:

> Dale—I didn't know you were at Pharos.  I don't believe we have closed a transaction with Pharos in the past, but I've certainly heard good things about the group.  I do believe NCFE is what it is cracked up to be.  It's extremely profitable and has been for many years.  They are the dominant player in the industry and still have great growth opportunities.  I do not remember our group (and we've

raised over $5 billion in equity) ever having worked with a company that generates as much cash flow as NCFE. I think there are some initiatives the company needs to undertake regarding systematizing their business, but I believe the company has already made some important steps in this regard. We should get some more clarity on how the process will move forward. Hopefully we can get your team out to Columbus shortly.

The e-mail was false and misleading because, when Hurwitz made those statements on CSFB's behalf, he and CSFB knew that NCFE was little more than a massive Ponzi scheme—that the cash flow was, in reality, money from new securities offerings; that NCFE was losing money; and that NCFE had taken no steps at all toward systematizing their business.

73.    CSFB and Shattan, in classic investment banker style, promoted National Century's business model in upbeat presentations such as the one the Pharos personnel attended at National Century's offices in Dublin, Ohio. This happened before Pharos decided to invest $12 million with National Century. Those representations were known by CSFB and Shattan to be false when made. Further, those representations were relied upon by Pharos in connection with its purchase of the Preferred Stock.

### 4.    **Purcell & Scott**

74.    The misstatements and various inaccurate representations made to Pharos also depended upon the complicity of its outside counsel, Purcell & Scott, in order to accomplish their goal – to induce Pharos to invest in National Century. In fact, Purcell & Scott issued a written opinion to Pharos on July 9, 2002. That opinion letter purported to advise Pharos that National Century's execution of, and performance under, the Agreement would not violate any debt covenant or any state or federal law. That opinion was patently false. By issuing the Preferred Stock, National Century flagrantly violated various provisions of the Ohio Securities Act that render unlawful the offering or sale of any security by means of a material false and misleading statement or omission. Moreover, National Century was in gross breach of various debt covenants because its reserves were woefully inadequate.

75.     Purcell & Scott knew of the misstatements, omissions, violations of law, as well as the company's breaches of the debt covenants.  It was also aware of the enormous overpayments to related entities and the grossly inadequate reserves.

76.     Purcell & Scott enjoyed unparalleled access to National Century's books, records, and personnel.  Moreover, Purcell & Scott served National Century as counsel on most, if not all, of National Century's securitization transactions and dealings with customers, including the related entities.  Indeed, it advised National Century on how to structure National Century's transaction with Pharos.

77.     Purcell & Scott flouted its professional and ethical obligations when it issued the opinion letter, dated July 9, 2002, to Pharos, knowing that Pharos would rely on that opinion and knowing that National Century could not legally issue the Preferred Stock under the circumstances in which those securities were sold.

### 5.     Pote and Wilkinson

78.     Pote, as the sole member of National Century's Audit Committee, irresponsibly approved Deloitte's audits.  Pote asked no questions of Deloitte and merely took Deloitte at its word with regard to the financial statements' compliance with GAAP and Deloitte's compliance with GAAS.  Moreover, Pote, by virtue of his position with National Century, exercised a substantial degree of control over National Century's actions.  Without Pote's blind seal of approval on National Century's financials, National Century could not have deceived and then defrauded Pharos.  Moreover, Pote held (but omitted to disclose) financial interests in companies such as Med Diversified—companies to whom National Century extended high-risk loans that amounted to about $1 billion.

79.     Likewise with Wilkinson.  Wilkinson, as a National Century director and enjoyed the position and ability to control National Century's conduct concerning securities offerings and

maintain adequate debt reserves.  Without Wilkinson's support, National Century could neither have deceived nor defrauded Pharos.

**H.**    **The Damage Done:  The Aftermath Of Rip-Offs And Deceptive Dealings**

80.    Over the course of just a few months, from October 2002 to January 2003, National Century went from an apparently-vibrant and profitable financial services company to a debtor-in-bankruptcy with no hope of reorganization or payment of its debts.  The discrepancy between National Century's publicly-portrayed health and its undisclosed sickness cannot be explained absent the complicity and active support and assistance of Defendants.  Had any one or more of them fulfilled their common law and statutory duties to the company's shareholders, the unlawful schemes concocted by National Century's management team would never have been executed and the company would never have been run into the ground.  More importantly for purposes of this action, if Defendants had fulfilled their duties, acted lawfully, and not cooperated, Pharos would never have become a National Century shareholder.

81.    Today, Pharos's $12 million investment in National Century Preferred Stock is not only worthless, but its loss has resulted in other consequential damages for the fund. Accordingly, Pharos has retained the undersigned counsel to prepare, file, and prosecute this complaint and the claims stated herein.  Pharos seeks from Defendants all legal and equitable relief to which it may be entitled as a result of Defendants' wrongdoing.

**V.**

**CLAIMS**

**A.**    **Count One:  Primary Violations of The Ohio Securities Act (Against CSFB, Shattan, Pote, and Wilkinson)**

82.    Pharos incorporates the allegations set forth in the preceding paragraphs.

83.    Ohio Revised Code Chapter 1707.41 provides that any person may recover damages who relies upon a misrepresentation in an offering circular or advertisement and purchases a security because of some misrepresentation therein.

84.    CSFB and Shattan, in conjunction with National Century, offered National Century's Preferred Stock for sale to Pharos.

85.    Pharos relied upon the various misrepresentations and omissions set forth in the Private Placement Memorandum and was injured because of that reliance.

86.    Accordingly, Defendants CSFB and Shattan are liable to Pharos for Pharos's $12 million loss.

87.    Further, when a corporation is liable under Chapter 1707.41, that corporation's directors become jointly and severally liable as well, whether or not they engaged in illegal conduct.  Because National Century violated Chapter 1707.41, Pote and Wilkinson are likewise liable to Pharos as National Century's directors.

88.    Pharos hereby elects to void the $12 million sale of National Century's Preferred Stock and, thus, tenders those shares to CSFB, Shattan, Pote, and/or Wilkinson.

**B.    Count Two:  Aiding And Abetting Primary Violations Of The Ohio Securities Act (Against All Defendants)**

89.    Pharos incorporates the allegations set forth in the preceding paragraphs.

90.    Ohio Revised Code Chapter 1707.43 allows recovery against any person "who has participated in or aided the seller in any way" in a sale of securities in violation of Chapter 1707.41.

91.    As described above, CSFB aided and participated in National Century's sale of securities to Pharos.  That conduct included, but was not limited to, CSFB's effusively positive e-mails that promoted National Century as a sound investment and CSFB's Memorandum.

92.     Shattan also aided and participated in National Century's sale of securities to Pharos.  This conduct included, but was not limited to, Shattan's promotion of National Century as a sound investment and its preparation and circulation of the Memorandum.

93.     As described above, Deloitte aided and participated in National Century's sale of securities to Pharos.  That conduct included, but was not limited to, Deloitte's knowing and/or reckless certification of materially false and misleading financial statements, which concerned such items as National Century's inadequate reserves for outstanding bonds and National Century's massive overpayments to related entities.  Deloitte's assistance exceeded that which might be deemed incidental to providing accounting/auditing services in that Deloitte was complicit in National Century's misdeeds under Chapter 1707.41.

94.     Purcell & Scott aided and/or participated in National Century's sale of securities to Pharos by, among other things, its promotion and issuance of the July 9, 2002, opinion letter to Pharos.  Purcell & Scott's assistance exceeded that which might be deemed incidental to the practice of law in that Purcell & Scott was complicit in National Century's misdeeds under Chapter 1707.41.

95.     Pote and Wilkinson aided or participated in National Century's sale of securities to Pharos.  For example, Pote and Wilkinson rubber-stamped Deloitte's audits, and they failed to prevent National Century's sale of securities to Pharos notwithstanding their knowledge of National Century's financial dire straits.

## C.     Count Three:  Negligent Misrepresentation (Against Deloitte)

96.     Pharos incorporates the allegations set forth in the preceding paragraphs.

97.     Deloitte is in the business of auditing financial statements for clients who sell securities to investors.  Deloitte knows that its clients may distribute its audit reports directly to potential investors for the purpose of inducing them to buy securities.  While preparing its audit

reports for National Century's financial statements for the years ending 1999 (original and restated) and 2000, Deloitte knew and intended, or reasonably should have expected, that these reports would be distributed to and relied upon by certain qualified institutional investors, such as Pharos, seeking to purchase National Century's securities in private placement transactions.

98.     On May 18, 2001, Deloitte's issued its combined audit report for National Century's 2000 and restated 1999 financial statements.  While preparing this audit report, Deloitte knew that the report would be used in connection with National Century's private placement of the Preferred Stock.  Deloitte supplied and/or specifically approved the dissemination of the report to Pharos.  While preparing the report, Deloitte also knew, or was aware of facts which put them on notice that, the report would be received and relied upon by Pharos and/or a specific group of targeted qualified institutional investors that included Pharos.

99.     Deloitte failed to exercise reasonable care and competence in preparing its audit report for National Century's 2000 and restated 1999 financial statements and failed to comply with the requirements of GAAS.

100.    The audit report contained material information in that National Century's financial performance in 1999 and 2000 was clearly a factor that would have influenced a reasonable investor's decision whether or not to purchase National Century's Preferred Stock.

101.    Pharos justifiably relied on the information contained in the audit report for National Century's 2000 and 1999 (restated) financial statements in deciding whether to invest in National Century's Preferred Stock.

102.    As a result of Pharos's justifiable reliance, Pharos has suffered pecuniary losses of at least $12 million, for which Pharos seeks to recover compensatory and consequential damages.

**D.**     **Count Four:  Common Law Fraud (Against All Defendants)**

103.     Pharos hereby incorporates the allegations set forth above.

104.     The Defendants made a number of material misrepresentations of fact, and omitted material facts, in the following documents:  (1) a Private Placement Memorandum, prepared and issued by CSFB and Shattan, as agents of National Century; (2) National Century's financial statements; (3) Deloitte's "clean" audit reports for National Century's year 1999, year 1999 restated, and year 2000 financial statements; (4) an opinion letter issued by Purcell & Scott; and (5) other materials created, reviewed and/or approved by National Century, its officers and directors, and its agents and consulting professionals (including, without limitation, Deloitte, Purcell & Scott, Shattan, CSFB, Pote, and Wilkinson).

105.     The Defendants knew that their representations and omissions were false at the time they were made.  In the alternative, the Defendants made those misrepresentations and/or engaged in those omissions with reckless disregard to the truth.

106.     Those Defendants knew and intended, or should reasonably have expected, that Pharos would rely upon their misrepresentations and omissions.

107.     In reliance upon the fraudulent statements and omissions of the Defendants, Pharos invested in NCFE's securities.

108.     Pharos's reliance on the fraudulent representations and omissions of Defendants proximately caused injury to Pharos, for which it seeks to recover compensatory and consequential damages.

**E.**     **Count Five:  Common-Law Negligence (Against Purcell & Scott)**

109.     Pharos incorporates the allegations set forth in the preceding paragraphs.

110.     Purcell & Scott is in the business of providing legal advice on such matters as securities offerings and other transactional work.  In the course of such work, Purcell & Scott

issued an opinion letter specifically for Pharos's benefit.  That letter contained materially false and misleading statements and omissions, particularly statements concerning the legality of the issuance of the securities with respect to the applicable securities laws.

111.    Purcell & Scott failed to exercise reasonable care and competence in communicating that opinion.

112.    Pharos justifiably relied on Purcell & Scott's representations in the opinion letter in deciding whether to invest in National Century's Preferred Stock.

113.    As a result of Pharos's justifiable reliance, Pharos has suffered pecuniary losses of at least $12 million, for which Pharos seeks to recover compensatory and consequential damages.

**F.      Count Five:  Negligent Misrepresentation (Against CSFB and Shattan)**

114.    Pharos incorporates the allegations set forth in the preceding paragraphs.

115.    CSFB and Shattan are in the business of providing financial advice and investment banking services for large companies such as National Century.  In the course of such work, CSFB and Shattan promulgated the Memorandum, which contained a panoply of material misstatements and omissions.  Pharos received copies of the Memorandum and relied on the representations and statements made therein.

116.    National Century's fraudulent sale of Preferred Stock was affected in part by CSFB's and Shattan's vigorously promoting the fraudulent sale.

117.    CSFB and Shattan failed to exercise reasonable care and competence in obtaining and communicating the information set forth in the Memorandum.

118.    Pharos justifiably relied on representations in the Memorandum in deciding to invest in National Century's Preferred Stock.

119.    As a result of Pharos's justifiable reliance, Pharos has suffered pecuniary losses of at least $12 million, for which Pharos seeks to recover compensatory and consequential damages.

**G.    Count Six:  Conspiracy And Aiding And Abetting (Against All Defendants)**

120.    Pharos incorporates the allegations set forth in the preceding paragraphs.

121.    Defendants entered into a combination or conspiracy in order to facilitate third-party capital investment in National Century, in the form of both equity (i.e., common and preferred stock) and debt (i.e., notes and other debentures).  That conspiracy manifested itself in a number of respects, including, but not limited to, the sale and offering for sale of the National Century Preferred Stock.

122.    Defendants reached a meeting of the minds on the foregoing objective and course of action and, in connection therewith, committed one or more unlawful acts or otherwise lawful acts for unlawful purposes.  More specifically, Defendants engaged in, facilitated, encouraged, and contributed to the acts of fraud, breach of fiduciary duty, and negligent misrepresentation committed by auditors and financial advisors, legal counsel, and certain officers and other employees.

123.    The foregoing acts were committed with the intent of injuring others, including investors in National Century's Preferred Stock.

124.    The conspiracy described above, and the acts committed in the course of that combination, proximately caused injury to Pharos, for which it seeks to recover compensatory and consequential damages.

125.    In addition, because the conspiracy among Defendants constituted fraud, and the wrongful acts in furtherance thereof were committed maliciously, Pharos seeks to recover exemplary damages.

## VI.

## <u>JURY DEMAND</u>

Pharos hereby requests a jury trial on all issues and claims.

## VII.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE Pharos requests that, upon final hearing, the Court enter judgment in favor of Pharos and against Defendants, jointly and severally, providing for the following relief:

1.      Rescissionary damages in an amount of at least $12 million;

2.      Consequential and other compensatory damages in an amount to be determined by the trier of fact;

3.      Punitive damages;

4.      Attorneys' fees;

5.      Prejudgment and postjudgment interest at the highest rates authorized by law;

6.      Costs of court; and

7.      Such further relief, at law and in equity, to which Pharos may be entitled and which this Court deems just and proper.

Dated: January _____, 2004

Respectfully submitted,

**MURRAY MURPHY MOUL & BASIL LLP**


By:     _____
            Joseph F. Murray
            326 South High Street
            Suite 400
            Columbus, Ohio 43216
            Telephone:  (614) 469-0400
            Telecopier:  (614) 469-0402

**BICKEL & BREWER**

            William A. Brewer III
            Michael J. Collins
            4800 Bank One Center
            1717 Main Street
            Dallas, Texas  75201
            Telephone:  (214) 653-4000
            Telecopier:  (214) 643-1014

**ATTORNEYS FOR PLAINTIFF**