IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| | : | |
| In re National Century | : | Case No. 2:03-md-1565 |
| Financial Enterprises, | | |
| Inc., Investment Litigation. | : | Judge Graham |
| | : | Magistrate Judge Abel |
| | : | |

OPINION AND ORDER ON CERTAIN MOTIONS TO DISMISS
FILED BY LEAD UNDERWRITER CREDIT SUISSE FIRST BOSTON

This matter is before the Court on motions filed by Credit Suisse First Boston LLC (now Credit Suisse Securities LLC) to dismiss the claims made against it in this multi-district litigation. Credit Suisse served as lead underwriter of the NPF VI, Inc. and NPF XII, Inc. securitization programs. The Court finds that the complaints put Credit Suisse at the center of the alleged scheme to defraud National Century Financial Enterprise's investors, and, thus, Credit Suisse's motions to dismiss are largely denied.

I.      **BACKGROUND**

A.      **Factual Allegations against Credit Suisse**

This order concerns the complaints filed by the following plaintiffs: Metropolitan Life Insurance Company and Metropolitan Insurance and Annuity Company (collectively "MetLife"); Lloyds TSB Bank PLC; the State of Arizona, the City of Chandler, and Crown Cork & Seal Company (collectively the "Arizona Noteholders"); the New York City Pension Funds; and Pharos Capital Partners, L.P. Though the allegations vary somewhat from complaint to complaint, below is a summary of what the Plaintiffs allege against Credit Suisse.

Plaintiffs allege that Credit Suisse underwrote and managed the notes issued by National Century through the NPF VI and NPF XII securitization programs. Between 1998 and 2002, NPF

VI made at least 10 bond issuances and NPF XII made at least 12 bond issuances. During this time, National Century issued approximately $3 billion of debt securities to finance the purchase of accounts receivable from healthcare providers.

The notes were sold to institutional investors who could invest millions, if not hundreds of millions, of dollars in notes. Credit Suisse was the initial purchaser and placement agent for each note issuance. Credit Suisse then created a secondary market for the notes by actively soliciting institutional investors, who were provided with various offerings materials and given sales presentations. Credit Suisse allegedly authored the offering materials in substantial part, and Credit Suisse's representatives allegedly participated in the sales presentations.

Plaintiffs allege that Credit Suisse made numerous misrepresentations and material omissions in the offering materials and sales presentations. These misrepresentations went to the financial soundness of the note programs, the quality of the notes, and, hence, the security of Plaintiffs' investments. According to Plaintiffs, Credit Suisse represented that NPF VI and NPF XII would use the note proceeds to purchase only high-quality accounts receivable, which would serve as collateral for the notes. Further, Credit Suisse represented that indenture trustees would maintain reserve accounts for NPF VI and NPF XII according to strict standards designed to offset the risks associated with buying receivables. Credit Suisse further represented that NPF VI and NPF XII would not engage in related-party transactions; that is, they would refrain from purchasing accounts receivable from healthcare providers in which National Century or its principals held a financial interest.

Plaintiffs contend that Credit Suisse's representations were false and that the NPF VI and NPF XII note programs, though perhaps at one time legitimate, had become a sham by the time Plaintiffs invested in them. In a nutshell, the complaints allege that National Century used Plaintiffs' money to purchase low-quality or even non-existent receivables from healthcare companies that National Century's principals (Lance Poulsen, Donald Ayers, and Rebecca Parrett, collectively "the Founders") controlled or had some financial interest in. These healthcare companies became overfunded because National Century paid them for receivables that had little

or no value.  The Founders allegedly used their control of the healthcare companies to gain access to the overfunded amounts.  In time, the reserves at NPF VI and NPF XII became severely depleted, the alleged wrongdoing was uncovered, and National Century filed for bankruptcy in November 2002, with an alleged aggregate loss to investors of at least $2.6 billion.

The complaints put Credit Suisse alongside National Century's Founders as being at the center of a scheme to defraud investors.  Beginning in 1995, National Century selected Credit Suisse to serve as its financial advisor at-large.  The Arizona Noteholders' complaints characterize National Century and Credit Suisse as having a "close, broad, and multifaceted relationship" whereby Credit Suisse "continuously enjoyed extensive access to inside information regarding [National Century], its finances, and its operations."  See State of Arizona Second Am. Compl., ¶96A.  Credit Suisse allegedly conducted numerous examinations of National Century's finances and reviewed the results of due diligence investigations performed by third party professionals.

According to the complaints, Credit Suisse's relationship with National Century was lucrative.  Credit Suisse allegedly received millions of dollars in investment banking and placement fees for its services.  The complaints therefore allege that Credit Suisse had a strong financial incentive to promote NPF VI and NPF XII notes to institutional investors.

Plaintiffs allege that as early as January 1998 Credit Suisse had knowledge that the NPF VI and NPF XII note programs were not operating in the manner described by the offering materials. The details of how Credit Suisse allegedly gained this knowledge will be reviewed below in the Court's discussion of Credit Suisse's scienter, but Plaintiffs allege that Credit Suisse gained extensive knowledge of National Century's operations.  The complaints allege that Credit Suisse knew in particular that National Century was purchasing ineligible accounts receivable, not properly maintaining reserve accounts, and engaging in related-party transactions.

Despite this knowledge, Credit Suisse allegedly proceeded to sell notes to Plaintiffs and other investors.  When rumors or reports surfaced that there were problems with the NPF VI and NPF XII note programs, Credit Suisse is alleged to have acted swiftly to undermine the reports and reassure investors that their money was safe, even though Credit Suisse allegedly knew NPF VI and

3

NPF XII were a fraud. The complaints allege that in order to preserve its lucrative position and protect the unsold notes it had on its hands, Credit Suisse went so far as to make unsecured loans to National Century when NPF VI's and NPF XII's reserves were depleted.

**B.     The Plaintiffs**

**1.     MetLife and Lloyds**

Metropolitan Life Insurance Company is a New York corporation with its principal place of business in New York. Between June 2001 and July 2002, MetLife purchased a total of $102.6 million of NPF XII notes. In August 2002, MetLife's affiliate, Metropolitan Insurance and Annuity Company, purchased $18.46 million of NPF XII notes.

Lloyds is a British public limited company with its principal place of business in London, England. Lloyds purchased a total of $60 million of NPF XII notes in March 2001. It separately purchased $68 million of NPF XII notes in November 2002 under a Participation Agreement with Credit Suisse.

MetLife and Lloyds filed separate suits in New Jersey federal court but have filed joint briefs and motions since their actions have been consolidated in this multi-district litigation.

MetLife asserts the following claims against Credit Suisse: violations of Section 10(b) of the Securities Exchange Act, violations of Ohio's and New Jersey's blue sky laws, fraud, negligent misrepresentation, and negligence.

Lloyds asserts those same claims against Credit Suisse in relation to its initial note purchase and to the Participation Agreement. Lloyds also asserts a breach of contract claim with respect to the Participation Agreement.

**2.     The Arizona Noteholders**

The Arizona Noteholders are a large collection of investors who filed three separate lawsuits in Arizona state court. Some of the Arizona Noteholders lack any direct connection to Arizona, but they are included in the group because they joined in the lawsuits originally filed in Arizona. The Arizona Noteholders include governmental entities from Arizona and other states, as well as businesses incorporated in various states and foreign countries. The Arizona Noteholders

4

collectively purchased about $1.4 billion of NPF VI and NPF XII notes between 1998 and 2002. Attached to their complaints are detailed lists of when and how much each Noteholder invested in NPF VI and NPF XII.

The Arizona Noteholders assert the following claims against Credit Suisse: violations of the blue sky laws of numerous states, unfair competition under Massachusetts state law, fraud, negligent misrepresentation, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, conspiracy, unjust enrichment, and breach of contract.

### 3.       The New York City Pension Funds

The New York City Pension Funds are a group of public pension funds in charge of managing the assets of various New York City employees and retirees.  The New York Funds purchased $89 million of NPF XII notes in October 2000 and May 2002.

The New York Funds originally filed suit in New York federal court.  They assert the following claims against Credit Suisse: violations of Section 10(b) of the Securities Exchange Act, fraud, aiding and abetting fraud, negligent misrepresentation, and negligence.

### 4.       Pharos Capital Partners

Pharos is a limited partnership organized under the laws of Delaware.  Pharos describes itself as being in the business of making equity investments on behalf of its limited partner investors. Pharos purchased $12 million worth of National Century preferred stock on July 8, 2002.

Pharos brought suit in the Southern District of Ohio and asserts the following claims against Credit Suisse: violations of Ohio's blue sky law, fraud, negligent misrepresentation, aiding and abetting, and conspiracy.

Because the claims of Pharos, who purchased preferred stock in National Century, are slightly different than the claims of the noteholder Plaintiffs, Pharos's claims will be discussed separately below.

## II.      MOTION TO DISMISS STANDARD OF REVIEW

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must construe

the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Roth Steel Prods. v. Sharon Steel Corp., 705 F.2d 134, 155 (6th Cir. 1982). A complaint may be dismissed for failure to state a claim only where "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). A motion to dismiss under Rule 12(b)(6) will be granted if the complaint is without merit due to an absence of law to support a claim of the type made or of facts sufficient to make a valid claim, or where the face of the complaint reveals that there is an insurmountable bar to relief. Rauch v. Day & Night Mfg. Corp., 576 F.2d 697 (6th Cir. 1978).

Because a motion under Rule 12(b)(6) is directed solely at the complaint itself, the court must focus on whether the claimant is entitled to offer evidence to support the claims, rather than whether the plaintiff will ultimately prevail. Scheuer, 416 U.S. at 236; Roth Steel Prods., 705 F.2d at 155; see also Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S.Ct. 1955, 1965 (2007) (Rule 8 "does not impose a probability requirement at the pleading stage"). A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory. Weiner v. Klais & Co., Inc., 108 F.3d 86, 88 (6th Cir. 1997). The court is not required to accept as true unwarranted legal conclusions or factual inferences. Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987). Though the complaint need not contain detailed factual allegations, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. Bell Atlantic, 127 S.Ct. at 1964-65; Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526 (1983). Plaintiff must provide more than labels and conclusions, or a formulaic recitation of the elements of a cause of action, Bell Atlantic, 127 S.Ct. at 1965, and the court is not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986); accord Morgan, 829 F.2d at 12.

## III.    THE NOTEHOLDERS' SECTION 10(B), FRAUD, AND NEGLIGENT MISREPRESENTATION CLAIMS

### A.    Elements

#### 1.    Section 10(b)

Plaintiff MetLife, Lloyds, and the New York Funds have brought claims against Credit Suisse for violating Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b).  Section 10(b) prohibits any person from making "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security."  Morse v. McWhorter, 290 F.3d 795, 798 (6th Cir. 2002); see 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b).  To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege, in connection with the purchase or sale of securities: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury."  Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001); see also In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 548 (6th Cir. 1999).

The Private Securities Litigation and Reform Act ("PSLRA") requires complaints asserting a claim of federal securities fraud to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Moreover, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

#### 2.    Fraud

MetLife, Lloyds, the New York Funds, and the Arizona Noteholders have asserted claims for common law fraud against Credit Suisse.  The elements of a fraud claim are: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading

another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. Russ v. TRW, Inc., 59 Ohio St.3d 42, 49, 570 N.E.2d 1076, 1083-84 (Ohio 1991).[1]

Under Rule 9(b), Fed. R. Civ. P., averments of fraud and the circumstances constituting the fraud must be stated with "particularity." To comply with Rule 9(b), "a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" Walburn v. Lockheed Martin Corp., 431 F.3d 966, 972 (6th Cir. 2005) (quoting Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993)). Scienter may be averred generally and inferred from circumstantial evidence. See Fed. R. Civ. P. 9(b); S.E.C. v. Blackwell, 291 F.Supp.2d 673, 696 (S.D. Ohio 2003).

### 3. Negligent Misrepresentation

MetLife, Lloyds, the New York Funds, and the Arizona Noteholders have also brought claims against Credit Suisse for negligent misrepresentation. The Ohio Supreme Court has defined negligent misrepresentation as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Delman v. Cleveland Hts., 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (Ohio 1989) (quoting 3 Restatement of the Law 2d, Torts (1965), Section 552(1)).

### 4. Summary of Credit Suisse's Arguments

Credit Suisse opposes the Section 10(b), fraud, and negligent misrepresentation claims on the same grounds. In its motions to dismiss, Credit Suisse first argues that it made no

---

[1] The Court has refrained from making choice-of-law determinations until the facts are further developed. Unless otherwise noted, the parties and the Court look primarily to Ohio law.

misrepresentations to Plaintiffs and owed no duty of disclosure.  Credit Suisse next argues that the complaints fail to sufficiently plead scienter.  Finally, Credit Suisse contends that the offering materials contained disclaimers that precluded Plaintiffs from claiming they justifiably relied on Credit Suisse's alleged misrepresentations.

### B.       The Alleged Misrepresentations

Plaintiffs allege that they received offering materials from Credit Suisse in connection with their purchase of NPF VI and NPF XII notes.  These materials included private placement memoranda, supplemental private placement memoranda, and the Master Indenture governing the NPF XII note program.  MetLife and Lloyds allege that Credit Suisse, as initial purchaser and lead underwriter of the notes, was "intimately involved with the drafting" of the offering materials.  See MetLife Fourth Am Compl., ¶34; Lloyds Fourth Am. Compl., ¶36.  The New York Funds similarly allege that Credit Suisse, as primary seller of the notes and as National Century's financial advisor, had "active involvement in drafting, editing and/or approving" the offering materials.  See New York Funds Second Am. Compl., ¶143.  The Arizona Noteholders make the same allegations that Credit Suisse played a significant role in drafting the offering materials.

Plaintiffs contend that the offering materials contained material misstatements and omissions regarding how NPF VI and NPF XII operated, including that the note programs:

- • maintained separate books and records from other National Century entities;

- • had on their boards of directors an independent director unaffiliated with National Century;

- • restricted their business to purchasing eligible receivables and issuing notes;

- • provided certain credit enhancements for the notes in accordance with the Master Indenture governing the note programs;

- • were capitalized by National Century in accordance with the Indenture;

- • maintained segregated reserve accounts;

- • used proceeds from issuing notes to purchase eligible receivables;

- did not purchase receivables in excess of payor concentration limitations set forth in the Indenture; and

- did not engage in related party transactions.

Plaintiffs contend that these misrepresentations were material because they went to assuring that National Century's business model was financially sound and that the notes were a good investment.

Plaintiffs allege that Credit Suisse repeated many of the same misrepresentations during sales presentations given to Plaintiffs. For instance, MetLife alleges that Credit Suisse gave a sales presentation at MetLife's offices on October 11, 2000. During this presentation, Credit Suisse allegedly misrepresented that the notes were of high quality and the note programs had strong credit controls and enhancements. The New York Funds allege that Credit Suisse made a sales presentation to them in October 2000 in which Credit Suisse made the same or similar misrepresentations as were contained in the offering materials. The Arizona Noteholders likewise allege that during sales presentations and telephone calls, representatives of Credit Suisse reiterated the misrepresentations made in the offering materials and made false assurances about the quality of the notes.

Plaintiffs further allege that Credit Suisse made material misrepresentations and omissions in other written materials. For instance, MetLife alleges that Credit Suisse sent it a "Salespoints" document on December 18, 2000. This Salespoints document allegedly made the same or similar misrepresentations as were contained in the offering materials, namely that NPF XII was operating in compliance with the material terms of the Master Indenture. In June 2001, Credit Suisse sent to MetLife an email misrepresenting that the reserve accounts were being properly maintained and that the accounts receivable being purchased were of high quality.

Lloyds similarly alleges that Credit Suisse sent it a document in January 2001 containing misrepresentations regarding the nature and quality of the receivables, the nature of the collateralization of the notes, and the maintenance of the reserve accounts. In July 2002, after the

NPF XII notes were downgraded by ratings agency Fitch, Inc., Lloyds contacted Credit Suisse, who responded by sending a "Research Report" containing the same or similar misrepresentations.

The New York Funds likewise allege that Credit Suisse issued the July 2002 Research Report, which misrepresented that there were no problems with the NPF XII note program. And the Arizona Noteholders allege that Credit Suisse sent them a number of "Salespoints" documents that repeated the same misrepresentations as were made in the offering materials.

In the face of these allegations, Credit Suisse argues that it made no misrepresentations to Plaintiffs. Selectively quoting language from the offering materials stating that National Century prepared the materials, Credit Suisse contends that any misrepresentations in those materials belonged to National Century and not to Credit Suisse. This argument is unpersuasive. Credit Suisse's name is displayed on the front page of all the offering materials, which identify Credit Suisse as the initial purchaser of the notes. The complaints allege that Credit Suisse drafted the materials and provided them to Plaintiffs when marketing the notes. Indeed, the complaints go so far as quoting Credit Suisse's own internal papers showing that Credit Suisse helped draft and review the offering materials. See MetLife Compl., ¶34, Lloyds Compl., ¶36, New York Funds Compl., ¶148. In Gabriel Capital, L.P. v. NatWest Finance, Inc., 94 F.Supp.2d 491, 502 (S.D.N.Y. 2000), the court rejected a similar argument made by two underwriters in a motion to dismiss: "[T]he cover of the Offering Memorandum prominently lists both NatWest and McDonald as two of the four initial purchasers. . . . In addition, NatWest and McDonald gave the Offering Memorandum to plaintiffs as part of their sales pitch. . . . At this stage of the proceedings, that is a sufficient basis to conclude that the alleged misrepresentations were attributable to NatWest and McDonald."

Credit Suisse next argues that it owed no duty of disclosure to Plaintiffs. Generally, a party to a business transaction has a duty to disclose only when a special relationship exists, which Credit Suisse contends was not the case here. See Interim Healthcare of Northeast Ohio, Inc. v. Interim Services, Inc., 12 F.Supp.2d 703, 712 (N.D. Ohio 1998). However, a party who chooses to speak in a securities transaction assumes a duty to speak truthfully and completely about the matters on

which he speaks.  See Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263, 268 (6th Cir. 1998) (en banc).  Even though a party "in a securities transaction may not always be under an independent duty to volunteer information . . . he assumes a duty to provide complete and nonmisleading information with respect to subjects on which he undertakes to speak."  Rubin, 143 F.3d at 268. Here, the complaints adequately allege that Credit Suisse undertook, through the offering materials, sales presentations, and other written materials, to speak about the material aspects of the NPF VI and NPF XII note programs.  These allegations are sufficient to impose a duty on Credit Suisse to provide complete and nonmisleading information regarding all the subjects on which Credit Suisse spoke.

Finally, Credit Suisse argues that the claims of the New York Funds and the Arizona Noteholders must be dismissed because the complaints fail to identify which, if any, of the various plaintiffs who make up the New York Funds and Arizona Noteholders received and reviewed the offering materials.  This argument too is without merit.  The New York Funds specifically allege that they made investment decisions through their agents Citibank, N.A. and Lincoln Capital, LLC and that these agents received and reviewed the offering materials from Credit Suisse.  Each of the Arizona Noteholders allege that Credit Suisse provided the offering materials either directly to them or to their investment advisors.

### C. Scienter

#### 1. Pleading Standard

The Sixth Circuit has described the PSLRA's provisions as "[a]dding to the Federal Rules of Civil Procedure 9(b) requirement that fraud must be stated with particularity."  In re Ford Motor Co. Secs. Litig., 381 F.3d 563, 567 (6th Cir. 2004).  "[N]ot only must the complaint make particular factual allegations, but the inference of scienter which those allegations generate must be strong." PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 682 (6th Cir. 2004).

To establish liability under Section 10(b) and Rule 10b-5, a plaintiff must prove that the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94, n.12 (1976).  In the Sixth Circuit, reckless

behavior may suffice for liability under Section 10(b).  Robert N. Clemens Trust v. Morgan Stanley DW, Inc., 485 F.3d 840, 847 (6th Cir. 2007); Helwig v. Vencor, Inc., 251 F.3d 540, 548 (6th Cir. 2001) (en banc).  Recklessness is a mental state falling "somewhere between intent and negligence" and is characterized by "highly unreasonable conduct which is an extreme departure from the standards of ordinary care."  Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1025 (6th Cir. 1979).  "While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it."  Id.

The United States Supreme Court recently discussed  Section 10(b)'s scienter requirement in Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, 127 S.Ct. 2499 (2007).  The Court was called on to interpret the PSLRA's requirement that the allegations give rise to a "strong inference that the defendant acted with the required state of mind."

> In the case before us, the Court of Appeals for the Seventh Circuit held that the "strong inference" standard would be met if the complaint "allege[d] facts from which, if true, a reasonable person could infer that the defendant acted with the required intent."  437 F.3d 588, 602 (2006).  That formulation, we conclude, does not capture the stricter demand Congress sought to convey in § 21D(b)(2) [of the PSLRA].  It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind.  Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2) must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, as the Seventh Circuit did, but also competing inferences rationally drawn from the facts alleged.  An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.  To qualify as "strong" within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable - it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

127 S.Ct. at 2504-05.

The Supreme Court set the following guidelines for analyzing whether a complaint sufficiently pleads scienter.  "First, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."  127 S.Ct. at 2509.  "Second, courts must consider the complaint in its entirety . . . .  The inquiry, as several Courts of Appeals have

recognized, is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. (citing cases). "Third, in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Id.  With respect to this last point, the Court explained:

> The strength of an inference cannot be decided in a vacuum.  The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?  To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.  The inference that the defendant acted with scienter need not be irrefutable . . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible" - it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Id. at 2510.

### 2.    Plaintiffs' Allegations of Scienter

Plaintiffs allege at length that Credit Suisse knew that its representations concerning the note programs were false.  Below is a summary of the numerous allegations of Credit Suisse's scienter.

MetLife and Lloyds allege that Credit Suisse became aware of the fraud at National Century no later than 1999 when Credit Suisse performed a due diligence review of National Century's operations.  Credit Suisse performed the review as a part of National Century's ultimately unsuccessful efforts to arrange an initial public stock offering, which Credit Suisse was set to underwrite.  During the due diligence, Credit Suisse allegedly reviewed, or at least had access to, documents informing it that National Century's operations were fraudulent.  For instance, Credit Suisse had access to draft audit reports dating back to 1995.  These reports directly stated that National Century had not complied with the Master Indenture's requirements for purchasing accounts receivable because it had purchased receivables that were "significantly aged" and "deemed uncollectible."  Moreover, Credit Suisse allegedly had access to a June 25, 1999 document authored by PriceWaterhouseCoopers LLP reporting that National Century had improperly done

14

the following: purchased receivables older than 180-day limit set by the Master Indenture; listed ineligible receivables as collateral; and commingled or transferred funds between note programs. MetLife and Lloyds further allege that Credit Suisse received and reviewed an April 27, 1999 document authored by Kaye, Scholer, Fierman, Hays & Handler stating that National Century had not complied with certain documentary and reporting provisions of the Master Indenture.

MetLife and Lloyds allege that Credit Suisse continued to receive information informing it of problems at National Century. For instance, they allege that in July 2000 representatives from Credit Suisse and Fitch met to discuss Fitch's concerns about the note programs. Fitch allegedly told Credit Suisse that it had found evidence of a surprising amount of related party transactions, meaning that National Century was purchasing receivables from healthcare providers in which National Century or its Founders held a financial interest. MetLife and Lloyds further allege that Credit Suisse received documents from April and May 2001 indicating that National Century was over-advancing money to healthcare providers and that the reserve accounts had dropped below the required levels. Credit Suisse allegedly received a March 7, 2002 letter from Lance Poulsen, one of National Century's Founders, indicating that National Century was kiting funds between note programs in order to create the appearance that the reserve level requirements were being met. Further, an October 15, 2002 internal memorandum written by Poulsen allegedly stated that he had met with Credit Suisse about artificially boosting the reserve accounts.

The New York Funds and the Arizona Noteholders also make extensive allegations of scienter. They allege that, as part of the due diligence, Credit Suisse reviewed a draft registration statement stating that National Century had engaged in related party transactions. The draft identified by name several of the healthcare providers in which National Century or its Founders held interests, and it stated that related party transactions accounted for 36.3% of National Century's gross revenues in 1998. These Plaintiffs further allege that in 1998 one of Credit Suisse's financial clients, Freenius, contacted Credit Suisse about selling a healthcare business, NMC Homecare, to National Century. Credit Suisse helped arrange the sale of NMC Homecare and its receivables to National Century. In the process, Credit Suisse allegedly learned that National Century was buying

NMC Homecare's receivables even though they did not meet the eligibility standards described in the offering materials and Master Indenture.

The New York Funds and the Arizona Noteholders additionally allege that Credit Suisse knew of large shortfalls in the reserve accounts. In September 2000, Credit Suisse allegedly loaned $300 million to National Century for the specific purpose of using the money to hide the shortfalls in the reserve accounts of NPF VI and NPF XII. The New York Funds and the Arizona Noteholders also cite a July 15, 2002 report issued by Credit Suisse in which it admitted that it knew for several years that the note programs had violated the concentration limits set forth in the Master Indenture. Those concentration limits were supposed to restrict the note programs from purchasing too many of the same class of receivables and from purchasing too many receivables from any one provider.

The complaints also contain numerous indirect allegations of scienter. According to Plaintiffs, the alleged fraud at National Century was so great in magnitude, with losses between $2 and $3 billion, that insiders like Credit Suisse had to have known of the fraud. The complaints further allege the existence of many "red flags" that should have alerted Credit Suisse to the alleged fraud. Some of the red flags included: (1) Credit Suisse's receipt of anonymous letters raising specific concerns about the operation of the note programs; (2) Deutsche Bank, which at one time served as an underwriter, abruptly terminating its relationship with National Century in 2000; (3) PriceWaterhouseCoopers, which served as National Century's auditor, abruptly terminating its relationship with National Century in 1999; (4) unexplained delays in the issuing of audits; (5) Deloitte & Touche, which replaced PriceWaterhouse as auditor, failing to complete its audit in 2001 and stating that there were concerns about the quality of the receivables; and (6) Fitch downgrading its rating of the NPF VI and NPF XII notes.

Each of the Plaintiffs further allege that Credit Suisse had financial motives for continuing to market the notes and misrepresent their quality, despite knowing that the note programs had repeatedly committed material violations of the Master Indenture. Plaintiffs allege that Credit Suisse collected significant investment banking and placement fees in its role as placement agent. In addition, Plaintiffs allege that Credit Suisse stood to lose millions of dollars if it, the initial

purchaser of the notes, could not transfer the notes to the secondary market before National Century's alleged fraud was exposed.

### 3. Discussion

Credit Suisse offers four main reasons for why Plaintiffs' allegations of scienter are insufficient.  First, Credit Suisse interprets the allegations as showing that it discovered the fraud after the fact – after it had already sold the notes to Plaintiffs.  Second, Credit Suisse contends that the complaints allege that it merely had access to information.  Third, Credit Suisse argues that the allegations concerning due diligence support nothing more than an inference that Credit Suisse performed the due diligence review negligently.  Finally, Credit Suisse argues that the allegations of motive are nonsensical because Credit Suisse would not have increased its exposure to National Century after having learned of the alleged fraud.

Upon review of the complaints, the Court finds that each complaint supports a strong inference of scienter that is more compelling than the competing inferences suggested by Credit Suisse.  Credit Suisse contends that scienter cannot be established through allegations of "fraud by hindsight."  As a legal principle, this is true.  If a defendant did not know or recklessly disregard the falsity of the statement at the time it was made, then Section 10(b) liability cannot be imposed even if the statement turns out to be false in hindsight.  See Sinay v. Lamson & Sessions Co., 948 F.2d 1037, 1042 (6th Cir. 1991) (holding that allegations of fraud by hindsight are insufficient to withstand a motion to dismiss).  But Credit Suisse confuses how this principle applies here.  It does not matter, as Credit Suisse seems to believe it does, that the complaints are unable to trace Credit Suisse's alleged knowledge of the fraud to the time the alleged scheme to defraud investors was conceived.  What matters for purposes of Section 10(b) liability is that Credit Suisse is alleged to have known of the fraudulent scheme by the time it made misrepresentations to Plaintiffs.  See Sinay, 948 F.2d at 1040 (the issue is "whether the statement was false when made").  The complaints here thoroughly allege that Credit Suisse knew of the material aspects of the fraud – including the purchase of ineligible receivables, the related-party transactions, and the depletion and manipulation of reserve accounts – before it solicited and sold notes to Plaintiffs.

17

In an argument directed particularly at MetLife and Lloyds, Credit Suisse argues that the complaints allege only that Credit Suisse had access to information.  For instance, MetLife and Lloyds allege that Credit Suisse had access to draft audit reports and a PriceWaterhouseCoopers document when it performed the due diligence review.  Credit Suisse correctly notes that mere access to information is not enough to establish scienter.  See Fidel v. Farley, 392 F.3d 220, 229-30 (6th Cir. 2004); PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 688 (6th Cir. 2004).  In Fidel and PR Diamonds, the complaints alleged in conclusory fashion that the defendants, because of their positions with the companies committing the fraud, had access to information that would have given them knowledge of the fraud.  The complaints failed to allege what documents in particular the defendants had access to or what information they would have learned from reviewing the documents.

In contrast to the plaintiffs in Fidel and PR Diamonds, MetLife and Lloyds describe exactly what documents Credit Suisse had access to, why Credit Suisse likely would have reviewed them, and what Credit Suisse would have learned by reviewing them.  More importantly, as discussed in Part III.C.2 above, the complaints of MetLife and Lloyds go beyond allegations of mere access and describe what information Credit Suisse did review and know.  The complaints allege that Credit Suisse knew -- based on the Kaye Scholer memo, information from the meeting with Fitch, documents dated from April and May 2001, and correspondence with Lance Poulsen -- that National Century was purchasing ineligible receivables, making related-party transactions, and manipulating its depleted reserve accounts.  Thus, even putting aside the allegations of access, the complaints sufficiently allege that Credit Suisse reviewed information giving it knowledge of the alleged fraud.

Credit Suisse next contends that the complaints portray its performance of the due diligence review as negligent at best, and negligence is not sufficient to impose Section 10(b) liability.  See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 210 (1976) (holding that Section 10(b) "cannot be extended, consistently with the intent of Congress, to actions premised on negligent wrongdoing").  But the thrust of the complaints is not that Credit Suisse negligently performed the due diligence.

Rather, it is that Credit Suisse did perform the due diligence and did receive and review information providing it with knowledge of the material aspects of the alleged fraud. The Arizona Noteholders, for instance, quote Credit Suisse's own statement to investors that it had done "lots of due diligence." See, e.g., State of Arizona's Second Am. Compl., ¶108. Even if the allegations about the due diligence review, standing alone, do not create a strong inference of scienter, the Court must consider each complaint as a whole. Each complaint contains additional allegations of post-due diligence information Credit Suisse actually received and knew, as well as specific allegations of numerous red flags that would have alerted a reasonable person in Credit Suisse's position of the fraud. See PR Diamonds, 364 F.3d at 686 ("Specific factual allegations that a defendant ignored red flags, or warning signs that would have revealed the accounting errors prior to their inclusion in public statements, may support a strong inference of scienter."). All of these allegations, when combined with the due diligence allegations, create a strong inference of scienter.

Finally, Credit Suisse attacks the allegations of motive as being nonsensical. Credit Suisse questions why it would continue to serve as the initial purchaser of the notes if it knew of the fraud. No reasonable business, according to Credit Suisse, would expose itself to such a high risk of loss. Though Credit Suisse may ultimately be able prove this to be the case, the Court at this stage must accept the allegations in the complaints as true. The complaints allege that Credit Suisse continued its involvement in National Century because that was the best way for Credit Suisse to reduce its exposure. Plaintiffs allege that Credit Suisse, having become deeply involved in the fraudulent enterprise and with hundreds of millions of dollars of unsold notes on its hands, reduced its exposure by selling the notes to unsuspecting investors. And by selling the notes, Credit Suisse generated enough funds to keep the note programs going awhile longer.

In summary, the Court finds that each complaint alleges facts that, when taken as true and considered collectively, give rise to a strong inference of scienter. Credit Suisse has challenged isolated portions of the complaints but does not offer any competing explanations of the pleaded facts that are as plausible as Plaintiffs' explanations. The complaints portray Credit Suisse as an insider to the scheme to defraud. They describe a complete picture of Credit Suisse's participation,

19

knowledge, and motivation regarding National Century's alleged scheme to defraud investors – a fraud so great in magnitude that the most plausible inference is that Credit Suisse almost surely had to know of it.  See PR Diamonds, 364 F.3d at 684 -85 (finding that fraud of great magnitude, in combination with other factors, may support a strong inference of fraud).

###### D. Reliance

Credit Suisse next argues that Plaintiffs could not have justifiably relied on the alleged misrepresentations.  Credit Suisse points to several disclaimers contained in the offering materials, including that: (1) Credit Suisse did not do "any independent investigation" of the statements in the offering materials; (2) Credit Suisse made no "representations or warranties as to the accuracy or completeness of the information" contained in the offering materials; (3) prospective purchasers "must rely on their own examination" of the issuer and note offering; and (4) no person, apart from those "specifically designated," was "authorized to give any information or to make any representations other than those contained in [the memoranda]."  See Private Placement Memoranda and Supplemental Private Placement Memoranda, pp. 3-4.  Credit Suisse argues that no reasonable investor could have relied on any misrepresentations in the offering materials after seeing the disclaimers .

Credit Suisse contends that the Participation Agreement between it and Lloyds contained similar disclaimers to the ones in the offering materials.  The Agreement stated that Credit Suisse had not made any representations or warranties to Lloyds and that Lloyds was responsible for conducting its own examination of the NPF XII note program.  See Participation Agr., §12.

The Court finds that the disclaimers in the offering materials and Participation Agreement do not preclude Plaintiffs from showing that they justifiably relied on Credit Suisse's alleged misrepresentations.  The reasons why this is so are fully explained in Plaintiffs' briefs, and the Court will discuss them only briefly.  The issue of whether a party's reliance was justifiable is largely a question of fact inappropriate for resolution on a motion to dismiss.  See Bass v. Janney Montgomery Scott, Inc., 210 F.3d 577, 590 (6th Cir. 2000) ("[T]he question of whether [plaintiff's] reliance was reasonable is beyond doubt a question of fact for a jury to decide, and not a fit subject

for judgment as a matter of law."). This is particularly true here because the purported disclaimers were undermined or contradicted by other information allegedly available to potential investors. For instance, the disclaimer stating that Credit Suisse had done no independent investigation would seem beyond credulity to potential investors who knew that Credit Suisse, a major financial institution, had helped devise the note programs, helped draft the offering materials, and had purchased hundreds of millions of dollars of notes in its role as initial purchaser.

Other disclaimers stated that Credit Suisse was not making any representations of accuracy and that potential investors should rely on their own examinations. But those disclaimers were contradicted by a statement on the second page of the offering materials telling potential investors, "You should rely only on the information contained in this document." The very documents that Credit Suisse put into the hands of investors told them to rely on the statements made in those documents.

The last disclaimer -- the one in the offering materials stating that no person, apart from those "specifically designated," was authorized to make representations *other than those in the private placement memoranda* -- on its face did not apply to representations made in the offering materials. Moreover, the offering materials nowhere made a specific designation of who was authorized to make representations. In the absence of a specific designation otherwise, investors dealing with Credit Suisse, who served as placement agent for the notes and whose name appeared prominently on the front page of the offering materials, certainly had reason to believe that Credit Suisse was authorized to make representations.

Courts have long held that general disclaimers of accuracy do not shield sellers who knowingly make false statements. "[I]f a deliberate fraud may be shielded by a clause in a contract that the writing contains every representation made by way of inducement, or that utterances shown to be untrue were not an inducement to the agreement, sellers of bogus securities may defraud the public with impunity, through the simple expedient of placing such a clause in the prospectus which they put out, or in the contracts which their dupes are asked to sign." Arnold v. Nat'l Aniline & Chemical Co., 20 F.2d 364, 369 (2d Cir. 1927). As Plaintiffs argue, it would defeat the securities

21

laws if parties could escape liability for their own deliberate misrepresentations by inserting boilerplate disclaimers into offering materials.  See  Milman v. Box Hill Systems Corp., 72 F.Supp.2d 220, 231 (S.D.N.Y. 1999) ("[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made."); Jadoff v. Gleason, 140 F.R.D. 330, 335 (M.D.N.C. 1991) ("[U]pholding such disclaimers of reliance would give a 10b-5 defendant license to make any representations he desired with impunity.").

Indeed, Section 29(a) of the Securities Exchange Act prohibits the waiver of the substantive obligations of the Act.  It provides,  "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this title or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."  15 U.S.C. § 78cc(a); see AES Corp. v. Dow Chemical Co., 325 F.3d 174, 179 (3d Cir. 2003).  "[A] party cannot disclaim liability for fraudulent misrepresentations by placing a disclaimer to that effect in a contract. . . . This is especially true of fraud in securities transactions. 15 U.S.C. § 78cc voids any contract which purports to release an individual from obligations under the federal securities laws, or to waive any claims under those statutes before those claims accrue."  Katz v. First of Mich., No. K87-264 CA4, 1989 WL 62196, at *10 (W.D. Mich. March 13, 1989).  Thus, the Court finds that Credit Suisse's purported disclaimers do not preclude Plaintiffs from pleading justifiable reliance.

### E.     Statute of Limitations Challenge to Arizona Noteholders' Fraud Claims

Credit Suisse argues that a significant number of the Arizona Noteholders filed their fraud claims, as well as the rest of their common law claims, after Arizona's statute of limitations had run. The Arizona Noteholders filed two of their lawsuits on May 23, 2003 and the third suit on August 9, 2003.  Credit Suisse argues that the common law claims accrued upon the purchase of the notes, some of which had purchase dates in 1998, 1999, and early 2000.  Arizona law has a three-year statute of limitations for fraud-based claims and a two-year statute of limitations for other common law claims.  See Ariz. Rev. Stat. Ann. §§ 12-542, 12-543.

The Court must reject Credit Suisse's argument.  The Arizona Noteholders have alleged at length that Credit Suisse concealed its conduct.  They contend that the offering materials did not

disclose the fraudulent nature of National Century's operations, and when they approached Credit Suisse with concerns, Credit Suisse allegedly issued false assurances about the health of the NPF VI and NPF XII programs.  The statute of limitations is subject to a discovery rule whereby a claim accrues when a plaintiff knows, or by the exercise of due diligence should know, of the defendant's wrongful conduct.  See Taylor v. State Farm Mut. Auto. Ins., Co., 913 P.2d 1092, 1095, 185 Ariz. 174, 177 (Ariz. 1996); Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am., 898 P.2d 964, 966-67, 182 Ariz. 586, 588-89 (Ariz. 1995).  The complaints sufficiently allege that the Arizona Noteholders could not have reasonably discovered the wrongful conduct until the time of National Century's collapse in October 2002.

####     F.      Summary

For the reasons discussed above, the Court finds that the complaints of MetLife, Lloyds, and the New York Funds satisfy the pleading standard of the PSLRA and sufficiently state claims against Credit Suisse under Section 10(b).  Those same complaints, as well as the complaints of the Arizona Noteholders, satisfy the standard of Rule 9(b) in stating claims for fraud and negligent misrepresentation.


### IV.    STATE BLUE SKY LAW CLAIMS

MetLife, Lloyds, and the Arizona Noteholders have asserted claims under the blue sky laws of various states.  These laws prohibit the use of misrepresentations and material omissions in connection with the sale of securities.  Typically, a state's blue sky law will have provisions imposing  primary liability on sellers or solicitors who make untrue statements in connection with a sale, and it will have provisions imposing secondary liability on persons who materially aid the seller and on persons who control the seller.  See e.g., Ohio Rev. Code § 1707.41(A) (primary liability), § 1707.43(A) (secondary liability).

Credit Suisse opposes the blue sky law claims for the same reasons that it opposed the Section 10(b) and fraud claims.  It contends that it made no misrepresentations, did not have a duty to disclose, did not act with the requisite scienter, and that the disclaimers precluded reasonable

reliance by Plaintiffs.  As discussed in Part III above, those arguments are not persuasive.

Credit Suisse additionally argues that the blue sky law claims fail for the following reasons: (1) certain plaintiffs have not alleged any nexus to the particular states whose blue sky laws they invoke; (2) the claims of certain Arizona Noteholders are time-barred; (3) the Arizona Noteholders who are governmental entities lack standing to assert a claim; (4) there is no private right of action under the blue sky laws of New Jersey and Oregon; (5) the laws of several states do not apply to private placements; (6) the laws do not protect certain Arizona Noteholders who purchased notes from Credit Suisse in the aftermarket; (7) Credit Suisse did not sell or solicit the sale of notes to certain Arizona Noteholders who purchased notes from someone other than Credit Suisse; and (8) Credit Suisse did not materially assist or aid the sale of notes to those Arizona Noteholders who purchased notes from someone other than Credit Suisse.

### A.    Nexus with Certain States

#### 1.    Lloyds

Credit Suisse first contends that Lloyds has not alleged a sufficient nexus with New Jersey to assert a claim under the blue sky law of that state.  This is correct.  In its May 7, 2007 Opinion concerning the Outside Directors, the Court found:

> [T]he complaint of Lloyds (a British public limited company with its principal place of business in London, England), makes no allegations about where it was offered, or where it accepted an offer, to purchase notes.  The complaint alleges that Credit Suisse First Boston LLC served as lead underwriter for the notes.  According to the complaint, Credit Suisse First Boston LLC is a Delaware limited liability company, with its principal place of business in New York.  Banc One Capital Markets, a broker-dealer that allegedly had a role in the note offering, is incorporated in Delaware, with it principal place of business in Illinois.
>
> The Court finds that the complaint of Lloyds fails to contain any allegations that would bring the Outside Directors' alleged conduct within the scope of New Jersey's Blue Sky law.   On the face of the complaint, there is no connection between New Jersey and the Outside Directors' actionable conduct.  Lloyds has amended its complaint four times, and despite the Outside Directors raising this issue from the outset, the complaint fails to allege any connection to New Jersey.  Accordingly, Lloyds's claim under New Jersey's Blue Sky law is dismissed.

May 7, 2007 Opinion, p. 35.  Lloyds's complaint likewise fails to allege any connection between

New Jersey and Credit Suisse's actionable conduct, and, thus, Lloyds's claim under New Jersey's blue sky law is dismissed.

### 2. Certain Arizona Noteholders

Credit Suisse next argues that four of the Arizona Noteholders have not alleged a sufficient nexus with the state whose blue sky law they invoke. Those plaintiffs and states are: the State of Indiana Public Employees' Retirement Fund (Indiana); Mellon Investor Services LLC (New Jersey); Crown, Cork & Seal Company Master Retirement Trust (Pennsylvania); and the Metropolitan Government of Nashville and Davidson County (Tennessee). Each of these plaintiffs reside in the state whose law they invoke. Credit Suisse argues that residency is not enough; rather, there must be a purchase or an offer to buy or sell in a particular state before that state's blue sky law may be invoked.

According to the complaints, the State of Indiana Public Employees' Retirement Fund and the Metropolitan Government of Nashville and Davidson County acted through an investment advisor in Illinois. The Crown, Cork & Seal Company Master Retirement Trust acted through an investment advisor in Minnesota. The complaint is not entirely clear about Mellon Investor Services, but it groups Mellon with other plaintiffs from New York in a way suggesting that it acted through an advisor in New York. Credit Suisse does not challenge the claims these plaintiffs make under the laws of the states where their investment advisors were located or under the law of Ohio, where National Century was headquartered. It challenges only the residency-based claims.

Each of the blue sky laws at issue apply to the "offer, sale, or purchase" of a security in that state. See Ind. Code § 23-2-1-12; N.J. Stat. Ann. § 49:3-51(a); 70 Pa. Cons. Stat. § 1-401; Tenn. Code Ann. § 48-2-121(a). Credit Suisse argues that the sales here occurred in the state where the plaintiff's agent was located, not where plaintiff resided. Plaintiffs counter that each state has an interest in protecting its residents and that the blue sky laws may validly be applied to protect residents who have been defrauded in purchasing securities.

The Court finds that these blue sky law claims should survive the motion to dismiss. Typically, a defrauded buyer of a security may assert a blue sky claim under the law of his own

state. In <u>A.S. Goldmen & Co., Inc. v. New Jersey Bureau of Securities</u>, 163 F.3d 780, 787 (3d Cir.

1999), the Third Circuit recognized that securities transactions often are not confined to one state.

Courts should look to where the "elements of the transaction have occurred." <u>Id</u>. Thus, a "contract

between [a seller] in New Jersey and a buyer in New York does not occur 'wholly outside' New

Jersey, just as it does not occur 'wholly outside' New York. Rather, elements of the transaction

occur in each state, and each state has an interest in regulating the aspect of the transaction that

occurs within its boundaries." <u>Id</u>. Here, the plaintiffs assert claims under the laws of their own

state, the state of the seller, and the state where their investment advisors were located. At this early

stage, the Court cannot say that the laws of the states where plaintiffs resided do not apply.

### B. Statute of Limitations

Credit Suisse argues that the claims of certain Arizona Noteholders are barred by the

applicable statutes of limitations. The Arizona Noteholders filed two of their lawsuits on May 23,

2003 and the third suit on August 9, 2003. The complaints allege that notes were purchased in 1998

and early 1999 by the Asset Allocation & Management Plaintiffs, Bayerische Landesbank, Mutual

of New York, SanPaolo IMI, and United of Omaha Insurance Company. Credit Suisse argues the

Ohio blue sky law claims being asserted on those notes are time-barred under the applicable two-

year statute of limitations. Credit Suisse also argues that United of Omaha's Nebraska law claim

is barred by Nebraska's three-year statute of limitations. <u>See</u> Neb. Rev. Stat. § 8-1118(4).

The Noteholders argue that the statute of limitations should be tolled because Credit Suisse

fraudulently concealed its conduct until October 2002. The Court agrees that the complaints amply

allege that Credit Suisse concealed the fraud; however, Ohio law sets a cut-off of four years for

bringing a blue sky claim. At the time the Noteholders filed suit, Ohio's blue sky law provided that

no action could be brought "more than two years after the plaintiff knew, or had reason to know,

of the facts by reason of which the actions of the person or director were unlawful, or more than

four years from the date of such sale or contract for sale, whichever is the shorter period." Ohio

Rev. Code § 1707.43(B) (2003). Thus, § 1707.43(B) has a two-year statute of limitations, which

may be tolled, and a four-year statute of repose, which may not be tolled. <u>See</u> <u>Wyser-Pratte Mgmt.</u>

Co., Inc. v. Telxon Corp., 413 F.3d 553, 561 n.7 (6th Cir. 2005); Cain v. Mid-Ohio Secs., Inc., No. 06CA008933, 2007 WL 2080553, at *2 (Ohio Ct. App. July 23, 2007).  Claims must be brought within two years after the discovery of facts constituting the violation or within four years from the date of the sale or contract for sale, "whichever is the shorter period."  Cf. Bovee v. Coopers & Lybrand, 216 F.R.D. 596, 603-04 (S.D. Ohio 2003) (discussing similar language in 15 U.S.C. § 78i(e) and noting that actions brought under Section 10(b) "are subject to a one-year statute of limitations and a three-year statute of repose. . . . Securities fraud claims must be brought within one year after the discovery of the facts constituting the violation and within three years after the violation.").  Four years will be the shorter period where, as alleged here, the fraud was concealed for more than two years.  The claims based on the 1998 and early 1999 note purchases were not asserted within four years of sale or contract for sale.

On September 16, 2003, an amendment became effective that changed the four-year period of repose to five years.  Ohio Rev. Code §1707.43(B) (2004).  The Noteholders argue that their claims should be covered by the amended, five-year period, which went into effect shortly after they filed suit.  The issue presented is whether claims that were time-barred when filed can be revived by a later extension of the limitations period.  The general rule, including in Ohio, is that laws do not have retroactive effect absent express legislative directive otherwise.  See Ohio Rev. Code § 1.48 ("A statute is presumed to be prospective in its operation unless expressly made retrospective."); Van Fossen v. Babcock & Wilcox Co., 36 Ohio St.3d 100,  105, 522 N.E.2d 489, 495 (Ohio 1988).  In the securities context, courts have refused to apply lengthened statutes of limitations retroactively unless the legislature says otherwise.  See In re Wright Enterprises, 76 Fed.Appx. 717, 723, 2003 WL 22232919, at *5 (6th Cir. 2003) (holding that lengthened limitations period for Kentucky blue sky law claim did not apply retroactively); Aetna Life Ins. Co. v. Enter. Mortgage Acceptance Co., 391 F.3d 401, 409-11 (2d Cir. 2004) (holding that Sarbanes-Oxley did not revive federal securities claim already time-barred prior to the effective date of the amendment).  Here, there is no language in § 1707.43 expressing a legislative intent for the five-year period to apply retroactively.  Accordingly, the Ohio blue sky law claims based on note purchases made in

1998 and early 1999 are time-barred.  This means that the Asset Allocation & Management Plaintiffs and SanPaolo IMI, who made all of their note purchases in 1998 and early 1999, have no claims remaining under Ohio's blue sky law.  Bayerische Landesbank, Mutual of New York, and United of Omaha made other note purchases in 2000, 2001, and 2002, and they still may pursue claims under Ohio's blue sky law for those later transactions.

Turning to Nebraska's blue sky law, the result is the same for United of Omaha.  Section 8-1118 provides that "[n]o person may sue under this section more than three years after the contract of sale or the rendering of investment advice."  Neb. Rev. Stat. § 8-1118(4).  Though case law is scarce, courts have held that "equitable tolling principles are no part of section 8-1118." Farr v. Designer Phosphate and Premix Intern., Inc., 804 F.Supp. 1190, 1199 (D. Neb. 1992); see also DeSciose v. Chiles, Heider & Co., Inc., 239 Neb. 195, 207, 476 N.W.2d 200, 207 (Neb. 1991). Thus, United of Omaha's Nebraska law claim for its 1998 note purchase is time-barred.  United of Omaha may still pursue claims based on its note purchases in 2001 and 2002.

### C.    Standing

Credit Suisse next argues that the Arizona Noteholders who are governmental entities lack standing to assert a claim.  In this litigation, there are 110 local governmental entities who are part of an investment pool managed by the treasurer of the State of Arizona.  Under Arizona law, "the state treasurer may maintain one or more pooled investment funds for the collective investment of monies in this state."  Ariz. Rev. Stat. Ann. § 35-326.A.  The treasurer directs how the investment pool is invested, regularly accounts for the funds in the pool, ensures that records are audited, disburses or reinvests mature securities, and allocates pooled income earnings on a pro rata basis. Ariz. Rev. Stat. Ann. § 35-327.  Credit Suisse argues that the individual governmental entities never purchased notes; only the treasurer purchased notes, and only the treasurer, as trustee of the investment pool, has standing to sue on behalf of the investment pool.

The Court finds that the standing issue raised by Credit Suisse is moot.  Credit Suisse acknowledges that a trustee of a trust generally has the authority to pursue a cause of action for injury to the trust property.  In the complaint captioned  State of Arizona, et al., v. Credit Suisse

First Boston, et al., Case No. CIV03-1618-PHX (D. Ariz.), the first plaintiff listed is the State of Arizona, ex rel. Treasurer David A. Peterson, in his official capacity on behalf of the local government investment pool.  Even if Credit Suisse is right that the individual governmental entities do not have standing, the state treasurer does and he is named as a plaintiff.

> ### D.    Private Right of Action

Credit Suisse argues that there is no private right of action under certain provisions of New Jersey's and Oregon's blue sky laws.  In both cases, there is a provision describing the prohibited conduct, see N.J. Stat. Ann.§ 49:3-52, Or. Rev. Stat. § 59.135, and a provision authorizing a civil remedy for any violations, see N.J. Stat. Ann. § 49:3-71, Or. Rev. Stat. § 59.115.  And in both cases, courts have held that there is no private right of action under the provision describing the prohibited conduct.  See Resolution Trust Corp. v. Del Re Castellet, No. 92-4635, 1993 WL 85973, at *5-6 (D.N.J. March 8, 1993) ("[A] private cause of action for defrauded sellers was not intended under N.J.S.A. 49:3-52.");  Rolex Employees Retirement Trust v. Mentor Graphics Corp., No. 90-726-CR, 1991 WL 45714, at *3 (D. Or. Mar. 26, 1991) ("A private right of action does not exist under [O.R.S. 59.135] independently, but rather may only be maintained through O.R.S. 59.115(1)(a).").

MetLife has asserted claims against Credit Suisse under §§ 49:3-52 and 49:3-71 of New Jersey law.  Oregon Insurance Guaranty Association, one of the Arizona Noteholders, has asserted claims against Credit Suisse under §§ 59.115(3) and 59.135 of Oregon law.  The Court will dismiss MetLife's claim under N.J. Stat. Ann.§ 49:3-52 and Oregon Insurance Guaranty Association's claim under Or. Rev. Stat. § 59.135, but their claims under the respective civil remedy provisions may go forward.

> ### E.    Private Placements

Credit Suisse next contends that the blue sky laws of six states do not apply to private placements.  Those states are the ones whom Credit Suisse claims have modeled their laws after Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(a)(2): Arizona, California, Massachusetts, Nebraska, New Jersey, and Ohio.  Credit Suisse argues that the blue sky laws of these states should be interpreted the same as courts have interpreted Section 12(2).  In Gustafson

v. Alloyd Co., Inc., 513 U.S. 561, 569-70 (1995), the United States Supreme Court held that Section 12(2) applies to public offerings of securities and not to private agreements to sell securities. Credit Suisse believes that the state laws should also not apply to private sales, such as the ones to MetLife, Lloyds, and the Arizona Noteholders.

The Court rejected this argument when it was raised by the Outside Directors in the context of Ohio's blue sky law. See May 7, 2007 Opinion, pp. 27-29. Section 12(2) imposes liability for misstatements in a "prospectus" or an oral communication related to a prospectus. 15 U.S.C. § 77*l*(a)(2). In Gustafson, the Supreme Court held that a prospectus "is confined to documents related to public offerings by an issuer or its controlling shareholders." 513 U.S. at 569. In reaching this conclusion, the Supreme Court looked to the definition of "prospectus" in other provisions of the Securities Act and looked to the traditional understanding of the word as referring to a public offering. Id. at 568-71, 575-76.

The state blue sky laws at issue are not limited in application to a prospectus. In fact, the California, Massachusetts, Nebraska, and New Jersey laws do not use the word "prospectus." See Cal. Corp. Code § 25401 (applying to "any written or oral communication"); Mass. Gen. Laws ch. 110A, § 410(a)(2) (applying to "any untrue statement"); Neb. Rev. Stat. § 8-1118(1) (applying to "any untrue statement"); N.J. Stat. Ann. § 49:3-71(a)(2) (applying to "any untrue statement"). And as discussed in the May 7, 2007 Opinion, Ohio's law applies to statements in a prospectus and to statements in a "circular," a term the Ohio Supreme Court has interpreted as including private placement memoranda. See Ohio Rev. Code § 1707.41(A); Arpadi v. First MSP Corp., 68 Ohio St.3d 453, 454, 628 N.E.2d 1335, 1336 (Ohio 1994); see also Black's Law Dictionary (8th ed. 2004) (defining an "offering circular" as a "document, similar to a prospectus, that provides information about a *private* securities offering") (emphasis added).

This leaves only Arizona's blue sky laws in question. The Arizona Noteholders concede that one provision regulating the offerings of securities, Ariz. Rev. Stat. Ann. § 44-1998(A), is restricted to untrue statements "by means of a prospectus," and a court has held that § 44-1998(A) does not apply to private placements. See Orthologic Corp. v. Columbia/HCA Healthcare Corp., No. CIV

01-0006-PHX-SRB, 2002 WL 1331735, at *8 (D. Ariz. Jan. 7, 2002).  However, the complaints of the Arizona Noteholders also assert a claim under another provision regulating the purchase or sale of securities, Ariz. Rev. Stat. Ann. § 44-1991(A).  This provision applies to "any untrue statement," and courts have applied it to private placements.  See, e.g., MacCollum v. Perkinson, 185 Ariz. 179, 186-87, 913 P.2d 1097, 1104-05 (Ariz. Ct. App. 1996).  Accordingly, the Arizona Noteholders may pursue a claim against Credit Suisse under § 44-1991(A).

> **F.** **Aftermarket**

A limited number of the Arizona Noteholders purchased notes several months or years after the initial offering date.  For example, in May 2002 Mellon Investor Services purchased from Credit Suisse securities that were issued in March 1999.  The other Noteholders who made aftermarket purchases from Credit Suisse are: the AmerUs Plaintiffs, Bristol CDO I Ltd., the Dreyfus Plaintiffs, the GMO Plaintiffs, Mutual of New York Life Insurance Company, Oregon Insurance Guaranty Association, and Phoenix Life Insurance Company.

Credit Suisse challenges the claims being asserted by these aftermarket Noteholders under the laws of Connecticut, Massachusetts, New Jersey, and Ohio.  Credit Suisse raises the same argument that it made about private placements.  It argues that under Gustafson's interpretation of the word "prospectus," courts have limited the application of Section 12(2) of the Securities Act of 1933 to initial public securities offerings.  See First Union Discount Brokerage Services, Inc. v. Milos, 997 F.2d 835, 843 (11th Cir. 1993); In re FirstEnergy Corp. Sec. Litig., 316 F.Supp.2d 581, 602 (N.D. Ohio 2004).  According to Credit Suisse, the blue sky laws should also be limited to initial offerings.

Again, however, the laws at issue here are not limited in scope to a prospectus.  Rather, the laws of Connecticut, Massachusetts, and New Jersey apply to "any untrue statement," and Ohio law applies to both a prospectus and a circular.  See Conn. Gen. Stat. § 36b-29(a); Mass. Gen. Laws ch. 110A, § 410(a)(2); N.J. Stat. Ann. § 49:3-71(a)(2); Ohio Rev. Code § 1707.41(A).  Credit Suisse has not cited any statutory language or case law suggesting that the state laws at issue do not apply to aftermarket transactions.  Absent such authority, Credit Suisse's position is contrary to the

principle that courts should liberally construe state blue sky laws. See Connecticut Nat'l Bank v. Giacomi, 242 Conn. 17, 78, 699 A.2d 101, 133 (Conn. 1997); Zendell v. Newport Oil Corp., 226 N.J.Super. 431, 439, 544 A.2d 878, 882 (N.J. Super. Ct. 1988); In re Columbus Skylines Securities, Inc., 74 Ohio St.3d 495, 498, 660 N.E.2d 427, 429 (Ohio 1996).

### G. Primary Liability as a Seller or Solicitor

A limited number of the Arizona Noteholders allege that they purchased all of their notes from someone other than Credit Suisse. These Noteholders and the blue sky law claims they assert are: Abu Dhabi Investment Company (Ohio), the Clifton Group Plaintiffs (Minnesota, Pennsylvania, Ohio), Louisiana Corporate Credit Union (Louisiana, Ohio), Oregon Insurance Guaranty Association (Oregon, Ohio), and select members of the Pacific Investment Management Company Plaintiffs[2] (California, Ohio). Two other Noteholders -- Bayerische Landesbank (Ohio) and Phoenix Life Insurance Company (Connecticut, Ohio) -- purchased some, but not all, of their notes from someone other than Credit Suisse.

### 1. Privity

Credit Suisse argues that the claims for primary liability under California and Oregon law must be dismissed because those laws require strict privity, such that liability does not extend to a party who solicits the sale of a security but does not pass title. The Court agrees that the claims for primary liability under California and Oregon law must be dismissed for lack of privity. California Corporations Code § 25501 limits primary liability to a person who "sells a security." Cal. Corp. Code § 25501; see also Scognamillo v. Credit Suisse First Boston LLC, No. C03-2061 2005 WL 645446, at *11 (N.D. Cal. March 21, 2005); California Amplifier, Inc. v. RLI Ins. Co., 94 Cal.App.4th 102, 109, 113 Cal.Rptr.2d 915, 921 (Cal. Ct. App. 2001). Privity is not alleged to have existed between Credit Suisse and select members of the Pacific Investment Management Company Plaintiffs; thus, their claims for primary liability under California's blue sky law are dismissed.

Oregon law also required privity at the time of the alleged actionable conduct. See Or. Rev.

---

[2] The members of the Pacific Investment Management Company Plaintiffs who did not purchase notes directly from Credit Suisse are listed in Exhibit 1 to the Arizona Noteholders' complaints.

Stat. § 59.115(1)(a) (2002) (imposing liability on a person who "sells a security").  Only after the Arizona Noteholders filed their complaints was the law amended to expand liability to persons who solicit the sale of a security.  See Or. Rev. Stat. § 59.115(1)(a) (2004) (expanding liability but not indicating a retroactive effect).  Privity is not alleged to have existed between Credit Suisse and the Oregon Insurance Guaranty Association when the note purchase was made in 2002; thus, the claim for primary liability under Oregon's blue sky law is dismissed.

>          **2.          Solicitor Liability**

The remainder of the blue sky laws at issue lack a privity requirement and thus extend liability to persons who solicit the sale of a security.  The Noteholders allege that Credit Suisse is liable as a solicitor because it drafted the offering materials, which all of the Noteholders are alleged to have received.  Credit Suisse counters that merely drafting the offering materials does not count as soliciting the sale of the notes.

In determining the scope of primary liability, state courts have looked to Pinter v. Dahl, 486 U.S. 622 (1988), a case in which the United States Supreme Court interpreted Section 12(1) of the Securities Act.  Section 12(1), like the blue sky laws here, applies to any person who sells or offers to sell a security.  See 15 U.S.C. § 77*l*(a)(1).  The Court held that primary liability can be imposed on the person who passes title and on "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  Pinter, 486 U.S. at 647.  "A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase."  Id. at 644.

The Court finds that the complaints sufficiently allege that Credit Suisse solicited the sale of the notes.  Even where Credit Suisse was not the immediate seller, it is alleged to have participated in drafting and circulating the offering materials received by all of the Arizona Noteholders and their investment advisors.  Credit Suisse allegedly played a key role in devising the NPF VI and NPF XII note programs and in soliciting investors nationwide, and it allegedly had a financial interest in the existence of a strong and active secondary market for the notes.  As the Arizona Noteholders argue in their brief, courts have held that drafting, circulating, or presenting

33

written sales material may, in the right circumstances, be enough to impose liability. See, e.g, Capri v. Murphy, 856 F.2d 473, 478 (2d Cir. 1988) (finding liable a defendant who prepared and circulated a prospectus to plaintiffs); In re Prof'l Fin. Mgmt., Ltd., 692 F.Supp. 1057, 1064 (D. Minn. 1988) (finding liable a defendant who was "the creator and principal proponent of the [securities] program nationally" and who "assisted with financial appraisals and helped draft a prospectus which was distributed to prospective buyers").

### H.    Secondary Liability

Finally, Credit Suisse challenges the secondary liability claims of the same Noteholders who purchased their notes from someone other than Credit Suisse. The blue sky laws at issue impose secondary liability on persons who participate in or materially assist or aid the fraudulent sale of securities. See, e.g, Cal. Corp. Code § 25504.1; Conn. Gen Stat. § 36b-29(a)(2); Ohio Rev. Code § 1707.43(A); Or. Rev. Stat. § 59.115(3). The Court finds that the complaints sufficiently allege that Credit Suisse participated in and materially assisted the sales to the Noteholders. The complaints allege that Credit Suisse played a material role in inducing the Noteholders to buy notes because it drafted and circulated the offering materials that were received and relied on by the Noteholders when they decided to purchase notes. See Federated Mgmt. Co. v. Coopers & Lybrand, 137 Ohio App.3d 366, 391, 738 N.E.2d 842, 860 (Ohio Ct. App. 2000) (noting that liability extends to any person who participates in or aids the sale, including "inducing the purchaser to invest").

### V.    NEGLIGENCE

MetLife, Lloyds, and the New York Funds assert claims for negligence. Credit Suisse argues that the negligence claims should be dismissed because they are indistinguishable from Plaintiffs' negligent misrepresentation claims. Upon review of the complaints, the Court agrees that the negligence claims are indistinguishable from the claims for negligent misrepresentation. The complaints allege that Credit Suisse breached its duty of care by misrepresenting and failing to disclose material facts concerning the NPF VI and NPF XII note programs. This is the same

conduct that forms the basis of the negligent misrepresentation claims. The Court will therefore will treat the negligence claims as claims for negligent misrepresentation. See Northwestern Mut. Life Ins. Co. v. Banc of Am. Sec. LLC, 254 F.Supp.2d 390, 401 (S.D.N.Y. 2003) ("The Complaint alleges negligence . . . but makes no specific allegations other than the alleged oral misrepresentations and omissions and the alleged misstatements in the Offering Memoranda."); Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P., 40 F.Supp.2d 183, 188 (S.D.N.Y. 1999) ("[T]he Court does not find any substantial difference between Vanguard's negligence and negligent misrepresentation claims and will address them together as a claim for negligent misrepresentation.").

## VI. AIDING AND ABETTING

The Arizona Noteholders and the New York Funds have asserted claims for aiding and abetting fraud against Credit Suisse. The Arizona Noteholders additionally assert a claim for aiding and abetting breach of fiduciary duty. Though the case law is unclear about whether a cause of action exists in Ohio for civil aiding and abetting, see Pavlovich v. National City Bank, 435 F.3d 560, 570 (6th Cir. 2006) ("It is unclear whether Ohio recognizes a common law cause of action for aiding and abetting tortious conduct."), this Court has held in prior orders that it will decline to dismiss the aiding and abetting claims on a Rule 12(b)(6) motion, because it cannot be said conclusively that Ohio law does not recognize such a cause of action. See May 7, 2007 Opinion, p. 58; Oct. 3, 2006 Opinion, pp. 15-17.

Credit Suisse argues that the Arizona Noteholders and the New York Funds have failed to allege the elements of an aiding and abetting claim. Those elements are: "(1) knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act." Andonian v. A.C. & S., Inc., 97 Ohio App.3d 572, 574-75, 647 N.E.2d 190, 191-92 (Ohio Ct. App. 1994); see also Aetna Cas. and Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 533 (6th Cir. 2000). Courts have interpreted the first element as requiring actual knowledge of the underlying tortious conduct. See Aetna, 219 F.3d at 533; Javitch

v. First Montauk Fin. Corp., 279 F.Supp.2d 931, 946 (N.D. Ohio 2003); see also In re Sharp Int'l Corp., 403 F.3d 43, 49 (2d Cir. 2005).  A plaintiff, however, need not allege that the aider and abettor had actual knowledge "of all of the details of the primary party's scheme."  Aetna, 219 F.3d at 536.  "[I]t is enough for the aider and abettor to have a general awareness of [his] role in the other's tortious conduct for liability to attach."  Id. at 534 (citing Camp v. Dema, 948 F.2d 455, 460 (8th Cir. 1991)).  A plaintiff may use circumstantial evidence to support an inference of actual knowledge.  Id. at 535.

Credit Suisse argues the complaints do not allege that it had actual knowledge of the fraud.  But as discussed above in relation to the scienter requirement of the Section 10(b) and fraud claims, the complaints of the Arizona Noteholders and the New York Funds allege at length that Credit Suisse had actual knowledge of the purchase of ineligible receivables, related-party transactions, the depletion and manipulation of reserve accounts, and violations of the Master Indenture.  Suffice to say, the complaints support an inference that when Credit Suisse offered to sell the notes to potential investors, it had actual knowledge that the notes were not the high-quality investment Credit Suisse allegedly made them out to be.

With respect to the Arizona Noteholders' claim for aiding and abetting breach of fiduciary duty, Credit Suisse similarly argues that it did not have actual knowledge of the Founders' purported breaches.  In an earlier order, the Court found that the Arizona Noteholders had stated a claim for breach of fiduciary duty against the Founders.  See Feb. 27, 2006 Order, pp. 24-27.  The Founders allegedly breached their duties to the company and to creditors by wasting corporate assets when National Century was insolvent.  Here, the Court finds that the Arizona Noteholders sufficiently allege that Credit Suisse had actual knowledge of the Founders' breaches.  The complaints allege that Credit Suisse knew the Founders were wasting corporate assets by purchasing ineligible receivables and by purchasing receivables from related parties.

Credit Suisse next argues that the complaints fail to allege that it substantially assisted the tortious conduct.  This argument is without merit, for the complaints plainly allege that Credit Suisse helped devise the note programs, helped draft and review the offering materials, and sold

notes to investors.

## VII.   BREACH OF CONTRACT

The Arizona Noteholders and Lloyds assert claims for breach of contract.  The Arizona Noteholders allege that they entered into sales contracts with Credit Suisse.  The terms of the contracts allegedly were the same as the representations contained in the offering materials.  They contend that Credit Suisse breached the sales contracts because the notes it delivered did not conform with the representations made in the offering materials.

Lloyds alleges that it entered into a Participation Agreement in which it purchased $68 million of NPF XII notes from Credit Suisse.  Lloyds alleges that, in breach of the Agreement, Credit Suisse delivered notes that were not properly secured and were worth far less than what Lloyds paid.

Credit Suisse argues that the only obligation that it had under the sales contracts and Participation Agreement was to deliver the notes, which it did.  It further argues that the complaints do not specify how the contracts were breached and that the contracts cannot be rewritten to incorporate the language of the offering materials.

It is true that the exact nature of the breach of contract claims are not entirely clear.  The Arizona Noteholders allege that the terms of the sales contracts were the same as those of the offering materials.  Lloyds alleges that the Participation Agreement required the notes to be properly secured and of a certain worth.  Nonetheless, applying the liberal standard of Fed. Rule Civ. P. 8(a), the complaints allege each element of a breach of contract claim: (1) the existence of a contract between the parties, (2) performance by the Plaintiffs, who paid the contract amounts for the notes; (3) a breach by Credit Suisse, who did not deliver notes of a certain type or quality, and (4) damages to the Plaintiffs.  See Lawrence v. Lorain County Cmty. Coll., 127 Ohio App.3d 546, 549, 713 N.E.2d 478, 480 (Ohio Ct. App. 1998).  These allegations are sufficient to survive a motion to dismiss.

Credit Suisse next argues that Plaintiffs cannot consistently assert their breach of contract

claims and tort claims.  "[T]he existence of a contract action generally excludes a cause of action based upon the same conduct sounding in tort."  Hanlin v. Ohio Builders and Remodelers, Inc., 196 F.Supp.2d 572, 579 (S.D. Ohio 2001).  Credit Suisse points out that the alleged breaches seem to be based on the same conduct on which the tort claims are based, namely, the misrepresentations in the offering materials.  The Court finds that dismissing the tort claims for this reason would be premature.  Under the rules of civil procedure, a party may assert inconsistent claims at the pleading stage.  See Fed. R. Civ. P. 8(d)(3).  Development of the facts will show whether pursuit of the contract claims would operate to exclude Plaintiffs' tort claims.

## VIII.  THE ARIZONA NOTEHOLDERS' OTHER CLAIMS

### A.    Conspiracy

The Arizona Noteholders allege that Credit Suisse conspired with National Century and the Founders to defraud investors.  A civil conspiracy is "'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'"  Kenty v. Transamerica Premium Ins. Co., 72 Ohio St.3d 415, 419, 650 N.E.2d 863, 866 (Ohio 1995) (quoting LeFort v. Century 21-Maitland Realty Co., 32 Ohio St.3d 121, 126, 512 N.E.2d 640, 645 (Ohio 1987)).  The elements of a civil conspiracy claim are: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy."  Universal Coach, Inc. v. New York City Transit Auth., Inc., 90 Ohio App.3d 284, 292, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993).

Credit Suisse argues that the complaints fail to allege that it entered into an agreement with another party.  The element of a malicious combination "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act."  Gosden v. Louis, 116 Ohio App.3d 195, 219, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996).  Because "conspirators seldom make records of their illegal agreements," United States v. Short, 671 F.2d 178, 182 (6th Cir. 1982), the existence of an agreement is often "provable only through circumstantial evidence."  Aetna Cas. and Sur. Co. v. Leahey Constr. Co., 219 F.3d 519,

538 (6th Cir. 2000) (discussing a conspiracy claim under Ohio law).  A plaintiff need not show that co-conspirators made an agreement as to every detail of the plan; rather, plaintiff must show that the co-conspirators "'shared in the general conspiratorial objective.'"  Id. (quoting Hooks v. Hooks, 771 F.2d 935, 944 (6th Cir. 1985)); see also Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007); Borden, Inc. v. Spoor Behrins Campbell & Young, Inc., 828 F.Supp. 216, 225 (S.D.N.Y. 1993) ("[T]o demonstrate a conspiracy, plaintiffs need not show that each conspirator agreed to every detail of the conspiracy but only that each agreed on the 'essential nature of the plan.'").

Courts are not in unison as to whether Rule 8 or Rule 9 applies to pleading the existence of an agreement to commit fraud.  Compare Southern Union Co. v. Southwest Gas Corp., 165 F.Supp.2d 1010, 1020 (D. Ariz. 2001) (requiring plaintiff to allege with particularity that defendants reached an understanding or agreement), with In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 175 F.Supp.2d 593, 634 (S.D.N.Y. 2001) ( applying Rule 8 and recognizing that, because conspiracies are by their nature often clandestine, it is typically difficult to plead with specificity the facts necessary to show the existence of an unlawful agreement).  The Sixth Circuit has not addressed which pleading standard should be applied.  Out of caution, this Court will apply Rule 8.  Cf. Bell Atlantic Corp. v. Twombly, _ U.S. _, 127 S.Ct. 1955, 1964-65 (2007) (applying Rule 8 to conspiracy claim under § 1 of the Sherman Act and requiring that the complaint plead "plausible grounds to infer an agreement").

The Court finds that the complaints adequately allege the existence of a common understanding between Credit Suisse and the Founders.  The Arizona Noteholders allege that Credit Suisse and the Founders conspired to effect the fraudulent sale of NPF VI and NPF XII notes.  Credit Suisse is alleged to have had a strong relationship with the Founders and National Century, beginning with the selection of Credit Suisse as National Century's financial advisor.  Representatives of Credit Suisse allegedly accompanied Lance Poulsen on sales presentations throughout the country.  The complaints allege that Credit Suisse had access to National Century's financial information and knew that National Century was purchasing ineligible receivables from healthcare providers in which the Founders had a financial interest.  Further, Credit Suisse is alleged

to have known that the reserves of the NPF VI and NPF XII note programs were dwindling and that more notes had to be issued and sold to keep the programs afloat.  In sum, the complaints allege that Credit Suisse marketed and sold notes, knowing of National Century's deepening insolvency and understanding that the funds invested would be misappropriated by National Century and the Founders.  The Court finds that these allegations are sufficient to state a claim for conspiracy.

### B.  Unfair Competition

A group of the Arizona Noteholders named the GMO Plaintiffs assert a claim under Massachusetts's unfair competition statute, which  prohibits unfair methods of competition and deceptive practices occurring "primarily and substantially within the commonwealth."  Mass. Gen. Laws ch. 93A, § 11.  Credit Suisse argues that this claim must be dismissed because the unfair conduct is not alleged to have occurred primarily and substantially within Massachusetts.

The Court finds that the complaint sufficiently invokes the unfair competition statute.  "In determining whether the conduct occurred 'primarily and substantially' in Massachusetts, we will look to three factors: (1) where the defendant engaged in unfair or unscrupulous conduct; (2) where the plaintiff was on the receiving end of the unfair or unscrupulous conduct; and (3) the situs of plaintiff's losses due to the unfair and unscrupulous conduct."  KPS & Associates, Inc. v. Designs By FMC, Inc., 318 F.3d 1, 24 (1st Cir. 2003) (citing cases).  The GMO Plaintiffs have their principal place of business in Boston, Massachusetts.  They allege that representatives of National Century and Credit Suisse made sales presentations at GMO's offices in Boston in May 2001.  They further allege that Massachusetts is where they were provided with offering materials, where they made the decision to purchase notes, and where they suffered losses.  Thus, the GMO Plaintiffs have adequately alleged that the unfair conduct occurred primarily and substantially in Massachusetts.

### C.  Unjust Enrichment

The Arizona Noteholders allege that Credit Suisse wrongly benefitted from its role in the securities offerings, to the harm of the Noteholders.  Though Credit Suisse argues that the complaints fail to allege how it was unjustly enriched, the Court finds that the complaints clearly

allege that Credit Suisse unjustly received significant investment banking and placement fees in its role as lead underwriter.

### D.    Punitive Damages

The Arizona Noteholders' complaints contain a demand for punitive damages.  Credit Suisse argues that the complaints do not allege the requisite mental state.  "Under Ohio law, an award of punitive damages in a tort case may be made only upon a finding of  actual malice, fraud, oppression, or insult on the part of the defendant."  Estate of Schmidt v. Derenia, 158 Ohio App.3d 738, 740, 822 N.E.2d 401, 404 (Ohio Ct. App. 2004).  The Court finds that the Arizona Noteholders have stated a claim for fraud and are therefore entitled to an opportunity to pursue punitive damages.


## IX.    PHAROS

### A.    Background

Pharos is differently situated from the other Plaintiffs because it was not a noteholder in the NPF VI and NPF XII programs.  Rather, it purchased $12 million worth of National Century preferred stock in 2002.  As an investor, though, Pharos brings some of the same claims asserted by the noteholders: fraud, negligent misrepresentation, violations of Ohio's blue sky law, aiding and abetting, and conspiracy.

Pharos alleges that it was approached by Credit Suisse in early 2002 about possibly investing in National Century preferred stock.  Credit Suisse provided Pharos with offering materials, including a private placement memorandum, financial statements, and audit reports.  Credit Suisse allegedly arranged meetings and phone calls among Pharos, Credit Suisse, and National Century's management.  Along the way, Credit Suisse allegedly made false assurances to Pharos about the financial soundness of National Century's operations.  On July 8, 2002, Pharos entered into a Stock Purchase Agreement whereby it purchased $12 million of preferred stock.

Like the other Plaintiffs, Pharos alleges that National Century engaged in fraud and deliberately abandoned the business model described in the offering materials.  Pharos alleges that

41

National Century raised $3 billion from investors and used 70% of those funds to purchase receivables that failed to meet the eligibility standards established for the NPF VI and NPF XII programs.  Pharos contends that most of the money went to healthcare providers in which the Founders held an undisclosed financial interest.

###### B.  Fraud and Negligent Misrepresentation

According to the complaint, Credit Suisse prepared a private placement memorandum and provided it to Pharos.  The memorandum allegedly contained material misrepresentations and omissions, including that National Century would purchase eligible receivables, would refrain from self-interested transactions, and would maintain certain levels of reserves as security for the notes.  The complaint alleges that Pharos relied on those misrepresentations regarding the financial soundness of National Century's operations when it decided to purchase stock.

Credit Suisse's primary challenge to the claims for fraud and negligent misrepresentation is that the offering materials contained disclaimers precluding Pharos from justifiably relying on them.  These disclaimers stated that Credit Suisse was not making any representations or warranties and that investors should not rely on statements made in the materials.  For the reasons discussed in Part III.D above, this argument is not persuasive.  Credit Suisse's name appeared prominently on the first page, and indeed every page, of the private placement memorandum given to Pharos.  Further, the memorandum stated that Credit Suisse was the authorized agent of National Century and that all inquiries by investors were to be directed to Credit Suisse.

Credit Suisse next contends that Pharos has failed to allege scienter with particularity.  Importantly, Pharos is not asserting a Section 10(b) claim, for which the complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.  Pharos is asserting a common law fraud claim, and, though the circumstances constituting the fraud must be stated with particularity, "intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  Upon review of the complaint, the Court finds it adequately alleges that Credit Suisse knew or should have known that its representations were false.

42

### C.  Other Claims

Credit Suisse argues that the claim under Ohio's blue sky law should be dismissed because the law does not apply to private placements.  But, as discussed in Part IV.E above, the Court finds that Ohio's blue sky law does apply to private placements.  See Ohio Rev. Code § 1707.41(A); Arpadi v. First MSP Corp., 68 Ohio St.3d 453, 454, 628 N.E.2d 1335, 1336 (Ohio 1994).

As to the aiding and abetting claim, Credit Suisse contends that the complaint does not allege how Credit Suisse materially assisted the fraud.  However, the complaint plainly alleges that Credit Suisse assisted National Century's fraud by drafting the private placement memorandum, soliciting Pharos to purchase stock, and arranging meetings among the parties.

Finally, Credit Suisse argues that the allegations of a conspiracy are deficient.  The Court agrees with this argument.  The complaint alleges that the conspiracy existed among the named defendants.  Neither National Century nor the Founders are named as defendants.  The named defendants beside Credit Suisse are National Century's legal counsel, accounting firm, and outside directors, as well as the entities allegedly controlling the outside directors.  The complaint is devoid of any allegations that Credit Suisse had an agreement or tacit understanding with any of the other named defendants.  Thus, Pharos's claim for conspiracy is dismissed.

### X.  CONCLUSION

Credit Suisse's motions to dismiss the complaints filed by MetLife, Lloyds, the Arizona Noteholders, the New York Funds, and Pharos (docs. 177, 242, 735, 743 in Case No. 03-md-1565; doc. 115 in Case No. 03-cv-362) are GRANTED IN PART and DENIED IN PART.

The motions to dismiss are GRANTED as to the following claims:

• Lloyds's claim under New Jersey's blue sky law (no nexus);

• the Ohio blue sky law claims based on note purchases made in 1998 and early 1999 by the Asset Allocation & Management Plaintiffs, Bayerische Landesbank, Mutual of New York, SanPaolo IMI, and United of Omaha (time-barred);

• United of Omaha's Nebraska blue sky law claim based on its November 1998 note purchase (time-barred);

- MetLife's claim under § 49:3-52 of New Jersey's blue sky law (no private right of action);

- Oregon Insurance Guaranty Association's claim under § 59.135 of Oregon's blue sky law (no private right of action);

- the Arizona Noteholders' claims under § 44-1998(A) of Arizona's blue sky law (does not apply to private placements);

- Pacific Investment Management Company Plaintiffs' claims for primary liability under California's blue sky law (lack of privity);

- Oregon Insurance Guaranty Association's claim for primary liability under Oregon's blue sky law (lack of privity);

- MetLife's, Lloyds's, and the New York Funds' negligence claims (duplicative of their negligent misrepresentation claims); and

- Pharos's claim of conspiracy (no alleged agreement or understanding).

The motions to dismiss are DENIED as to all other claims asserted against Credit Suisse by MetLife, Lloyds, the Arizona Noteholders, the New York Funds, and Pharos.


                                s/ James L. Graham
                                JAMES L. GRAHAM
                                United States District Judge


DATE: December 19, 2007