IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: National Century Financial Enterprises, Inc. Financial Investment Litigation | : | |
| | : | Case No. 2:03-md-1565 |
| | : | Judge James L. Graham |
| | : | Magistrate Judge Abel |
| | : | |

# Order

This matter is before the Magistrate Judge on the September 17, 2008 motion of Credit Suisse Securities (USA) LLC, formerly known as Credit Suisse First Boston LLC ("Credit Suisse") for sanctions against Pharos Capital Partners. L.P. ("Pharos") (doc. 1422).

Credit Suisse requests, pursuant to the Court's inherent equitable powers, Rule 37(c) of the Federal Rules of Civil Procedure, and Rule 37.1 of the Local Civil Rules of the Southern District of Ohio, that the Court grant its motion for sanctions and dismiss, with prejudice, Pharos's second amended complaint against it. In the alternative, Credit Suisse requests that the following facts be deemed as established for all purposes in this litigation: (1) that Pharos conducted inadequate diligence before making its investment in National Century Financial Enterprises, Inc. ("NCFE"); (2) that Dale LeFebvre, a former managing partner of Pharos, vehemently objected to Pharos' investment in

NCFE; and (3) that Pharos relied upon itself, and not Credit Suisse, with respect to any issues concerning related party transactions by NCFE.

As a preliminary matter, Thomas G. Mendell, Eric R. Wilkinson, and Linda E. Johnson, Executor of the Estate of Harold W. Pote's September 22, 2008 motion for joinder to the motion by the Credit Suisse defendants for sanctions against plaintiff Pharos Capital Partners, L.P. and October 23, 2008 motion for joinder to the reply memorandum of law in further support of defendant Credit Suisse's motion for sanctions (docs. 1424 & 1430) are GRANTED.

I. **Arguments of the Parties**

A. **Credit Suisse**

Credit Suisse maintains that Pharos has engaged in discovery-related misconduct. Pharos's second amended complaint alleges that Credit Suisse committed fraud that caused it to invest in and lose its entire $12 million investment in NCFE. Credit Suisse maintains that Pharos has withheld information and made misrepresentations regarding critical issues in this case. Credit Suisse asserts that Pharos, not Credit Suisse, must bear responsibility for Pharos' decision to invest in NCFE.

Credit Suisse argues that Pharos hid from discovery the fact that its former managing partner, Dale LeFebvre, warned that Pharos' due diligence on NCFE was inadequate. In August 2008, Credit Suisse learned that Pharos filed a complaint against LeFebvre in May 2007 alleging he had breached his duty of loyalty and trust owed the partnerships. In his August 20, 2007 counterclaim against Pharos, LeFebvre alleged that

Pharos had failed to properly conduct due diligence with respect to the NCFE investment and that the other managing partners, ignoring the requirement that all investment decisions be unanimous, overrode his objection to the investment. The lawsuit was settled September 6, 2007. Credit Suisse maintains that Pharos' deposition witnesses purposefully provided evasive testimony when questioned about LeFebvre's resignation.

Credit Suisse further argues that Pharos made misrepresentations about its document production. Credit Suisse maintains that Pharos failed to produce an email from Mike Devlin, a managing partner, to Lance Poulsen that said he had "waded through" the related party transaction documents NCF E had provided and that he did not "see a material issue" and that the transactions were "certainly justifiable." Doc. 1422, Exh. I. Credit Suisse further asserts that Pharos has not offered any explanation for its failure to produce the email.

Credit Suisse argues that the dismissal of Pharos' second amended complaint is warranted because it knowingly provided false testimony on numerous occasions through numerous witnesses. Credit Suisse maintains that it has been prejudiced by Pharos' misconduct because it would have questioned Pharos' witnesses at length about them to build its contributory negligence defense.

B. Pharos

Pharos argues that Credit Suisse's motion should be denied because Credit Suisse never sought discovery about the lawsuit Pharos filed against LeFebvre and because the lawsuit was a matter of public record. With respect to the email, Pharos argues that Credit Suisse cannot establish legal prejudice from Pharos' inability to disclose it when it was not in its possession, custody, or control at the time it was requested.[1] Pharos points out that the email was produced by NCFE in the bank-

---

[1] Pharos makes this bald assertion, but does not support it with affidavits detailing Pharos's records retention policies, the directions given to its employees regarding preservation of documents related to the claims it intended to bring against Credit Suisse, and the steps taken to search all of its computers, other media, and paper documents responsive to Credit Suisse's document requests. The letters Pharos points to, Brody September 17, 2008 Affidavit, Doc. 1422-2, Exh. H, states a bright line adversarial position and make no attempt to respond to Credit Suisse's underlying request for an assurance that all reasonable steps were taken to produce relevant documents.

Pharos counsel assured Credit Suisse's counsel on December 10, 2007 that "all relevant e-mails have been produced, and no relevant documents – including e-mails – have been destroyed, automatically or otherwise." *Id.*, Doc. 1422-7, p. 3. In a December 20, 2007 letter, Pharos's counsel asserted that it was his client's "practice to provide, from time to time, a paper memo, as well as an e-mail, to its employees generally reminding them to retain all documents related to: (i) any matters in litigation; and (ii) all ongoing business matters. Pharos, however, no longer has in its possession any such notices from the relevant time period." *Id.*, Doc. 1422-7, p. 5.

When Credit Suisse discovered in late August 2000 the May 24, 2002 email from Mike Devlin to Lance Poulsen, its counsel asked Pharos's counsel why the email had not previously been produced. Pharos's counsel responded with a now familiar mantra: "Pharos has, to its knowledge, produced all non-privileged e-mails and documents in its possession, custody, or control that are responsive to any of Defendants' document request." *Id.*, Doc. 1422-7, p. 12. Credit Suisse's counsel followed up with a letter dated August 26, 2008 asking Pharaohs if it stood by its earlier, specific representations about the searches conducted for emails responsive to Credit Suisse's document request. *Id.*, Doc. 1422-7, p. 14. Rather than state the specific steps it took to locate emails responsive to the Credit Suisse's document request, Pharos's counsel responded with the usual

4

ruptcy proceedings and was among the millions of pages of documents provided to Credit Suisse before depositions began. It also argues that's Pharos's witnesses were extensively examined about their awareness of the related-party transactions and their review of NCF E's responses to Goldman Sachs's questions on that issue before it invested in NCFE. Finally, Pharos maintains that the underlying legal premise for Credit Suisse's motion is without merit because contributory negligence is not an affirmative defense to any of Pharos' claims in this action.[2]

## II. Discussion

### A. The Court's Inherent Equitable Powers

In *Chambers v. Nasco, Inc.*, 501 U.S. 1269 (1991), the Supreme Court held that the inherent authority of the Court is an independent basis for sanctioning bad faith conduct in litigation. The inherent authority of the Court

> is both broader and narrower than other means of imposing sanctions. First, whereas each of the other mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices.

---

mantra and concluded: "No further explanation on this issue is necessary." *Id.*, Doc. 1422-7, p. 16.

[2] However, Pharos does plead a negligent misrepresentation claim. Pharos own negligence would also be relevant to the question of whether it reasonably relied on Credit Suisse's representations. Finally, the Devlin email may be relevant to whether Pharos relied on Credit Suisse's representations, that is, it is at least some evidence that Pharos relied on NCFE's representations to Goldman Sachs.

501 U.S. at 46. "A most fundamental and abiding principle of our system of justice is that false testimony under oath in a formal proceeding will not be tolerated." *Ciba Specialty Chemicals, Corp. v. Zinkan Enterprises, Inc.*, No. C2-03-174, 2003 WL 22309275 (S.D. Oh. Jul. 29, 2003). A court "must neither reward nor condone such a 'flagrant affront' to the truth-seeking function of adversary proceedings." *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 323 (1994) (citations omitted). To determine whether a fraud on the Court has been committed requires a fact-intensive inquiry where clear and convincing evidence supports the finding.

Pharos argues that there is no clear and convincing evidence that it deliberately hid from defendants the lawsuit filed against LeFebvre or that defendants have been prejudiced in any way. Pharos identified LeFebvre as a person with knowledge of its claims against defendants. Pharos argues that Credit Suisse sought no substantive discovery from LeFebvre despite serving multiple sets of interrogatories, requests for production, and requests for admissions. A single interrogatory asked only for his last known address and telephone number.

In May 2007, Pharos filed suit in the District Court of Dallas County, Texas against LeFebvre. Pharos asserted that LeFebvre breached his contractual, fiduciary, and common law duties as a manager, officer, and member of the Pharos Group. Doc. 1422-3, at 2. The complaint asserted that "it is difficult to imagine a more cynical fiduciary." *Id.* at 3. Pharos sought a "judicial declaration separating LeFebvre from [Pharos], to obtain a refund of all amounts paid to him during his tenure as a disloyal

6

fiduciary, for damages, and to force [LeFebvre] to forfeit any ill-gotten gains. *Id.* The complaint further asserted that LeFebvre behaved in an abusive manner toward his subordinates and colleagues; failed to report to work; exhibited bizarre behavior which had a deleterious impact on investment companies; abused corporate accounts; and, breached his duty of loyalty. *See id.* at 7-10. The complaint alleged that in December 2005 Pharos hired a consulting company to analyze and report on the group. After performing its evaluation, the consulting group recommended that Pharos terminate LeFebvre immediately. *Id.* at 11. Rather than terminating him, on December 27, 2005, Pharos mangers sent LeFebvre a detailed memorandum which offered him a chance to improve. *Id.* Two months later, LeFebvre resigned.

In his August 20, 2007 answer and counterclaim, LeFebvre made the following allegations with respect to Pharos' investment in NCFE:

> Again, ignoring the unanimity requirement, the Remaining Managers overrode Mr. LeFebvre's vehement objection to the investment of $12 million by the PCG Fund in National Century Financial Enterprises, Inc. ("NCFE"), another of the PCG Funds' portfolio companies. NCFE was an enormous company that had been passed over by many respected Wall Street firms. Mr. LeFebvre felt that the due diligence had not been properly conducted and was concerned that all of the Wall Street firms had passed on the deal. At the end of the day, the Wall Street firms had passed on the opportunity because they figured out something that Mr. Devlin (the ardent proponent of this investment) had not.

Counterclaim, ¶ 25, Doc. 1422-4, p. 13. The counterclaim also asserted that NCFE was not the type of investment the Pharos companies were committed to investing in.

7

Counterclaim, ¶ 26, *id.* at 14. On September 6, 2007, Pharos and LeFebvre executed a settlement agreement.

Credit Suisse has not supported its assertion that LeFebvre vehemently objected to Pharos's investment in NCFE with any admissible evidence.[3] Paragraph 25 of the counterclaim is an allegation, not a factual statement supported by an affidavit. The allegation was never the subject of discovery or proved in an adversary proceeding. The lawsuit was settled just two and a half weeks after the counterclaim was filed.

Credit Suisse contends that Pharos' deposition witnesses led them astray with false and misleading testimony about the lawsuit. Pharos maintains that the defendants never posed a specific question to any of Pharos' witnesses regarding the lawsuit with LeFebvre. D. Robert Crants, III, who was Pharos' Rule 30(b)(6) designee, testified as follows:

> Q. Did you enter into any sort of agreement with [LeFebvre] in connection with his resignation?
> A. Not in connection with his resignation specifically.
> Q. Okay. Well, did you enter into any sort of agreement relating to his resignation at all–to his resignation at all.
> A. It's the same question. Nothing related to his resignation specifically.
> Q. Did his resignation have anything to do with NCFE?
> A. It did not.

Defs.' Exh. D. at 13:3-13:14. Kneeland Youngblood, Pharos' founding partner, testified about the circumstances surrounding LeFebvre's departure:

---

[3] LeFebvre was deposed sometime after August 26, 2008 and before the motion for sanctions was filed, but his deposition has not been filed. Credit Suisse has not submitted any portions of that deposition to support its motion for sanctions.

8

> Q. And do you remain on good terms with [LeFebvre] following his departure.
> A. I haven't spoken with him since he's left.
> Q. Did you leave on bad terms with him?
> A. Not particularly.
> Q. Do you know if others at Pharos remained on good terms with him following his departure?
> A. No. We actually don't talk about him, so I have no idea.

Defs.' Exh. F. at 57:14-22. Michael Devlin, another managing partner at Pharos, testified:

> Q. I think you testified why Dale resigned. Would you–would you characterized his resignation as amicable or not?
> A. I would characterize it as his decision.
> Q. Should I infer from that that he wasn't fired, that it was his decision and it wasn't involuntary?
> A. Correct.
> Q. So Pharos didn't fire [LeFebvre]?
> A. No.
> Q. All right. So we have established that he wasn't terminated, he resigned. But I don't know that that was my question. My question was, you know, was it a friendly parting? I think we both know people can resign, and you know, go about their way a couple of different ways. One is I found a better opportunity, it's great to know you, I'm moving on. The other is there have been something of a falling out between the folks and, you know, one decides to move on. One is, I think you would agree, is more amicable than the other, right?
> A. Yes.
> Q. Okay. Which was Mr. LeFebvre?
> A. I would say that it was professional and–certainly with any departure there are some hurt feelings.
> Q. Why in Mr. LeFebvre's case were there hurt feelings?
> . . .
> A. I think that Kneeland viewed his relationship with Dale as kind of a mentor relationship, and I think that he had hurt feelings about Dale leaving.

Defs.' Exh. G. at 174:12-176:9.

Crants also testified as to whether the decision to invest in NCFE was unanimous:

> Q. At the end of that paragraph it says, "Decisions to proceed with any investment will require the unanimous approval of all the principals." Do you see that?
> A. Yes.
> . . .
> Q. Now, was there unanimous approval of all the principals of the investment in NCFE?
> A. Yes.
> Q. And who were the principals you were referring to there?
> A. Michael Devlin, myself, Kneeland Youngblood, and Dale LeFebvre.
> Q. Was there much debate within that group about whether or not to go forward with this investment?
> A. There was not.

Defs.' Exh. D at 49:9-50:5. In his deposition, Joel Goldberg also testified that the managing partners unanimously consented to the NCFE investment:

> Q. Do you know which of the–which principals of Pharos approved the transaction?
> A. Well, our policy is that all of the managing partners would have to approve any investment.
> Q. By unanimous consent?
> A. Yes.
> Q. And as it relates to the NCFE investment, who would those individuals have been in the 2002 timeframe?
> A. At that time we had four managing partners, which are Bob, Mike, Dale and Kneeland.

159:5-15.

The pleadings in the lawsuit against LeFebvre suggest that the testimony given by Crants, Youngblood, and Devlin misrepresented the nature of the relationship between LeFebvre and Pharos when he resigned. Pharos contends that its alleged nondisclosures was substantially justified because the lawsuit and counterclaim were part

of the public record. Simply because the information was accessible elsewhere does not discharge Pharos's witnesses' obligation to respond truthfully to deposition questions. It is true that the Pharos witnesses were never directly asked whether a lawsuit had been filed relating to LeFebvre's actions while a partner of Pharos or his resignation. But they were questioned about whether Pharos entered into any agreement with LeFebvre. Crants stated that there was no agreement "related to his resignation specifically." From the pleadings, this appears technically correct. With respect to LeFebvre's resignation, no one gave the impression that it was wholly amicable, although the answers were cautiously ambiguous and less than forthright.

Despite the far less than open and candid answers to deposition questions, Pharos argues that Credit Suisse's counsel should have been aware that there was an agreement related to the circumstances of LeFebvre's departure because Pharos's counsel referred to an agreement during the deposition of Krantz:

> Q. When did he stop working with Pharos?
> A. He stopped working with Pharos February 22nd of 2001.
> Q. And what were the circumstances surrounding his departure?
> [Pharos's counsel]: I'm going to instruct you not to answer to the extent it might be covered by a confidentiality agreement . . . .
> A. He resigned from the firm.

Hickox Dep., Exh. 4 at 12:12-25. Pharos also argues that when Krantz responded to Brody's question about whether there was an agreement related to the circumstances of LeFebvre's departure, "Not in connection with his resignation specifically," that he communicated that there *was* an agreement.

Both these arguments are disingenuous at best. If there is a confidentiality agreement that covers the circumstances surrounding LeFebvre's resignation, it is part of the settlement agreement compromising the litigation between Pharos and LeFebvre. That is, the settlement agreement contained an agreement (the confidentiality agreement) that related specifically to LeFebvre's resignation. That being the case, counsel should have insured that their clients' witnesses disclosed the existence of the settlement agreement when repeatedly questioned about the circumstances of LeFebvre's departure and about any agreement related to his departure. Disclosure of the existence of a settlement agreement containing a confidentiality agreement covering the circumstances of LeFebvre's departure clearly would have been responsive to the questions set out above. An answer leaving out that agreement was not fairly responsive to the questions.

Pharos relies on a narrow reading of the questions asked during the depositions and a gamesmanship view of discovery. That is not within the spirit of the Federal Rules Civil Procedure in any circumstance. It is a violation of the Rules under the circumstances under which discovery was conducted in this lawsuit. At plaintiffs' insistence, the court adopted a very ambitious discovery schedule. Deposition time was divided among a number of parties, and depositions were frequently double- and triple-tracked. A large number of depositions were taken in a shorter period of time than is normal. Under these circumstances, even in relatively straight-forward litigation, narrowly technical readings of deposition questions violate both the spirit and the letter of the Rules.

However, the initial question before the court is not whether Pharos has violated the Federal Rules of Civil Procedure, but whether it has committed a fraud on the court. Credit Suisse has the burden of presenting clear and convincing evidence that a fraud on the court has been committed. It is failed to do so either with respect to the Devlin email or to the Pharos witnesses' less than fully forthcoming answers to deposition questions about the circumstances of LeFebvre's resignation.

As to the Devlin email, Pharos has not offered an adequate explanation as to why the email was not produced in response to Credit Suisse's document request. But at the same time, Credit Suisse has not conducted any discovery about the searches Pharos made to locate and review emails responsive to its discovery requests. Other documents concerning related party transactions were produced, even though they may prove to be helpful to Credit Suisse in defending against Pharos's claims. Although not free from doubt, I conclude that Credit Suisse has failed to meet its burden of proving a fraud on the court by clear and convincing evidence.

Similarly, while the responses of Pharos's employees to questions about LeFebvre's resignation were less than forthcoming and, indeed, misleading regarding the question about whether there was an agreement pertaining to that resignation, Credit Suisse has offered no evidence supporting its assertion that it was injured by that lack of candor. Weighing the evidence available, I conclude that Credit Suisse has failed to prove by clear and convincing evidence that Pharos committed a fraud on the court.

### B. Rule 37(c) of the Federal Rules of Civil Procedure

Rule 37 of the Federal Rules of Civil Procedure provides in pertinent part:

13

(c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.
(1) Failure to Disclose or Supplement. If a party fails to provide information or identify a witness as required by Rule 26(a) or (e),[4] the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c). Sanctions permitted under Rule 37(b)(2)(A)(i)-(vi) are:

(I) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
(iii) striking pleadings in whole or in part;
(iv) staying further proceedings until the order is obeyed;
(v) dismissing the action or proceeding in whole or in part:
(vi) rendering a default judgment against the disobedient party; or

---

[4]Rule 26(e) states:
(e) Supplementing Disclosures and Responses.
(1) In General. A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response:
(A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
(B) as ordered by the court.

Fed. R. Civ. P. 26(e).

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. Rule 37(b)(2)(A)(i)-(vi).

When determining whether dismissal of the action is an appropriate sanction, courts consider (1) whether a party's conduct is the result of willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the party's conduct; (3) whether the party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or conserved prior to dismissing the action. *Harmon v. CSX Transportation, Inc.*, 110 F.3d 364, 366-67 (6th Cir. 1997). "Although no one factor is dispositive, dismissal is proper if the record demonstrates delay or contumacious conduct." *U.S. v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002). The party seeking to avoid the sanction of dismissal has "the burden of showing that its failure to comply was due to inability, not willfulness or bad faith." *Id.* at 458.

Pharos maintains that it did not intentionally withhold the email from production and that the email was not in its possession, custody, or control. Pharos asserts that the email was not on Pharos' servers or the computers of the relevant Pharos employees. Pharos further argues that there is no evidence that it deleted the email to avoid its disclosure because it was aware that it might be relevant to this action or after Pharos was on notice that it might need to preserve it for this action.

Pharos contends that defendants were not prejudiced by its inability to produce it. Pharos stated in answer to Credit Suisse's Interrogatory No. 6 that on May 17, 2002 it received from Lance Poulsen "copies of documents purporting to be NCFE's responses

15

to questions prepared by Goldman Sachs & Co." Doc. 1428-2, p. 77. It further answered that those documents were reviewed by Mike Devlin, Bob Crants and Joel Goldberg. *Id.* Defendants questioned Pharos' witnesses at length about Pharos' review of NCFE's answers to questions concerning related-party transactions at NCFE. Specifically, the Pharos witnesses acknowledged that Pharos was aware of NCFE's related-party transactions prior to its investment and had reviewed the NCFE responses to Goldman Sach's questions discussed in the email.

Pharos's refusal to provide any meaningful explanation why the email in question was not in its possession, custody, or control is unacceptable. Here, the burden lies on Pharos to demonstrate that its ability to comply was the result of inability rather than willfulness or bad faith, and Pharos has failed to meet that burden. Given the admission of Pharos's witnesses that they had read and were familiar with the concerns raised by Goldman Sachs with respect to NCFE related-party transfers and their apparent satisfaction with the responses provided by NCFE, it is not clear how much Credit Suisse has been prejudiced by Pharos' failure to produce the email. But Credit Suisse has been prejudiced to the extent that it was forced to depose the Pharos witnesses without having the Mike Devlin email and without knowing that LeFebvre had sued Pharos.

Under the circumstances as presently known, the sanctions of dismissal, claim preclusion, and a court order that certain facts be deemed admitted[5] are too severe.

---

[5] Credit Suisse has failed to demonstrate that--had Pharos promptly produced the Devlin email and had its witnesses acknowledged the lawsuit Pharos filed against

Pharos's failures to timely produce the email and to timely disclose the litigation with LeFebvre can be remedied by giving Credit Suisse the opportunity to reopen the Pharos witnesses' depositions, at Pharos's expense, to permit Credit Suisse to examine those witnesses about the Devlin email and the claims of LeFebvre made in his counterclaim about the purchase the NCFE securities.[6]

Accordingly, the September 17, 2008 motion of Credit Suisse for sanctions against Pharos(doc. 1445) is **GRANTED** to the extent set out above, but otherwise **DENIED.**

Credit Suisse requests the attorneys fees it expended in filing this motion. When a motion to compel discovery is granted, "the court shall, after opportunity for hearing, require the party . . . whose conduct necessitated the motion . . . to pay the moving party the reasonable expenses incurred in obtaining the order, including attorney fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust." Rule 37(a)(4), Fed. R. Civ. P. The "great operative principle of Rule 37(a)(4) is that the loser pays." Wright & Miller, Federal Practice and Procedure: Civil § 2288 at pp. 657-58 (1994). *E.g., Merritt v. Int'l. Brotherhood of Boilermakers*, 649 F.2d 1013, 1018 (5th Cir. 1981).

---

LeFebvre-- it would have been able to discover facts that it has not otherwise been able to discover that would have the tendency to prove the facts it asks the court to deem admitted. Further, it has not demonstrated that a lesser remedy would be inadequate to cure any harm caused by Pharos's failure to provide discovery.

[6] The extent to which Credit Suisse may use on summary judgment and at trial Pharos's failure to produce the Devlin email and the less than candid testimony that the Pharos witnesses gave concerning Lefebvre's departure is a decision for another day.

Pharos's opposition to the motion for sanctions was not substantially justified and there are no other circumstances that would make an award of expenses unjust. Accordingly, Credit Suisse is awarded its expenses in filing the motion for sanctions. Credit Suisse's counsel is DIRECTED to provide opposing counsel with an itemization if its reasonable expense incurred in pursuing the motion. If Pharos contests this Order awarding expenses or the reasonableness of the itemization, its counsel should promptly notify opposing counsel and request a hearing date from me.

Under the provisions of 28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P., and Eastern Division Order No. 91-3, pt. F, 5, either party may, within ten (10) days after this Order is filed, file and serve on the opposing party a motion for reconsideration by the District Judge. The motion must specifically designate the Order, or part thereof, in question and the basis for any objection thereto. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

s/ Mark R. Abel<br>United States Magistrate Judge