IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re National Century Financial Enterprises, Inc., Investment Litigation. | : | Case No. 2:03-md-1565 |
| | : | Judge Graham |

---

| | | |
|---|---|---|
| Pharos Capital Partners, L.P., | : | Case No. 2:03-cv-362 |
| Plaintiff, | : | Judge Graham |
| v. | : | |
| Deloitte & Touche, L.L.P., *et al.*, | : | |
| Defendants. | : | |

<u>OPINION AND ORDER</u>

Plaintiff Pharos Capital Partners, L.P. brings this action against defendant Credit Suisse Securities LLC for fraud in connection with a failed $12 million equity investment. In 2002 Pharos purchased preferred stock in National Century Financial Enterprises, Inc. Credit Suisse acted as a co-placement agent on the stock offering, and, according to Pharos, should have told Pharos that National Century was not operating its business in a manner consistent with what was represented to Pharos.

Credit Suisse moves for summary judgment on the grounds that the parties entered into a Letter Agreement in which Pharos acknowledged that it was "a sophisticated institutional investor" who was "relying exclusively" on its own due diligence investigation and who would bear the risk of "an entire loss" of its investment. The Agreement further stated that any non-public information known by Credit Suisse about National Century "need not be provided" to Pharos.

Though Pharos offers many purported reasons for discounting the plain language of the Agreement, "what matters when litigation breaks out is what the parties actually signed." <u>Rissman v. Rissman</u>, 213 F.3d 381, 385 (7th Cir. 2000). The court finds as a matter of law that Pharos could not have justifiably relied on the alleged misrepresentations and omissions made by Credit Suisse and thus

grants summary judgment to Credit Suisse.

## I.      BACKGROUND

Pharos is a limited partnership that makes private equity investments for its limited partner investors.  In 2002 Pharos had four managing partners, whose unanimous consent was required for any proposed investment.  Credit Suisse ("CS") Ex. 73 at PHAROS00002030; Pharos ("Ph.") Ex. 22, Crants Dep. at 49.  Those managing partners were Bob Crants, Mike Devlin, Dale LeFebvre, and Kneeland Youngblood.  Ph. Ex. 22, Crants Dep. at 49-50.  Crants, a Princeton graduate, and Devlin, a Duke Law School graduate, first met while working at Goldman Sachs.  Ph. Ex. 22, Crants Dep. at 20-22; Ph. Ex. 34, Devlin Dep. at 14-15.  Before forming Pharos, they formed several other firms together.  Ph. Ex. 22, Crants Dep. at 20-22.  LeFebvre graduated from Harvard Law School and Harvard Business School, and worked for Morgan Stanley before joining Pharos.  CS Ex. 73 at PHAROS00002022.  Youngblood came to Pharos with several years of private equity and capital markets experience.  Id. at PHAROS00002021.

On February 25, 2002, Bob Crants sent the following email to Heather Nicolau of Credit Suisse,

We haven't seen any deals from you in a while and were wondering what you were working on and what is in the pipeline.  Clearly, we are looking for healthcare primarily, but we would like to see anything that is over $10 MM in revenues.  I look forward to hearing from you.  Thanks.  Bob

CS Ex. 76.

At the time of the email, Credit Suisse was acting as a co-placement agent for National Century in connection with a $190 million private placement of securities.  Credit Suisse and National Century had entered into an Engagement Letter whereby Credit Suisse agreed to act as placement agent, along with the Shattan Group, LLC, and use reasonable efforts to arrange for the private placement of equity securities.  CS Ex. 54.

Nicolau responded to Crants,

We are currently raising equity and mezzanine for a company called NCFE.  It is a profitable healthcare receivables company.  Would you be interested in participating in a transaction for this type of company?  I can send you some information.

2

> We are also working with a number of public companies.  Do you invest in public companies in addition to private?

CS Ex. 76.

> Crants explained to Nicolau that Pharos did not invest in public companies, and added,

> [W]e actually know quite a bit about the healthcare receivables business & would love to take a look.  I look forward to getting some materials on it.

Id.  Nicolau then sent Pharos a private placement memorandum ("PPM") for the preferred stock offering.  CS Ex. 78, Nicolau Dep. at 115; Ph. Ex. 21.

After receiving the PPM, Pharos requested that Credit Suisse send any "easy to forward due diligence materials."  Ph. Ex. 292.  A "data room" of due diligence materials was maintained for potential investors in the private placement offering.  Ph. Ex. 299, Nicolau Dep. at 66.  Credit Suisse directed the Shattan Group to send three boxes of the data room materials to Pharos on March 1, 2002.  Ph. Exs. 52, 241.  The materials included: yearly financial audits; unaudited financial data, including income statements and balance sheets; operational materials for National Century and its note-issuing entities, NPF VI and NPF XII; PPMs for note issuances by NPF VI and NPF XII; and debt information.  CS Exs. 82-84.

Pharos reviewed the due diligence materials and had follow-up communications with Credit Suisse.  Ph. Ex. 22, Crants Dep. at 104.  Dale LeFebvre emailed Credit Suisse's David Hurwitz on March 5, 2002 asking if the National Century deal was "all it's cracked up to be."  CS Ex. 213.  Hurwitz responded,

> I do believe NCFE is what it is cracked up to be.  It's extremely profitable and has been for many years.  They are the dominant player in the industry and still have great growth opportunities.  I do not remember our group (and we've raised over $5 billion in equity) ever having worked with a company that generates as much cash flow as NCFE.  I think there are some initiatives the company needs to undertake regarding systematizing their business, but I believe the company has already made some important steps forward in this regard.

Id.  In Bob Crants's view, Hurwitz projected a "positive, very bullish outlook on NCFE."  Ph. Ex. 22, Crants Dep. at 123.

Also in March 2002, Crants had a telephone conversation with Credit Suisse's Todd Fasanella, who responded to several lines of inquiry.  Crants asked about how the NPF reserve accounts worked;

Fasanella gave an answer consistent with what the PPM described.  Ph. Ex. 22, Crants Dep. at 124. Crants asked about the market for the NPF notes, and Fasanella said the market had "infinite depth" for AAA-rated notes.  Id. at 125.  Fasanella stated that "there would be a cost" if the notes were downgraded because there would be less demand for sub-AAA notes.  Id.  Crants confirmed with Fasanella that National Century itself was not rated and that the NPF trusts were bankruptcy remote. Id. at 125-27.  When Crants asked about what would happen if one of National Century's clients went bankrupt, Fasanella gave an "incomplete answer."  Id. at 126.

Pharos reported to Credit Suisse on March 12, 2002 that it had completed its due diligence investigation, and had three remaining items to attend to: (1) conducting a site visit at National Century's offices in Columbus, Ohio; (2) obtaining a list from National Century of three customer references; and (3) reviewing the final terms of equity financing.  Ph. Ex. 30.  Pharos also stated that it would be able to close on the deal as early as the next week.  Id.

At the request of Pharos, Credit Suisse helped arrange a site visit on March 19, 2002, see Ph. Ex. 30, and forwarded to National Century a list of questions for which Pharos wanted "to hear the responses directly from management."  CS Ex. 81.  Three Pharos representatives met directly with three National Century representatives, including CEO Lance Poulsen, for two to three hours.  CS Ex. 70, Devlin Dep. at 77-78.  They toured National Century's offices and were shown a PowerPoint presentation.  No one from Credit Suisse was present, although David Hurwitz listened on the phone while the parties met in the conference room.  Id.

The next day, Mike Devlin emailed David Hurwitz to say that Pharos "loved the company and the management team" and was ready to close the deal at quarter's end.  Ph. Ex. 251.  Devlin also sent an email that day to Lance Poulsen saying that Pharos was "deeply impressed" with National Century, "want[ed] to be a part of it," and would be ready to close by quarter's end, pending review of closing documents.  CS Ex. 112.  On March 25, 2002, Crants informed Hurwitz that Pharos had completed its due diligence and was "enthusiastic about closing."  Ph. Ex. 252.

The deal between Pharos and National Century did not close as quickly as Pharos had anticipated.  Investment bank Goldman Sachs had been considering since May 2001 whether to serve

as lead investor on the private equity offering.  Pharos was aware of Goldman's potential involvement. CS Ex. 120.  Indeed, co-investors typically rely on the presence of a lead investor in private equity transactions.  CS Ex. 121, Expert Report of John A. Krasznekewicz at ¶ 68.  After conducting due diligence, Goldman decided not to invest in the National Century offering.  CS Ex. 122, DeLuise Dep. at 33, 41.

Pharos continued update its due diligence during April, May, and June of 2002.  Ph. Ex. 22, Crants Dep. at 117.  Pharos had direct contact with Lance Poulsen during this time.  Poulsen emailed Mike Devlin on May 10, 2002 to explain that Goldman likely would pull out as an investor.  CS Ex. 113. Devlin responded, "Notwithstanding Goldman, our commitment and enthusiasm towards NCFE remains unchanged."  Id.  A week later, Poulsen sent Devlin a letter enclosing National Century's responses to a series of inquiries Goldman had posed about potential areas of concern it had with National Century.  CS Ex. 110.  Devlin emailed Poulsen on May 24:

> Thanks for the material.  The numbers look great, congratulations.  Regarding Goldman's questions, we've waded through all of that and just don't see a material issue. Clearly there's been some complex deals done with some current and former clients, but from our point of view, that's somewhat to be expected, and certainly justifiable when the primary beneficiary is NCFE!

CS Ex. 111.  Poulsen and Devlin had another email exchange in early June evidencing that the parties were preparing to close on the deal.  CS Ex. 114; see also Ph. Exs. 37, 80, 129 (showing that Pharos and National Century were negotiating closing documents in late May and early June of 2002).

On June 12, 2012, Heather Nicolau of Credit Suisse emailed Mike Devlin a "standard letter" that she requested Pharos to sign.  Ph. Ex. 294.  The letter stated that Pharos was "relying exclusively" on its own due diligence and would bear the risk of an entire loss and that Credit Suisse had made no representations as to National Century or the credit quality of the securities and had no duty to disclose non-public information to Pharos.  Id.  Devlin forwarded the letter to Bob Crants, saying, "Clearly we're not signing this [as is].  It's an odd and obnoxious concept really."  Ph. Ex. 20.  Pharos referred the matter to its legal counsel, who drafted a version that struck out much of the proposed agreement and contained some other minor revisions.  Ph. Ex. 296; CS Ex. 60, Franck Dep. at 159.  Counsel's version struck out the language stating that Pharos was relying exclusively on its own due diligence and would

bear the risk of an entire loss.  Ph. Ex. 296.  It also struck out the language stating that Credit Suisse had made no representations about National Century and owed no duty to disclose non-public information. Id.; see also Ph Ex. 22, Crants Dep. at 178-85.

On July 8, 2002, Pharos signed a Letter Agreement that incorporated some of the revisions proposed by Pharos but retained the language regarding reliance, risk, representations, and disclosure. Ph. Ex. 293.  The Agreement provided that in connection with the purchase of preferred stock in National Century, Pharos represented to and agreed with Credit Suisse ("the Agent"):

> (a) that we are a sophisticated institutional investor and have such knowledge and experience in financial and business matters and expertise in assessing credit risk, that we are capable of evaluating the merits, risks and suitability of investing in the Securities, that we have conducted our own due diligence investigation of the Company, that we are relying exclusively on our due diligence investigation and our own sources of information and credit analysis with respect to the Securities and that we are able to bear the economic risks of and an entire loss of our investment in the Securities;
>
> (b) that (i) neither the Agent nor any Affiliate (as defined herein) has been requested to or has provided us with any information or advice with respect to the Securities nor is such information or advice necessary or desired, (ii) neither the Agent nor any Affiliate has made or makes any representation as to Company or the credit quality of the Securities, and (iii) the Agent and any Affiliate may have acquired, or during the term of the Securities may acquire, non-public information with respect to the Company, which we agree need not be provided to us;
> . . .
>
>  (f) that, in connection with the issue and purchase of Securities, neither the Agent nor any of its Affiliates have acted as our financial advisor or fiduciary . . . .

Ph. Ex. 293.

Mike Devlin signed the Agreement for Pharos.  He formerly had served as a transactional attorney at a Wall Street law firm and also a vice president of a business development group at Goldman Sachs.  CS Ex. 70, Devlin Dep. at 13-15, 35-37.  Devlin testified that he had reviewed the Agreement carefully before signing it and had worked with counsel in connection with the Agreement.  Id. at 294. Despite believing the Agreement to be factually inaccurate, "we certainly decided to sign it. . . . To do this transaction and to have an ongoing relationship with CSFB."  Id. at 303.  Bob Crants testified that though Pharos "questioned quite considerably" whether to sign the Agreement, "the discussion about signing it stopped because we did want to close."  Ph. Ex. 22, Crants Dep. at 186.

National Century and Pharos entered into a Preferred Stock Purchase Agreement on July 8, 2002 whereby Pharos purchased $12 million worth of National Century Series B Convertible Preferred Stock. Ph. Ex. 304. Credit Suisse received a placement fee of $450,000 in connection with the Pharos investment. Ph. Ex. 297. It is undisputed that the stock fully lost its value when National Century filed for bankruptcy on November 18, 2002. It is further undisputed that National Century committed a massive fraud, as has been described in full detail in several court opinions. See, e.g., U.S. v. Poulsen, 655 F.3d 492, 498-99 (6th Cir. 2011); U.S. v. Faulkenberry, 614 F.3d 573, 577-79 (6th Cir. 2010); In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 617 F.Supp.2d 700, 705-07 (S.D. Ohio 2009); U.S. v. Poulsen, 568 F.Supp.2d 885, 890-912 (S.D. Ohio 2008); In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., No. 2:03-md-1565, 2006 WL469468 at **1-6 (S.D. Ohio Feb. 27, 2006); In re Nat'l Century Fin. Enterprises, Inc., 341 B.R. 198, 209-10 (Bankr. S.D. Ohio 2006).

Pharos originally filed suit against Credit Suisse and other defendants in March 2003 in this court. The Pharos action later became consolidated with many other cases as part of the National Century multidistrict investment litigation. Credit Suisse is the only defendant remaining in the Pharos action. Pharos alleges that Credit Suisse had knowledge of the material aspects of National Century's fraud and misrepresented to Pharos how National Century ran its operations. These misrepresentations allegedly were made in offering materials Pharos received and in two communications Credit Suisse had with Pharos in March 2002 (the Hurwitz email and the Fasanella phone call). Pharos further alleges that Credit Suisse should have disclosed facts about National Century's fraud when Pharos conducted its due diligence investigation. In an earlier order, the court dismissed the conspiracy claim brought by Pharos against Credit Suisse, but allowed the fraud-based claims and Ohio Securities Act claims to survive Credit Suisse's motion to dismiss. See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 541 F.Supp.2d 986 (S.D. Ohio 2007).

This matter is now before the court on Credit Suisse's motion for summary judgment.

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

III.    **CLAIMS FOR PRIMARY LIABILITY**

Pharos alleges that primary liability must be placed on Credit Suisse for the loss of its equity investment in National Century.  This is so, Pharos argues, because it relied on Credit Suisse's misrepresentations and material omissions about National Century and how the NPF note-issuing programs were operated.  Pharos advances three causes of action against Credit Suisse for primary liability: fraud, negligent misrepresentation, and violations of the Ohio Securities Act.

A.    **Fraud and Negligent Misrepresentation**

The parties argue at length over whether the law of New York or Ohio should apply to the fraud and negligent misrepresentation claims.  Credit Suisse believes that New York law should apply because it dealt with Pharos from its New York offices and because the Letter Agreement has a New York choice of law provision.  Pharos, which has offices in Tennessee and Texas, counters that Ohio law should apply because it was the central site of the National Century fraud.  Though Credit Suisse has pointed to some areas where New York and Ohio law might differ (such New York's clear and convincing evidence standard, compare In re Vivendi Universal, S.A. Sec. Litig., 765 F.Supp.2d 512, 534 (S.D.N.Y. 2011), with Cornwall v. N. Ohio Surgical Ctr., 185 Ohio App.3d 337, 345, 923 N.E.2d 1233, 1239-40 (Ohio Ct. App. 2009)), the court finds that a choice of law determination is unnecessary with respect to these claims because Pharos cannot clear a fundamental hurdle under the law of either state – that of justifiable reliance.

Justifiable reliance is an element of both a fraud and a negligent misrepresentation claim.  See Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 1373 (N.Y. 1996); Russ v. TRW, Inc., 59 Ohio St.3d 42, 49, 570 N.E.2d 1076, 1083-84 (Ohio 1991); Delman v. Cleveland Hts., 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (Ohio 1989).  In determining whether reliance is justifiable, courts consider such factors as the sophistication of the parties, the nature of their relationship, their access to information, whether the plaintiff initiated the transaction or sought to expedite it, the nature of the alleged misrepresentation, and the content of any agreement they entered into.  See Brown v. Earthboard Sports USA, Inc., 481 F.3d 901, 921 (6th Cir. 2007) (federal securities law context); Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 181 (2nd Cir. 2007) (applying New York

law); Johnson v. Church of the Open Door, 179 Ohio App.3d 532, 539, 902 N.E.2d 1002, 1007 (Ohio Ct. App. 2008).  Many courts decline to adopt a *per se* rule that a no-reliance provision forecloses recovery, see Brown, 481 F.3d at 921 (citing cases), but the existence of such a provision can be "a fairly convincing [factor] in many cases."  Rissman v. Rissman, 213 F.3d 381, 388 (7th Cir. 2000) (Rovner, J., concurring).

After examining the relevant factors, the court finds as a matter of law that Pharos cannot establish justifiable reliance.  Pharos was a private equity fund with about $160 million in committed capital in 2002. CS Ex. 77.  It was Pharos who first approached Credit Suisse, looking for an investment deal in the healthcare sector.  When Credit Suisse mentioned that it was raising equity for National Century, Pharos said it already knew "quite a bit about the healthcare receivables business" and wanted to take a look. CS Ex. 76.  Pharos, which considers itself skilled at doing due diligence, had access to "bankers boxes full of materials," conducted "extensive due diligence," communicated directly with National Century's management, and met with them in person during a site visit. Ph. Ex. 22, Crants Dep. at 78, 103; CS Ex. 64, Pl.'s First Am. Answer to Interrog. No. 4.

This is not a case where Pharos was shielded from adverse information about National Century. Pharos knew that Goldman Sachs had decided not to serve as lead investor.  It received a lengthy document outlining some of the areas of concern that Goldman had, particularly National Century's practice of engaging in related-party transactions, and Pharos stated that it did not see a "material issue." CS Exs. 110, 111.  Pharos admits that it also learned, during its due diligence, that National Century had failed to maintain reserve accounts in the NPF programs at the levels required by the Master Indentures governing those programs.  Ph. Ex. 22, Crants Dep. at 90-94.  Pharos knew as well that National Century's equity offering sought to raise $190 million and that without a lead investor, National Century would be raising only $12 million from Pharos and another $10-12 million from National Century's management.  Dale LeFebvre felt the financial risk of proceeding without Goldman was too great, but his colleagues overrode his objection. CS Ex. 71, LeFebvre Dep. at 40, 125.  Even in the face of Fitch, Inc. putting certain NPF notes on a "Ratings Watch Negative" and National Century being overdue in issuing its audited financial statement for 2001, Pharos remained enthusiastic about investing.  CS Ex.

96, at PHAROS00001159; CS Ex. 108, Pl.'s Response to Request for Admission No. 7.

The Letter Agreement was the product of negotiations between the parties. When Credit Suisse circulated a proposed agreement, Pharos found it to be "obnoxious" and engaged counsel to craft revisions. Ph. Ex. 20. After Credit Suisse incorporated some of the revisions, Pharos "elected to sign the document" and close on the deal with National Century. Ph. Ex. 22, Crants Dep. at 173, 186 ("[O]ur changes were not taken . . . . And at that point the discussion about signing it stopped because we did want to close."). Pharos confesses that it does not "offer up signatures unnecessarily" and that it was "quite confident that [Credit Suisse] had information that [Pharos] didn't have." Id. at 118, 186.

The language of the Letter Agreement is clear. It states that Pharos is a "sophisticated institutional investor" who was "relying exclusively" on its own due diligence investigation, its own sources of information, and its own credit analysis in deciding to invest in National Century preferred stock. Ph. Ex. 293. Indeed, Pharos represented in the Agreement that Credit Suisse's information and advice was not "necessary or desired," that Credit Suisse had made no representations about National Century or the credit quality of the securities, and that any non-public information Credit Suisse possessed about National Century "need not be provided" to Pharos. Id. The parties referred to the Letter Agreement as a "big boy" agreement because Pharos in essence said that it knew what it was doing and could take care of itself. See Extra Equipamentos E Exportacao Ltda. v. Case Corp., 541 F.3d 719, 724 (7th Cir. 2008) ("as in 'we're big boys and can look after ourselves'"). To underscore the point, the Agreement stated that Pharos would bear the risk of an "entire loss" of its investment. Ph. Ex. 293.

Thus, the clear language of the Letter Agreement and the surrounding factors render any claimed reliance by Pharos unjustifiable. The case law strongly supports this conclusion in the context of sophisticated parties who have agreed to no-reliance language.[1] See Jackvony v. RIHT Fin. Corp., 873 F.2d 411, 416-17 (1st Cir. 1989) (reliance unreasonable where sophisticated plaintiff received written proxy statement directing him not to rely on it); Harsco Corp. v. Segui, 91 F.3d 337, 343 (2d Cir. 1996)

---

[1]  Pharos does not argue that the "relying exclusively" language in the Letter Agreement has any less import than the "no-reliance" language enforced in the cases cited below.

(reliance unreasonable where sophisticated business entities negotiated an agreement containing a "no other representations" clause); Extra Equipamentos, 541 F.3d at 724-26 (reliance unreasonable where large company signed a no-reliance clause and was represented during negotiations by attorneys who were experienced in commercial transactions); Paracor Fin., Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1159-60 (9th Cir. 1996) (reliance unreasonable where investors were expected to do their own due diligence and signed an agreement saying that they were making their own decision and not relying on other persons).

To allow Pharos to proceed any further with its fraud and negligent misrepresentation claims would upset the risk allocation the parties bargained for. Pharos agreed that it was relying exclusively on its own investigation and analysis and that it would bear, as to Credit Suisse, 100% of the risk of loss. The Seventh Circuit in Rissman emphasized that securities transactions would be "impossibly uncertain" if courts fail to protect the primacy of written agreements entered into by sophisticated parties. 213 F.3d at 383. The court thus rejected plaintiff's attempt to set aside a no-reliance clause and shift the risk in a way the "could not conceivably have been the outcome of bargaining." Id. at 385. So too here Pharos's attempt to shift risk onto Credit Suisse must be rejected. See also Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 735 (2d Cir. 1984) ("[W]here the parties to an agreement have expressly allocated risks, the judiciary shall not intrude into their contractual relationship."); Dyncorp v. GTE Corp., 215 F. Supp.2d 308, 322 (S.D.N.Y. 2002) ("It is not the role of the courts to relieve sophisticated parties from detailed, bargained-for contractual provisions that allocate risks between them, and to provide extra-contractual rights or obligations for one side or the other.").

Pharos offers a number of reasons why its claims should survive summary judgment. Each reason is unavailing. It argues that the reasonableness of reliance is a fact-intensive issue that cannot be resolved at the summary judgment stage. The court agrees that the issue depends on context, see Brown, 481 F.3d at 921, but "cases involving a non-reliance clause in a negotiated contract between sophisticated parties will often be appropriate candidates for resolution at the summary judgment stage." AES Corp. v. Dow Chemical Co., 325 F.3d 174, 181 (3d Cir. 2003); see also Extra Equipamentos, 541 F.3d at 725 (holding that the reliance issue can be settled on summary judgment where parties have

signed valid no-reliance clause); Paracor, 96 F.3d at 1160 (resolving the issue on summary judgment).

Pharos next contends that Credit Suisse had an independent duty to disclose material information to Pharos because Credit Suisse chose to act as National Century's placement agent. Picking up from language in this court's order on Credit Suisse's motion to dismiss, Pharos contends that Credit Suisse assumed a duty to disclose because it chose to speak by providing the PPM to Pharos. See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 541 F.Supp.2d 986, 998 (S.D. Ohio 2007) (citing Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263, 268 (6th Cir. 1998)).  However, the court in the earlier order had to accept as true the allegations Pharos made in its complaint.  The court did not have before it the Letter Agreement, which states that Pharos neither needed nor desired any information or advice from Credit Suisse about National Century and that Credit Suisse had no obligation to provide such information.  The Agreement further states that Credit Suisse was not a financial advisor or fiduciary of Pharos. This unmistakable language defeats any argument Pharos now makes about a duty to disclose and renders unreasonable any expectation Pharos may have had about informational parity.  See Harborview Master Fund, LP v. Lightpath Technologies, Inc., 601 F.Supp.2d 537, 547-48 (S.D.N.Y. 2009) (party in securities transaction cannot recover for "omissions to which it contractually agreed"); Dyncorp, 215 F. Supp.2d at 320 (under New York law contracting parties are able to limit the representations made and the duties owed); Blon v. Bank One, Akron, N.A., 35 Ohio St.3d 98, 101, 519 N.E.2d 363 (Ohio 1988) (presumption in business transactions is that parties have no duty to disclose absent a fiduciary duty or some other special relationship).

Again citing this court's opinion on the motion to dismiss, Pharos argues that disclaimers are not enforceable when the party making them is engaged in fraud.  See Nat'l Century, 541 F.Supp.2d at 1005 (holding that boilerplate disclaimers in PPMs did not necessarily protect Credit Suisse if it knew the disclaimers were false when made).  But again discovery has disproved the complaint's allegations and the issue is no longer whether Pharos can state a claim for fraud.  Credit Suisse has proved the existence of language having greater force than a boilerplate disclaimer in a PPM.  It has proved that the parties entered into a bargained-for, retrospective statement of their dealings.  Their Agreement establishes that Pharos agreed not to rely on Credit Suisse and agreed that Credit Suisse had no duty to

provide information to Pharos.

Pharos next argues under New York law that disclaimers are enforceable only if they track the substance of the alleged misrepresentation. See Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 320-21, 157 N.E.2d 597, 599 (N.Y. 1959). Pharos argues that the language of the Letter Agreement is too general to be enforced, but the line of cases Pharos cites is not applicable. Those cases hold that general disclaimers do not preclude a claim for fraud in the inducement. See, e.g., Manufacturers Hanover Trust Co. v. Yanakas, 7 F.3d 310, 316 (2d Cir. 1993) ("[I]n order to be considered sufficiently specific to bar a defense of fraudulent inducement under Danann, a guarantee must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim."); In re CINAR Corp. Sec. Litig., 186 F.Supp.2d 279, 313 (E.D.N.Y. 2002). But Pharos does not claim that it was fraudulently induced to sign the Letter Agreement. If Pharos was fraudulently induced to enter into a contract, it would have been the Preferred Stock Purchase Agreement – a contract to which Credit Suisse was not a party.

Also under New York law, Pharos contends that disclaimers do not preclude a party from claiming reliance on an alleged misrepresentation of a fact that is peculiarly within the other party's knowledge. See DIMON Inc. v. Folium, Inc., 48 F.Supp.2d 359, 368 (S.D.N.Y. 1999). This facet of law likewise has no application here. The peculiar knowledge exception was recognized to protect those parties who have "no independent means of ascertaining the truth." Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1542 (2d Cir. 1997). Pharos is not such a party.

As a prospective equity investor, Pharos had access to boxes of data room materials, conducted extensive due diligence, and communicated directly with National Century's management. After becoming aware that Goldman had withdrawn as lead investor, Pharos received a detailed listing of Goldman's concerns and National Century's responses, and Pharos told National Century that it did not see a material issue with the related-party transactions. See Tr. of Nov. 16, 2009 Hearing at 158 (counsel for Pharos admitting that it had knowledge of certain related-party transactions). Pharos moreover knew of the Fitch downgrade and the delayed 2001 audited financial statement, yet it remained unwavering in its enthusiasm to invest in National Century. Pharos then represented in the

Letter Agreement that it, being a sophisticated investor, had the "knowledge and expertise" to independently conduct due diligence and assess the merits and risks of the equity investment. Pharos further stated in the Agreement that information known by Credit Suisse was not "necessary or desired" and "need not be provided." Pharos cannot now seek reprieve in the peculiar knowledge exception, regardless of what it claims Credit Suisse knew. See DIMON, 48 F.Supp.2d at 368 (noting that for a sophisticated party that "has the means of learning the facts and disclaims reliance on the defendant's representations, there simply is no reason to relieve it of the consequences of both its failure to protect itself and its bargain to absolve the defendant of responsibility"); DynCorp, 215 F.Supp.2d at 321-22 (declining to apply the peculiar knowledge exception because plaintiff was aware "that the information it had received had been selected . . . . Sophisticated parties to major transactions cannot avoid their disclaimers by complaining that they received less than all information, for they could have negotiated for fuller information or more complete warranties.").

Finally, Pharos argues that the Letter Agreement should be disregarded because it was not signed until "late" in the process and Pharos was led to believe that the Agreement was "standard" and had to be signed in order to complete the stock purchase. Pharos fails to cite any legal basis for why these considerations would invalidate the Agreement, but they could charitably be construed as an argument that Pharos was under duress. "To avoid a contract on the basis of duress, a party must prove coercion by the other party to the contract. It is not enough to show that one assented merely because of difficult circumstances that are not the fault of the other party." Blodgett v. Blodgett, 49 Ohio St.3d 243, 246, 551 N.E.2d 1249, 1251-52 (Ohio 1990); see also 805 Third Ave. Co. v. M.W. Realty Associates, 58 N.Y.2d 447, 451, 448 N.E.2d 445, 447 (N.Y. 1983) (duress claim requires the existence of a threat or coercion that precludes the exercise of free will). The factual record at most shows that Credit Suisse exerted financial or business pressures on Pharos, but this does not constitute duress. See Gartech Elec. Contracting Corp. v. Coastal Elec. Const. Corp., 887 N.Y.S.2d 24, 40, 66 A.D.3d 463, 485 (N.Y. App. Div. 2009); Sheet Metal Workers Nat'l Pension Fund v. Bryden House Ltd. P'ship, 130 Ohio App.3d 132, 141, 719 N.E.2d 646, 652-53 (Ohio Ct. App. 1998). As one court aptly stated, "A defense of duress cannot be sustained by a contracting party who has simply been bested in contract

negotiations by the 'hard bargaining' of another contracting party, . . . even when the hard bargainer knowingly takes advantage of his counterpart's difficult financial circumstances." Regent Partners, Inc. v. Parr Dev. Co., Inc., 960 F.Supp. 607, 612 (E.D.N.Y. 1997) (internal citations omitted).

Thus, the court finds that Credit Suisse is entitled to summary judgment as to the fraud and negligent misrepresentation claims.

**B.      Ohio Revised Code Section 1707.41**

The Ohio Securities Act provides,

> [A]ny person that, by a written or printed circular, prospectus, or advertisement, offers any security for sale, or receives the profits accruing from such sale, is liable, to any person that purchased the security relying on the circular, prospectus, or advertisement, for the loss or damage sustained by the relying person by reason of the falsity of any material statement contained therein or for the omission of material facts, unless the offeror or person that receives the profits establishes that the offeror or person had no knowledge of the publication prior to the transaction complained of, or had just and reasonable grounds to believe the statement to be true or the omitted facts to be not material.

O.R.C. § 1707.41(A). Pharos asserts that Credit Suisse violated this provision because the PPM Credit Suisse supplied to Pharos contained material misrepresentations.

Pointing again to the Letter Agreement, Credit Suisse argues that the §1707.41 claim fails because Pharos cannot establish justifiable reliance. Pharos responds, in passing in its response brief, that reliance need not be justifiable; Pharos clarified at oral argument that its position is based on the absence of the words "reasonably" or "justifiably" in front of "relying" in § 1707.41(A). See Tr. of Nov. 16, 2009 Hearing at 167.

The court has found little case law on the issue, but the cases do not favor Pharos's interpretation. Two Ohio courts of appeals, though not directly ruling on the issue, have imposed a reasonableness requirement. In Federated Mgmt. Co. v. Coopers & Lybrand, the court held that summary judgment could not be granted against a § 1707.41 claim because the plaintiff had demonstrated that a jury could find both that the plaintiff had relied on a prospectus and that "the reliance was reasonable." 137 Ohio App.3d 366, 396, 738 N.E.2d 842, 864 (Ohio Ct. App. 2000). In an unpublished case, a court of appeals held that a purchaser could not prevail on his §1707.41 claim because, among other things, his reliance was not reasonable. Citizens Nat'l Bank v. Barge-In, Inc., No.

CA83-07-008, 1984 WL 3429, at *6 (Ohio Ct. App. Sept. 28, 1984).

Courts interpreting Ohio securities law have often looked to parallel provisions of federal law. See, e.g., In re Columbus Skyline Securities, Inc., 74 Ohio St.3d 495, 499-500, 660 N.E.2d 427, 429-30 (Ohio 1996); Baker v. Conlan, 66 Ohio App.3d 454, 462, 585 N.E.2d 543, 548 (Ohio Ct. App. 1990); Roddy v. Alexander, No. 18503, 2001 WL 1174276, at *2 (Ohio Ct. App. Oct. 5, 2001); see also Booth v. Verity, Inc., 124 F.Supp.2d 452, 460 (W.D. Ky. 2000) ("To interpret provisions of Blue Sky Laws patterned after the Uniform Securities Acts, other state courts have looked to decisions construing parallel federal securities laws."). It is therefore appropriate to note that federal courts have held that justifiable reliance is an essential element of a claim for securities fraud under 15 U.S.C. § 78j(b) even though that requirement is not expressly stated in the statute. See Ley v. Visteon Corp., 543 F.3d 801, 806 (6th Cir. 2008); Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001) (en banc); see also Harrison v. Dean Witter Reynolds, Inc., 79 F.3d 609, 618 (7th Cir. 1996) ("The fact of reliance in this case, however, is not enough by itself; that reliance must be justifiable, or reasonable.").

Pharos has not cited any authority for why a party whose reliance is unjustifiable should still have recourse under § 1707.41(A). Putting aside a fraud-on-the-market theory, the requirement of reasonable reliance is an important one for claims of primary liability under securities law. See Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1410 (6th Cir. 1991); Banca Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1028 (4th Cir. 1997); Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 529-30 (7th Cir. 1985); Zobrist v. Coal-X, Inc., 708 F.2d 1511, 1516 (10th Cir. 1983). "Because the justifiable reliance requirement 'requir[es] plaintiffs to invest carefully,' it 'promotes the anti-fraud policies' of the securities acts by making fraud more readily discoverable." Banca Cremi, 132 F.3d at 1028 (quoting Dupuy v. Dupuy, 551 F.2d 1005, 1014 (5th Cir. 1977)); accord Aschinger, 934 F.2d at 1410. Further, it serves as a critical limitation to ensure that a causal connection exists between the misrepresentation and the plaintiff's harm, Zobrist, 708 F.2d at 1516, and precludes an investor from "clos[ing] his eyes." Teamsters Local 282, 762 F.2d at 530. For these reasons, the court finds that justifiable reliance is an element of a § 1707.41(A) claim.

As discussed above in connection with the fraud and negligent misrepresentation claims, Pharos

cannot establish justifiable reliance; thus, summary judgment is granted on the § 1707.41(A) claim.


IV.    CLAIMS FOR SECONDARY LIABILITY

    A.    Ohio Revised Code Section 1707.43

        1.    Predicate Violation Based on Section 1707.41

Ohio law imposes joint and several liability on any person who "has participated in or aided the seller in any way" in making a sale that violates Chapter 1707.  O.R.C. § 1707.43(A).  Secondary liability cannot be imposed if the plaintiff fails to establish a primary violation of Chapter 1707.  In the complaint, Pharos alleged that National Century committed a primary violation of § 1707.41 by issuing a PPM containing misrepresentations about how National Century operated.

Credit Suisse's motion for summary judgment contends that Pharos cannot prove a predicate violation of § 1707.41 by National Century because discovery failed to uncover any false statements in the PPM on which Pharos relied.  After Pharos initially received the PPM, it proceeded to conduct extensive due diligence and had numerous direct interactions with National Century's management.  Certain aspects of what Pharos claims was misrepresented in the PPM, such as the related-party transactions and the failure to maintain reserve accounts at certain levels, were later disclosed by National Century.  See Ph. Ex. 22, Crants Dep. at 88-94 (acknowledging that Pharos knew of related-party transactions and of reserve accounts dipping below required levels).  Credit Suisse argues that Pharos, having learned so much, cannot show that it relied on any alleged misrepresentations made in the initial document.  Credit Suisse challenges Pharos to "identif[y] a single false statement in the PPM that it reasonably relied on" when it finally bought the stock.  CS Mot. for Summ. J. at 90.

Pharos has no good answer to Credit Suisse's challenge.  Indeed Pharos devotes a single paragraph to the matter and contends that Credit Suisse admitted in its briefs that Pharos relied on the PPM.  But this mischaracterizes what Credit Suisse said about the PPM.  Credit Suisse concedes that it sent the PPM to Pharos and argues that Pharos read certain disclaimers in the PPM (that Credit Suisse was not guaranteeing the accuracy of the information in the PPM, that investors should conduct their own due diligence, and that they should rely only on representations made in a final purchase

agreement).  See CS Ex. 57; CS Ex. 61, Crants Dep. at 72-73; CS Ex. 70, Devlin Dep. at 265-66. However, nowhere has Credit Suisse conceded that Pharos reasonably relied on false statements in the PPM.

Pharos also points to the fact that National Century committed a massive fraud – a point Credit Suisse does not dispute.  See CS Mot. for Summ. J. at 36-42.  Even so, the fact that National Century defrauded some investors does not mean that it defrauded Pharos in particular or in the manner proscribed by § 1707.41.  That section is not violated unless there is reliance upon a false statement in written offering materials.  Pharos has failed to direct the court to any evidence from which a jury could reasonably find that Pharos justifiably relied on a false statement made by National Century in the PPM.

The court has no duty to comb the record for facts to support Pharos's claim.  See InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989).  "Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties."  Books A Million, Inc. v. H & N Enterprises, Inc., 140 F.Supp.2d 846, 853 (S.D. Ohio 2001).  Again, Pharos has failed to direct the court's attention to any evidence in the record that would support its claim that it relied on a misrepresentation by National Century in the PPM.  Nonetheless, the court has examined certain documents – among the 850 exhibits submitted by the parties – that would seem to be the most likely to speak to the issue of reliance on specific misstatements in the PPM.  These documents include the depositions of the managing partners of Pharos, their contemporaneous communications about the investment, and Pharos's answers to interrogatories.

The court is unable to locate facts from which a jury could reasonably find that Pharos, in making its decision to invest, relied on a misrepresentation by National Century in the PPM.  Pharos sometimes cites the PPM as a document that it received and reviewed.  See, e.g., Ph. Ex. 34, Devlin Dep. at 264; CS Ex. 71, LeFebvre Dep. at 174.  However, Pharos does not pinpoint any specific alleged misrepresentations by National Century in the PPM on which it relied.  For instance, in response to interrogatories asking Pharos on which documents it relied, Pharos stated that it received the PPM but

cited other documents (a legal opinion letter, unaudited financial forecasts attributed to Credit Suisse, the Hurwitz email) as the particular ones it relied on when deciding to invest.  CS Ex. 63, Pl.'s Answer to Interrog. Nos. 4 and 5; CS Ex. 64, Pl.'s First Am. Answer to Interrog. No. 4.  Pharos also relied on the strength of National Century's management, <u>see</u> Ph. Ex. 251 (Devlin saying the day after the site visit that "we loved the company and the management team"), and took comfort in the fact that Poulsen himself was putting his own money in the deal, <u>see</u> Ph. Ex. 23, Crants Dep. at 242.  Managing partner Bob Crants, who was Pharos's Rule 30(b)(6) corporate representative, stated in his deposition that Pharos relied on the PPM.  Ph. Ex. 22, Crants Dep. at 65-66.  Yet his testimony went no further than this – a general statement that Pharos relied on the PPM.  Crants did not identify any allegedly false representation within the PPM, and attributable to National Century, on which Pharos reasonably relied.[2]

It is appropriate at the summary judgment stage for the court to expect Pharos to demonstrate reliance with a greater degree of specificity than a general statement that it relied on the PPM.  Indeed, more than that is required at the pleading stage.  <u>See</u> Fed. R. Civ. P. 9(b) (complaint must "state with particularity the circumstances constituting fraud"); <u>U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.</u>, 525 F.3d 439, 444 (6th Cir. 2008) ("To satisfy Rule 9(b), a complaint of fraud, at a minimum, must allege the time, place, and content of the alleged misrepresentation on which the plaintiff relied . . . .") (internal citations omitted).  The PPM is nearly 100 pages long and Pharos has never claimed that the whole document is false.  After having had several years to prepare its case and having conducted substantial discovery, Pharos must do more than what it has done to create a genuine issue of fact concerning an essential element of its claim.  When, as here, the moving party meets its initial burden of showing the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing there is a genuine issue for trial."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986)

---

[2]  Crants did testify that he believed the PPM failed to disclose the extent or magnitude of the related-party transactions and the failure to maintain reserve accounts.  Ph. Ex. 23, Crants Dep. at 254-56.  Crants, however, admitted to Pharos having learned of these problem areas during its due diligence and of having had follow-up communications with Poulsen, who downplayed the seriousness of these issues.  Any reliance, thus, would have been on Poulsen's later statements and not the PPM.

(quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and offer admissible evidence supporting its position. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Pharos has failed to do so.

The court thus finds that Pharos has failed to establish a primary violation of § 1707.41 for purposes of its § 1707.43 secondary liability claim against Credit Suisse.

### 2. Predicate Violation Based on Section 1707.44

Pharos argues that even if it cannot establish a primary violation of § 1707.41, it can still show that National Century violated paragraphs (B)(4), (G), and (J) of § 1707.44, which provide:

> (B) No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for any of the following purposes: . . . (4) Selling any securities in this state;

> (G) No person in purchasing or selling securities shall knowingly engage in any act or practice that is, in this chapter, declared illegal, defined as fraudulent, or prohibited;

> (J) No person, with purpose to deceive, shall make, issue, publish, or cause to be made, issued, or published any statement or advertisement as to the value of securities, or as to alleged facts affecting the value of securities, or as to the financial condition of any issuer of securities, when the person knows that the statement or advertisement is false in any material respect.

O.R.C. § 1707.44 (B)(4), (G), and (J).

Credit Suisse protests that the complaint does not allege predicate violations of § 1707.44 and that a party may not present a legal theory for the first time after the close of discovery and in response to a properly-supported motion for summary judgment. The Sixth Circuit has made clear that a party may not "expand its claims to assert new theories" in response to a motion for summary judgment. Bridgeport Music, Inc. v. WM Music Corp., 508 F.3d 394, 400 (6th Cir. 2007); see also Priddy v. Edelman, 883 F.2d 438, 446 (6th Cir. 1989) (holding that "[a] party is not entitled to wait until the discovery cutoff date has passed and a motion for summary judgment has been filed on the basis of claims asserted in the original complaint before introducing entirely different legal theories"); Tucker v. Union of Needletrades, Industrial and Textile Employees, 407 F.3d 784, 788 (6th Cir. 2005) (holding that a plaintiff may not raise a new claim in response to summary judgment); Desparois v. Perrysburg

Exempted Village Sch. Dist., 455 Fed. App'x 659, 666 (6th Cir. 2012); Yanovich v. Zimmer Austin, Inc., 255 Fed App'x 957, 970 (6th Cir. 2007).  District courts have thus held that a plaintiff may not offer new theories in support of a claim in response to a motion for summary judgment.  See, e.g., Sweitzer v. Am. Express Centurion Bank, 554 F.Supp.2d 788, 797 (S.D. Ohio 2008) (holding that a plaintiff could not expand the theory of its negligence claim in response to a motion for summary judgment); Saad v. City of Dearborn Heights, __ F.Supp.2d __, 2012 WL 2403490, at *11 (E.D. Mich. 2012) (holding that a plaintiff could not expand the theory of a Monell claim in response to a motion for summary judgment).

In Count Two of the Second Amended Complaint, Pharos specifically identified § 1707.41 as the section that National Century violated and as underpinning its secondary liability claim against Credit Suisse.  See Sec. Am. Compl. at ¶¶ 99-105.  The complaint made no mention of § 1707.44, which differs from § 1707.41 in important ways.  As applied to this case, § 1707.44 has a broader imposition of liability than does § 1707.41.  Section 1707.41 contains a reliance requirement, but paragraphs (B)(4), (G), and (J) of § 1707.44 do not appear to require a plaintiff to prove reliance upon a false statement. See Wilson v. Ward, 183 Ohio App.3d 494, 502, 917 N.E.2d 821, 827 (Ohio Ct. App. 2009); Ferritto v. Alejandro, 139 Ohio App.3d 363, 368, 743 N.E.2d 978, 982 (Ohio Ct. App. 2000).  Further, § 1707.41 is limited to false statements in written materials or advertisements, but paragraph (B)(4), which prohibits any written or oral misrepresentations, and paragraph (G), which prohibits any fraudulent acts or practices, have a greater sweep.  And § 1707.44(J) is different still, being directed at statements as to the value of securities or the financial condition of the issuer.  The effect of these differences is that Credit Suisse has prepared a defense – focusing on reliance and on the PPM – that is different from the defense it would have likely prepared had it been given notice of an alleged violation of § 1707.44.

The court has reviewed Pharos's responses to interrogatories and has revisited the briefing associated with Credit Suisse's earlier motion to dismiss.  Nothing in those materials gave notice to Credit Suisse that Pharos would assert that National Century had committed a violation of paragraphs (G) or (J) of § 1707.44.  Even now that Pharos has attempted to raise those paragraphs in opposition to the motion for summary judgment, it does so only in passing.  It quotes those statutory provisions in footnotes and makes no effort to match the language of the provisions to record evidence that would

support a finding that paragraphs (G) and (J) were violated.

Pharos did mention paragraph (B)(4) of § 1707.44 in responding to Credit Suisse's original motion to dismiss. Pharos cited both § 1707.41 and § 1707.44(B)(4) in arguing that its § 1707.43 should claim should survive dismissal. (Doc. 63 in Case No. 2:03-cv-362 at 32-33). After filing this brief, Pharos twice was granted leave to amend its complaint; however, Pharos chose not to allege a primary violation of § 1707.44(B)(4) in either its first or second amended complaints. Instead, it expressly claimed a primary violation of § 1707.41, alleging that defendants had aided unlawful sales "in violation of Chapter 1707.41" and had aided "National Century's misdeeds under Chapter 1707.41." (Doc. 105 in Case No. 2:03-cv-362 at ¶¶ 90, 93; doc. 64 in Case No. 2:03-md-1565 at ¶¶ 100, 103).

The court finds that the operative pleading, the Second Amended Complaint, does not give Credit Suisse notice of an alleged primary violation of § 1707.44(B)(4). Credit Suisse has tailored its defense to the elements of § 1707.41. Pharos may not now avoid summary judgment by expanding its § 1707.43 claim to include the new alleged violation. See Bridgeport Music, 508 F.3d at 400; Sweitzer, 554 F.Supp.2d at 797. Moreover, as it did with paragraphs (G) or (J) of § 1707.44, Pharos's brief simply cites paragraph (B)(4) without providing any legal analysis or directing the court to record evidence supporting a finding that paragraph (B)(4) was violated.

The court thus finds that Credit Suisse is entitled to summary judgment against Pharos's claim under O.R.C. § 1707.43.

**B.    Aiding and Abetting Fraud**

The Restatement (Second) of Torts § 876 provides for liability for persons acting in concert with a wrongdoer. In particular, it imposes liability on one who: (1) knows that the primary party's conduct constitutes a breach of duty and (2) substantially assists or encourages the primary party's conduct. See Restatement (Second) of Torts § 876(b). Many states, New York included, expressly recognize a cause of action for aiding and abetting tortious conduct. See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006) (discussing New York law). But, as will be discussed below, it recently became clear that Ohio does not. See DeVries Dairy, L.L.C. v. White Eagle Coop. Ass'n., Inc., 132 Ohio St.3d 516, 974 N.E.2d 1194 (Ohio 2012). This makes a choice of law determination necessary for this claim. The

23

parties have argued that either Ohio or New York law applies.

The Pharos action, though consolidated by the Judicial Panel on Multidistrict Litigation into the National Century MDL, was originally filed in this court and Ohio's choice-of-law rules apply. See generally Rosen v. Chrysler Corp., 205 F.3d 918, 921 n.2 (6th Cir. 2000); In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 97 F.3d 1050, 1055 (8th Cir. 1996).  Ohio has adopted the Restatement (Second) of Conflict of Laws in making choice-of-law determinations in tort actions. See Morgan v. Biro Mfg. Co., Inc., 15 Ohio St.3d 339, 341-42, 474 N.E.2d 286, 288-89 (Ohio 1984).

The primary inquiry in a making a choice-of-law decision for a tort claim is which state "has the most significant relationship to the occurrence and the parties."  Restatement (Second) of Conflict of Laws § 145(1); Morgan, 15 Ohio St.3d at 342, 474 N.E.2d at 289.  Factors to be considered are:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.

Restatement § 145(2).  In the context of a fraud-based tort, the court may also consider:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
>
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement § 148(2).

From the outset, the parties acknowledge that several of the factors do not favor either the application of Ohio or New York law.  Pharos is a Delaware limited partnership whose partners maintained offices in Tennessee and Texas at the time of the investment in National Century.  See CS Ex. 70, Devlin Dep. at 64-65; CS Ex. 71, LeFebvre Dep. at 69.  Thus, the places of injury, reliance, and domicile of the plaintiff do not favor applying either Ohio or New York.

Looking to the remaining factors, the court finds that Ohio has the most significant relationship to the occurrence and parties relevant to the aiding and abetting claim.[3]  As Pharos argues, the subject of the claim is a primary fraud based in Ohio.  Pharos invested in an Ohio company and this private equity investment counted on the integrity and skill of those who ran National Century.  CS Ex. 73 at PHAROS00002028 (Pharos memo explaining that the "most important determinant of success" to its investment approach was "the strength of the management team" of the private companies in which it invested).  Pharos alleges that National Century made misrepresentations and deceived Pharos about the nature of the company and its operations.  The deception included a site visit made by Pharos to National Century's offices in Dublin, Ohio in March 2002, as well as direct communications between Lance Poulsen and Pharos.  See CS Ex. 61, Crants Dep. at 104-06; CS Exs. 109-16; Ph. Exs. 251, 282.  The deception culminated in Pharos rendering performance of the stock purchase by wiring $12 million to National Century in Ohio in July 2002.  See Ph. Ex. 284.

Credit Suisse allegedly aided National Century's fraud in several ways: it introduced Pharos to the potential investment opportunity, sent Pharos a PPM, arranged for Pharos to receive data room materials, answered Pharos's questions about the investment, and set up the site visit.  See, e.g., Sec. Am Compl. at ¶¶ 76-78; Ph. Mem. in Opp'n at 16-26.  Though Credit Suisse was based in New York, its alleged assistance in the fraud came in its role as a conduit for an Ohio company to convey false information to Pharos.

In certain other actions in the National Century MDL, this court held that New York law applies

---

[3]  The court reached the same conclusion with respect to Pharos's claims against other defendants.  See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., No. 2:03-md-1565, 2008 WL 1995216, at *4 (S.D. Ohio May 5, 2008) (holding that "Ohio has the most significant relationship to the claims against JPMorgan and the Beacon Entities").

to fraud claims made by noteholder investors against Credit Suisse. See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 846 F.Supp.2d 828, 852-56 (S.D. Ohio 2012). It is important to distinguish those investors, many of whom had places of business in New York and who purchased notes directly from Credit Suisse in New York, from Pharos, who has no such New York connections and who made its stock purchase directly from National Century. In those other actions, Credit Suisse was a party to the allegedly fraudulent securities transactions. Here it was not. And in those other actions, Credit Suisse allegedly made direct misrepresentations on which the investors relied. Here, the Letter Agreement establishes that Credit Suisse did not.

The court thus finds that Ohio law should apply to the claim for aiding and abetting fraud. Until recently the issue of whether Ohio recognizes such a cause of action has been murky. State courts repeatedly expressed doubt about whether a claim for aiding and abetting tortious conduct was cognizable. See Andonian v. A.C. & S., Inc., 97 Ohio App.3d 572, 574, 647 N.E.2d 190, 191 (Ohio Ct. App. 1994) ("Ohio has not definitively adopted this section [Restatement(Second) of Torts § 876] and few Ohio cases have applied it. The Supreme Court of Ohio has never expressly approved Section 876 . . . ."); Whelan v. Vanderwist of Cincinnati, Inc., No. 2010-G-2999, 2011 WL 6938600, at *4 (Ohio Ct. App. Dec. 30, 2011) ("[I]t remains unclear whether The Supreme Court of Ohio would adopt the doctrine of liability for civil aiding and abetting as derived from the Restatement of the Law 2d, Torts (1979), Section 876(b)."). Some courts flatly refused to recognize such a claim. See Federated Mgmt. Co. v. Coopers & Lybrand, 137 Ohio App.3d 366, 382, 738 N.E.2d 842, 853 (Ohio Ct. App. 2000) ("Ohio does not recognize such a claim for relief [for civil aiding and abetting]."); Collins v. Nat'l City Bank, No. 19884, 2003 WL 22971874, at *5 (Ohio Ct. App. Dec. 19, 2003) ("[A]iding and abetting common law fraud is not cognizable in law."). But see Kelley v. Buckley, 193 Ohio App.3d 11, 36, 950 N.E.2d 997, 1016 (Ohio Ct. App. 2011) (holding that a civil aiding and abetting claim is cognizable).

Federal court decisions have reflected this uncertainty. The Sixth Circuit twice noted that it was unclear whether Ohio would recognize a claim for aiding and abetting tortious conduct. See Aetna Cas. and Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 533 (6th Cir. 2000); Pavlovich v. National City Bank, 435 F.3d 560, 570 (6th Cir. 2006). This court in the National Century MDL previously denied Credit

Suisse's motion to dismiss aiding and abetting claims because it could not be said conclusively that Ohio law did not recognize such a cause of action. See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 541 F.Supp.2d 986, 1014 (S.D. Ohio 2007). See also William D. Mundinger Trust U/A v. Zellers, 473 B.R. 222, 231-32 (N.D. Ohio 2012).

The Ohio Supreme Court just recently settled the issue by holding that Ohio does not recognize a cause of action under Restatement (Second) of Torts § 876. The matter was presented by way of a question certified by the United States District Court for the Northern District of Ohio: "does Ohio recognize a cause of action for tortious acts in concert under the Restatement (2d) of Torts, § 876?" The Ohio Supreme Court answered: "The certified question is answered in the negative. This court has never recognized a claim under 4 Restatement 2d of Torts, Section 876 (1979), and we decline to do so under the circumstances of this case." DeVries Dairy, L.L.C. v. White Eagle Coop. Ass'n., Inc., 132 Ohio St.3d 516, 517, 974 N.E.2d 1194, 1194 (Ohio 2012). The Court did not elaborate further, but it is clear now that a claim under § 876 for aiding and abetting tortious conduct is not cognizable under Ohio law.

Thus, summary judgment is granted to Credit Suisse on the claim asserted by Pharos for aiding and abetting fraud.

## V.    CONCLUSION

Accordingly, Credit Suisse's motion for summary judgment (doc. 1547) is granted. The court denies as moot Credit Suisse's motions to strike evidence and exclude an expert report (docs. 1714, 1729).

The Clerk shall enter judgment in favor of Credit Suisse in Case No. 2:03-cv-362 and shall close Case No. 2:03-md-1565.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: October 26, 2012